1  Joseph M. Alioto (SBN 42680)
   Theresa D. Moore (SBN 99978)
2  Jamie Miller (SBN 271452)
   ALIOTO LAW FIRM
3  One Sansome Street, Suite 3500
   San Francisco, CA 94104
4  Telephone:  (415) 434-8900
   Facsimile: (415) 434-9200
5  Email:  jmiller@aliotolaw.com
   Email: tmoore@aliotolaw.com
6

7  Lingel H. Winters, Esq. (State Bar No. 37759)
   LAW OFFICES OF LINGEL H. WINTERS
8  275 Battery Street, Suite 2600
   San Francisco, California 94111
9  Tel: (415) 398-2941
   Fax: (415) 393-9887
10 Email:  sawmill2@aol.com

11 Attorneys for Plaintiffs
   And All Others Similarly Situated
12 [ADDITIONAL COUNSEL APPEAR ON LAST PAGE]

13

14              UNITED STATES DISTRICT COURT

15            NORTHERN DISTRICT OF CALIFORNIA

16               SAN FRANCISCO DIVISION

17 MELVIN SALVESON, an individual,          CV No:  **13  5816**
   EDWARD LAWRENCE, an individual
18 DIANNA LAWRENCE, an individual           **CLASS ACTION COMPLAINT FOR**
   and WENDY M. ADAMS, an individual on     **VIOLATIONS OF THE SHERMAN ACT**
19 behalf of themselves and those similarly situated,  **(15 USC § 1), THE CALIFORNIA**
                                            **CARTWRIGHT ACT (BUS. & PROF.**
20              Plaintiffs,                  **CODE § 16700 *et seq.*)**

            v.
21                                          **DEMAND FOR JURY TRIAL**
   JP MORGAN CHASE & CO; J.P. MORGAN
22 BANK, N.A.; BANK OF AMERICA
   CORPORATION; BANK OF AMERICA N.A.;
23 CAPITAL ONE F.S.B.; CAPITAL ONE
   FINANCIAL CORPORATION; CAPITAL ONE
24 BANK; HSBC FINANCE CORPORATION;
   HSBC BANK USA, N.A.; HSBC NORTH
25 AMERICAN HOLDINGS, INC.; HSBC
   HOLDINGS, PLC,
26
                Defendants.
27

28

---

1

CLASS ACTION COMPLAINT

1   Transactions in the United States involving general purpose payment cards amount to
2   more than one trillion, eight hundred billion dollars ($1,800,000,000,000) annually. These
3   transactions are subject to so-called "Interchange Fees" and other fees that are paid directly by
4   cardholders to the banks that issue the payment cards (including the Defendants herein). Since at
5   least 1991, the Defendants and their co-conspirators have conspired to fix the Visa and
6   MasterCard Interchange Fees, and as a result they extract more than fifty-four billion
7   ($54,000,000,000) each year from Visa and MasterCard cardholders by way of illegal
8   overcharges.

9       Plaintiffs Dr. Melvin Salveson, Edward Lawrence, Dianna Lawrence and Wendy M.
10  Adams bring this action, on behalf of themselves and all other Visa and MasterCard cardholders
11  similarly situated within the United States ("Cardholders"), in order to obtain damages, treble
12  damages, restitution, legal fees, and injunctive relief under Sections 4 and 16 of the Clayton Act,
13  15 U.S.C. §§ 15, 26, and Section 16750(a) of the California Business & Professions Code,
14  against Defendants Bank of America Corporation; Bank of America, N.A. ( together, "Bank of
15  America"); JP Morgan Chase & Co; J.P. Morgan Bank, N.A. (together, "J.P. Morgan Chase");
16  Capital One Bank; Capital One F.S.B.; Capital One Financial Corporation ( together, "Capital
17  One"); HSBC Finance Corporation; HSBC Bank USA, N.A.; HSBC North American Holdings;
18  HSBC Holdings, plc (together, "HSBC"), arising out of Defendants' violations of the Sherman
19  Act, 15 U.S.C. § 1, and Sections 16700 *et seq.*, 16720 *et seq.*, of the California Business &
20  Professions Code (the "Cartwright Act"). Plaintiffs demand a trial by jury, and allege and
21  complain as follows:

22      1.      Plaintiffs on behalf of a nationwide class of Visa and MasterCard
23  Cardholders, similarly situated, seek injunctive relief, legal fees, and monetary damages,
24  including treble damages, to compensate them for more than fifty-four billion dollars
25  ($54,000,000,000) in illegal overcharges imposed upon them each year by Defendants J.P.
26  Morgan Chase, Bank of America, Capital One, and HSBC and their co-conspirators as a result of
27  agreements among Defendants and their co-conspirators to fix the Visa and MasterCard
28  Interchange Fees paid directly by Cardholders on annual transactions totaling more than one

1 | trillion eight hundred billion dollars ($1,800,000,000,000).

2 |      2.       No court has ever been confronted with such massive figures.  In the absence
3 | of this price-fixing conspiracy, more than forty billion dollars ($54,000,000,000) per year would
4 | have been available to Cardholders as disposable income in the United States economy.  This
5 | price-fixing conspiracy is ongoing and additional overcharge dollars are being extracted from
6 | Cardholders pursuant to the conspiracy every time they swipe their Visa and MasterCard
7 | payment cards.

8 |      3.       Visa's uniform *Operating Regulations* (including Section 9.4 entitled
9 | "Interchange Reimbursement Fees), issued May 15, 2000, and Visa's *OpRegs* (including Section
10 | 9.5), re-issued November 15, 2008, and other agreements pertaining to the fixing of Visa
11 | Interchange Fees and other anticompetitive restraints were adopted, ratified, agreed to and
12 | implemented by Defendants and their co-conspirators.  Similarly, MasterCard's uniform
13 | *MasterCard Worldwide U.S. and Interregional Interchange Rates* (hereafter "*MasterCard's*
14 | *Interchange Rates*"), *MasterCard Rules*, *MasterCard Consolidated Billing System Reports*, and
15 | related other agreements pertaining to the fixing of MasterCard Interchange Fees and other
16 | anticompetitive restraints were adopted, ratified, agreed to and implemented by Defendants and
17 | their co-conspirators.  Such agreements among Defendants and their co-conspirators to fix the
18 | Interchange Fees paid directly by Visa and MasterCard Cardholders nationwide are illegal price-
19 | fixing agreements.

20 |      4.       Because J.P. Morgan Chase, Bank of America, Capital One and HSBC are
21 | competitors, their horizontal conspiracy to fix the Interchange Fees, using Visa and MasterCard
22 | as co-conspirator implementers of their nationwide price-fixing scheme, is per se illegal under
23 | Section 1 of the Sherman Act and the California Cartwright Act.

24 |      5.       Pursuant to their unlawful agreements, Defendants have fixed Interchange
25 | Fees and imposed them directly on Visa and MasterCard Cardholders for transactions processed
26 | over the Visa and MasterCard computer network systems.  In furtherance of the conspiracy,
27 | Defendants and their co-conspirators also agreed to and have collectively imposed restraints on
28 | competition, such as so-called "Exclusionary Rules," "No Discount Rules," "No Surcharge

1 Rules," and "Honor All Cards Rules," as well as Anti-Steering and other restrictions imposed
2 upon merchants to the detriment of Cardholders.

3   6.   The supracompetitive Interchange Fees fixed by Defendants and paid directly
4 by Visa and MasterCard Cardholders are traceable through the application of economic analyses
5 to the computerized bank records of Defendants, their bank co-conspirators, and their co-
6 conspirators Visa and MasterCard.

7   **JURISDICTION AND VENUE**

8   7.   This is an action under Section 4 of the Clayton Act (15 U.S.C. § 15) and
9 Section 16750(a) of the Cartwright Act to recover damages and legal fees, including treble
10 damages, and under Section 16 of the Clayton Act (15 U.S.C. § 26) and the Cartwright Act to
11 obtain injunctive and equitable relief, against the Defendants J.P. Morgan Chase, Bank of
12 America, Capital One, and HSBC due to their violations of Section 1 of the Sherman Act (15
13 U.S.C. § 1), as well as the Cartwright Act and other laws of the State of California, arising from
14 Defendants' illegal conspiracy to fix Visa and MasterCard Interchange Fees and to impose other
15 restraints on competition that injured Cardholders. Jurisdiction of this Court is based on
16 violations of the Sherman Act (15 U.S.C. § 1) and the California Cartwright Act (Cal. Bus. &
17 Prof. Code §16700 *et seq.*, 16720 *et seq.*).

18   8.   This Court has subject matter jurisdiction under Sections 4 and 16 of the
19 Clayton Antitrust Act (15 U.S.C. §§ 15 and 26), Section 1 of the Sherman Act (15 U.S.C. § 1),
20 and Title 28, United States Code, Sections 1331 and 1337. This Court has subject matter
21 jurisdiction of California law claims asserted in this action under Title 28, United States Code,
22 Sections 1332(d) and 1367, in that the amount in controversy exceeds the sum of $5 million
23 exclusive of interest and costs, and members of the nationwide Cardholder class are citizens of
24 states different from defendants.

25   9.   Venue is proper in this Judicial District pursuant to Section 12 of the Clayton
26 Act (15 U.S.C. § 22) and Title 28, United States Code, Section 139 1 (b), (c), and (d), because a
27 substantial part of the events giving rise to plaintiffs' claims occurred in this District, a
28 substantial portion of the affected interstate trade and commerce was carried out in this District,

1   and one or more of the Defendants J.P. Morgan Chase, Bank of America, Capital One, and

2   HSBC has an agent, maintains an office or does business in this District.

3         10.        Defendants J.P. Morgan Chase, Bank of America, Capital One, and HSBC

4   conduct business throughout the United States, including in this jurisdiction, and they have

5   purposefully availed themselves of the laws of the United States, as well as the laws of the State

6   of California.  Defendants J.P. Morgan Chase, Bank of America, Capital One, and HSBC

7   Payment Card products and services are sold in the flow of interstate commerce, and defendants'

8   activities had a direct, substantial and reasonably foreseeable effect on such commerce.

9         11.        Defendants J.P. Morgan Chase, Bank of America, Capital One, and HSBC

10  have availed themselves of the laws of the State of California relating to the production,

11  marketing, and sale of Visa and MasterCard products and services.  Defendants J.P. Morgan

12  Chase, Bank of America, Capital One, and HSBC produced, promoted, sold, marketed, and/or

13  distributed Visa and MasterCard products and services in California and throughout the 50

14  United States plus the District of Columbia, thereby purposefully profiting from access to Visa

15  and MasterCard  Cardholders in California nationwide.  As a result of the activities described

16  herein, Defendants:

17              a.        Caused injury and  damage  to Visa and MasterCard Cardholders in the

18  Northern District of California and each of the 50 states plus the District  of Columbia by overt

19  acts of combination, agreement, and conspiracy to fix the Interchange Fees and to impose other

20  restraints on competition by adopting and ratifying price-fixing agreements and trade restraints in

21  California and enforcing price-fixing agreements and trade restraints from California;

22              b.        Engaged in continuing courses of conduct within California and each of

23  the 50 States plus the District of Columbia  and/or derived substantial revenue in California from

24  the marketing of Visa and MasterCard payment cards or related products and services from

25  California used in each of the 50 United States plus the District of Columbia; and

26              c.        Committed acts or omissions in California that they knew or should have

27  known would cause damage and that did, in fact, cause such damage, while regularly soliciting

28  business from California in each State plus the District of Columbia, engaging in continuing

1  courses of conduct, and/or deriving substantial revenue from the marketing of Visa and
2  MasterCard payment cards or related products and services nationwide.

3      12.    The California-based conspiracy of Defendants has resulted in injury or
4  damage to the members of the nationwide class of Visa and MasterCard Cardholders in each of
5  the 50 United States plus the District of Columbia who directly paid supra-competitive
6  Interchange Fees inflated as a consequence of Defendants' scheme.

7      13.    Interchange Fees nationwide were raised to supra-competitive levels by the
8  price-fixing conspiracy among Defendants J.P. Morgan Chase, Bank of America, Capital One,
9  and HSBC. Defendants' illegal conduct has resulted in injury and damage to Visa and
10 MasterCard Cardholders within the Northern District of California, within the State of California
11 and throughout the United States, and the trade described herein is carried on in interstate
12 commerce.

13 **THE PLAINTIFFS**

14     14.    Plaintiff, Dr. Melvin Salveson, a California resident, has been issued Visa and
15 MasterCard payment cards, and has purchased many thousands of dollars' worth of goods and
16 services and paid related Interchange Fees on Visa and MasterCard transactions at prices inflated
17 by the Defendants' price-fixing conspiracy over many years. Dr. Salveson and others similarly
18 situated have been injured in that they have paid more in Interchange Fees than they would have
19 paid in the absence of Defendants' antitrust violations.

20     15.    Dr. Salveson is the inventor of the credit card form of payment card here in
21 issue, and is particularly knowledgeable about the origins, workings, operations of Visa and
22 MasterCard and their computer networks. In or about 1968, Dr. Salveson received patents on the
23 very credit cards that are now the subject of this litigation.

24     16.    Wendy M. Adams, a California resident, has been issued Visa and MasterCard
25 payment cards, including payment cards issued by Bank of America and J.P. Morgan Chase and
26 has purchased thousands of dollars' worth of goods and services and paid related Interchange
27 Fees on Visa and MasterCard transactions at prices inflated by the Defendants' price-fixing
28 conspiracy over many years. Wendy Adams and others similarly situated have been injured in

1  that they have paid more in Interchange Fees than they would have paid in the absence of the

2  antitrust violations of Defendants.

3       17.    Edward Lawrence, a California resident, has been issued Visa and MasterCard

4  Payment Cards, including Payment Cards issued by J.P. Morgan Chase, and has purchased

5  thousands of dollars' worth of goods and services and paid related Interchange Fees on Visa and

6  MasterCard transactions at prices inflated by the Defendants' price-fixing conspiracy over many

7  years.  Edward Lawrence and others similarly situated have been injured in that they have paid

8  more in Interchange Fees than they would have paid in the absence of Defendants' antitrust

9  violations.

10       18.    Dianna Lawrence, a California resident, has been issued Visa and MasterCard

11  Payment Cards, including Payment Cards issued by J.P. Morgan Chase, and has purchased

12  thousands of dollars' worth of goods and services and paid related Interchange Fees on Visa and

13  MasterCard transactions at prices inflated by the Defendants' price-fixing conspiracy over many

14  years.  Dianna Lawrence and others similarly situated have been injured in that they have paid

15  more in Interchange Fees than they would have paid in the absence of Defendants' antitrust

16  violations.

17  **PLAINTIFF CARDHOLDER CLASS ACTION ALLEGATIONS**

18       19.    Plaintiffs bring this action under Federal Rule of Civil Procedure Rule 23, on

19  behalf of themselves and a class defined as follows:

20      All Visa and MasterCard Cardholders in the United States who

21      paid supracompetitive  Interchange Fees to Defendants and their
    co-conspirators incident to the purchase of retail products or

22      services using a Visa or MasterCard Payment Card, at any time
    during the period at least since  January 1, 2000 to and including

23      class certification, herein. Excluded from the class are Defendants,
    any co-conspirators of Defendants, Defendants' predecessors,

24      successors, parent, subsidiaries, affiliates, officers and directors,
    federal and state government entities and agencies, cities, counties,

25      and other municipalities, and any judge, justice or judicial officer
    presiding over this matter and members of their immediate family.

26       20.    "Cardholders" and "Cardholder Class" as used herein mean all holders of Visa

27  and MasterCard credit and debit payment cards resident in the 50 United States plus the District

28  of Columbia.

21.      The anticompetitive conduct of Defendants J.P. Morgan Chase, Bank of America, Capital One, and HSBC alleged herein has imposed, and threatens to impose, a common antitrust injury on Plaintiffs and the Plaintiff Visa and MasterCard Cardholder Class members. The number of potential Plaintiff Cardholder Class members is so numerous that joinder is impracticable.

22.      Plaintiffs, as representatives of the Plaintiff Visa and MasterCard Cardholder Class will fairly and adequately protect the interests of the class members and have engaged counsel experienced and competent in litigation of this type.  The interests of plaintiffs are coincident with, and not antagonistic to, those of the class members.

23.      The anticompetitive conduct of Defendants has been substantially uniform. Plaintiffs' claims are typical of those to be asserted by the Visa and MasterCard Cardholder Class. Except as to the amount of damages each member of the class has sustained, all other questions of law and fact are common to the class, including, but not limited to, the combination and conspiracy and acts of unfair competition hereinafter alleged, and the effects of such violation.

24.      The questions of law and fact common to the members of the class predominate over any questions affecting only individual members of the class. Among the questions of law and fact common to the class are the following:

a.      Whether Defendants J.P. Morgan Chase, Bank of America, Capital One, and HSBC illegally combined, agreed and conspired to set, fix and establish uniform schedules of Interchange Fees for payment card transactions, which were imposed directly on Visa and MasterCard Cardholders, thereby extracting supra-competitive Interchange Fees.

b.      All questions of law and fact relating to Defendants are common to all members of the class especially since Defendants  have participated in a common combination, agreement and conspiracy with Visa and MasterCard to adopt, ratify, implement and enforce the payment of Interchange Fees by Visa and MasterCard Cardholders and enforced implementation of the common trade restraints and have adopted, ratified, implemented and enforced Visa's uniform *Operating Regulations* and related rules, and MasterCard's uniform *MasterCard*

8

1 | *Worldwide U.S. and Interregional Interchange Rates* and related documents, implementing their

2 | common Interchange Fees price-fixing conspiracy over Visa's BASE II network system and

3 | MasterCard's network system.

4 |       c.    Plaintiffs' claims against Defendants are typical of the claims against,

5 | Defendants by class members. The separate prosecution by individual class members would

6 | create risks of inconsistency or varying adjudications respecting the validity, scope, and

7 | enforceability of Visa's uniform *Operating Regulations* and related rules, and MasterCard's

8 | *Interchange Rates* Rules, by-laws and related rules, and the existence of and legal effect of the

9 | combination, agreement and conspiracy among Defendants J.P. Morgan Chase, Bank of

10 | America, Capital One, and HSBC.

11 |      25.    Class action treatment is a superior method for the fair and efficient

12 | adjudication of the controversy, as joinder is impracticable. Since the damages suffered by many

13 | Class members are small in relation to the expense and burden of individual litigation, it is

14 | highly impractical for such Class members to individually attempt to redress the wrongful

15 | anticompetitive conduct alleged herein.

16 | **THE DEFENDANTS**

17 |      26.    Defendant J.P. Morgan Chase & Co. and Defendant J.P. Morgan Chase N.A.

18 | (together, "J.P. Morgan Chase") are Delaware corporations with their principal place of business

19 | in New York, New York, whose predecessor Chase Bank held seats on MasterCard

20 | International's and MasterCard U.S. Region boards of Directors as well as on major committees

21 | of both Visa and MasterCard. Defendants J.P. Morgan Chase and their predecessors have issued

22 | general purpose payment cards in this judicial district, and do business in California and in

23 | interstate commerce. J.P. Morgan Chase is an Issuer of Visa and MasterCard payment cards. It

24 | has had actual knowledge of, and has knowingly participated in, the conspiracy alleged in this

25 | Complaint.

26 |      27.    Defendant Bank of America NA is a Delaware Corporation and Defendant

27 | Bank of America Corporation is a Delaware corporation (together, "Bank of America") that had

28 | their principal place of business in San Francisco, California during the development of

CLASS ACTION COMPLAINT

1    BankAmericard and the BASE II system that its San Francisco Bay Area-based successor, Visa,

2    employs to effectuate Cardholders' payment of price-fixed Interchange Fees directly to

3    Defendants. Bank of America had a seat on Visa International's Board of Directors, and on

4    major committees of Visa and MasterCard. Bank of America later relocated its principal place

5    of business to Charlotte, North Carolina, and subsequently acquired Countrywide Bank and

6    MBNA Bank, which significantly increased its general purpose payment card issuing capacity

7    and power. It has issued general purpose payment cards in this judicial district, in California and

8    does business in interstate commerce. Bank of America is an Issuer of Visa and MasterCard

9    payment cards. It has had actual knowledge of, and has knowingly participated in the conspiracy

10   alleged in this Complaint.

11        28.      Defendant HSBC Finance Corporation is a Delaware corporation with its

12   principal place of business in Prospect Heights, Illinois. It is a subsidiary of Defendant HSBC

13   Bank USA, NA, a Delaware corporation with its principal place of business in Wilmington,

14   Delaware, which is a subsidiary of Defendant HSBC North America Holdings, Inc. which is a

15   subsidiary of defendant HSBC Holdings, plc, a United Kingdom corporation with its principal

16   place of business in London, England. These entities are collectively referred to as "HSBC."

17   HSBC Finance Corporation is the successor to Household Finance Corporation that held seats on

18   MasterCard International's and MasterCard International's U.S. Region Boards of Directors as

19   well as on major committees of both Visa and MasterCard. HSBC is an Issuer of Visa and

20   MasterCard payment cards. It has had actual knowledge of, and has knowingly participated in,

21   the conspiracy alleged in this Complaint. In 2012, HSBC Finance and HSBC North America

22   were acquired by Capital One.

23        29.      Defendant Capital One Bank F.S.B. is a Virginia bank with its principal place

24   of business in Glen Allen, Virginia, has its principal place of business in McClean, Virginia, is

25   wholly owned-owned subsidiary of Defendant Capital One Financial Corporation, a Delaware

26   corporation with its principal place of business in McLean, Virginia. Defendants Capital One

27   Bank, Capital One F.S.B., and Capital One Financial Corporation are collectively referred to as

28   "Capital One." Capital One is a member of both Visa and MasterCard, has been represented on

the MasterCard Board of Directors, has issued general purpose payment cards in this judicial district, and does business in interstate commerce. Capital One is an Issuer of Visa and MasterCard payment cards. It has had actual knowledge of, and has knowingly participated in, the conspiracy alleged in this Complaint. In 2012, Capital One acquired HSBC Finance and HSBC North America.

   30.  Co-conspirator Wells Fargo Bank, NA is a Delaware corporation with its principal place of business in San Francisco, California and is an Issuer and an Acquirer of Visa and MasterCard Payment Cards, which during pertinent times herein had a seat on Visa U.S.A., Inc.'s Board of Directors as did Wachovia Bank, which was acquired by Wells Fargo. Both banks had seats on major committees of Visa and MasterCard and both have issued Visa and MasterCard payment cards in this judicial district, and do business in interstate commerce. Wells Fargo has had actual knowledge of, and has knowingly participated in, the conspiracy alleged in this complaint. In 1966, Wells Fargo Bank through its predecessor California banks, headquartered in San Francisco, California formed the Interbank Card Network ("ICA"), which joined with HSBC Bank USA to create "MasterCharge The Interbank Card." In 1979, "MasterCharge The Interbank Card" changed its name to "MasterCard." Well Fargo Banks's predecessor California banks were San Francisco headquartered Crocker National Bank, which merged into Wells Fargo Bank and San Francisco headquartered United California Bank, which became First Interstate Bank and subsequently merged into Wells Fargo Bank.

   31.  Co-conspirator Visa U.S.A., Inc. ("Visa"), is organized under the laws of the State of Delaware, with its principal places of business in San Francisco, California and Foster City, California. Visa has offices, agents and transacts business, and is found in San Francisco, California and Foster City, California. Visa is the successor to the original BankAmericard, which originated in San Francisco, California where its BASE II software was developed so that Visa, its successor, could affect the network transactions by which Cardholder's payment of Interchange Fees to Bank Issuers and Acquirers is performed. Visa entered into agreements and arrangements with its Issuers to set, fix, establish, adopt, ratify, and enforce uniform, standard payment card Interchange Fees including, among other things as set forth in Visa's *Operating*

*Regulations* at Chapter 9 *"Fees and Charges"* sec. 9.4, 9.5 "Interchange Reimbursement Fees," drafted, adopted and promulgated by Visa in the San Francisco, California Bay Area, which are the price-fixed Interchange Fees that Defendants have adopted, ratified, agreed to, implemented and comply with. It has had actual knowledge of, and has knowingly participated in the conspiracy alleged in this Complaint.

32.     Co-conspirator MasterCard International Incorporated ( "MasterCard"), which was originated in the San Francisco Bay Area as MasterCharge, is organized under the laws of the State of Delaware, with its principal place of business in Purchase, New York. MasterCard has offices, agents, and transacts business, and is found in the Northern District of California, including in San Francisco, California. MasterCard's anticompetitive policies are extensions of the anticompetitive policies developed and enforced by Visa in San Francisco, California and MasterCard has engaged in anticompetitive meetings and litigation in the Northern District of California to fix Interchange Fees and to enforce trade restraints in furtherance of the conspiracy to fix Interchange Fees alleged in this Complaint. It has had actual knowledge of, and has knowingly participated in the conspiracy alleged in this Complaint.

33.     Co-conspirator Citibank a.k.a Citicorp is a Delaware corporation with its principal place of business in New York, New York that held seats on MasterCard International's and MasterCard U.S. Region Boards of Directors as well as on major committees of both Visa and MasterCard.

34.     Various persons, firms, corporations, organizations, and other business entities, some unknown and others known, have participated as co-conspirators in the violations alleged and have performed acts in furtherance of the conspiracies. Defendants J.P. Morgan Chase, Bank of America, Capital One, and HSBC and their co-conspirators received approximately $700 Billion in Troubled Asset Recovery Program ("TARP") bailout funds in 2008 and after from United States taxpayers through the U. S. Department of the Treasury. Plaintiffs may seek leave to amend this complaint to add the co-conspirators, known and unknown as Defendants.

## THE ORIGINS OF VISA AND MASTERCARD

35.     The Visa and Mastercard networks evolved from regional and local credit card systems formed during the 1960's.  Visa's predecessor, BankAmericard, was the local credit card program of Bank of America, founded and based in San Francisco, California by A. P. Gianini.  In 1970, the San Francisco program was introduced throughout the United States under the name National Bank Americard, Inc.  In 1977, its name was changed to Visa.

36.     With the development of computer technology, Bank of America's IT staff in 1976 created a data processing network and software program, known as BASE II, for the clearing and settlement of its BankAmericard Payment Card  transactions (BASE stands for "Bank of America System Engineering"). The BASE II system is utilized by all Defendants, who are all members of Visa, to provide net daily account settlement of payment card transactions among Defendants and their co-conspirator Visa and MasterCard members.

37.     MasterCard was also formed and originated in the San Francisco Bay Area. In 1966, Wells Fargo Bank through its predecessor California banks, headquartered in San Francisco, California formed the Interbank Card Network ("ICA"), which joined with HSBC Bank USA to create "MasterCharge The Interbank Card."  In 1979, "MasterCharge The Interbank Card" changed its name to "MasterCard."  It operates a network computer system similar to Visa's BASE II.

38.     A typical Visa or MasterCard payment card transaction involves four parties: (a) the Cardholder, who seeks to purchase a good or service utilizing his or her card; (b) a Visa or MasterCard member bank that issued the payment card (the "Issuer"); (c) the merchant who is selling the good or service; and (d) the merchant's own bank (known in industry parlance as the "Acquirer").  The Cardholder (such as the Plaintiffs here) pays the gross amount of the transaction, including fees, directly to the Issuer, which keeps the Interchange Fee and passes on a separate transaction fee to the Acquirer and the net transaction amount to the merchant via the Visa or MasterCard network.

## DEFENDANTS' ILLEGAL CONSPIRACY TO FIX VISA AND MASTERCARD INTERCHANGE FEES IS DOCUMENTED IN WRITTEN AGREEMENTS, INCLUDING VISA'S OPERATING REGULATIONS AND MASTERCARD'S INTERCHANGE RATE AGREEMENTS

39.       Since at least 1991, Defendants  Bank of America, J.P. Morgan Chase, Capital One and HSBC and their co-conspirators have entered  into illegal written membership agreements and written perpetual  license agreements with Visa U.S.A., Inc. requiring Interchange with all other licensees and members of Visa and agreeing to, adopting, ratifying, and implementing  (a) Visa's *Operating  Regulations* including Interchange rates, among other agreements, including Bank Agreements, Membership Agreements and Partnership Agreements (*e.g.* Partnership II Agreements), and (b) illegal written membership agreements and written perpetual license price-fixing agreements with MasterCard International, Inc. requiring Interchange with all other Licensees and members of MasterCard and agreeing to, adopting, ratifying,  and implementing MasterCard's uniform *MasterCard Worldwide U.S. and Interregional Interchange Rates, MasterCard Rules, MasterCard Consolidated Billing System Report*, among other agreements, in a conspiracy to fix and enforce uniform, standard Visa and MasterCard Interchange Fees, utilizing Visa's BASE  II network computer system and MasterCard's network computer system to implement their price-fixing agreements.

The Visa network and its *Operating Regulations* and the MasterCard network and its *Rules, Interchange Rates* and  *Billing System* were and are the hubs of the conspiracy to fix Interchange Payment Card rates  and each of the defendants and their co-conspirator members were obligated to apply these regulations and rules by Membership Agreements, Licensing Agreements and  other written agreements with  Visa and MasterCard, which agreements preceded and continue on to the present after  Visa's IPO and MasterCard's IPO.  Each of the Defendants and their co-conspirator members of Visa and MasterCard knew that they were in competition with each other and that without substantially common action with respect to Interchange and increases in Interchange, there was a prospect of a loss of business contrary to each member's self-interest if each member bank acted independently, but that with the conspiracy to fix Interchange rates there was the prospect of increased profits. Defendants and their member banks and Visa and MasterCard knew and was assured that it would not lose business to its competitor banks due to the fact that Defendants and their co-conspirators were engaged in a  conscious commitment to a common scheme to fix the price of Interchange Fees.

40.     The Defendants have collectively agreed to Visa's by-laws and *Operating Regulations*, including Chapter 9 *"Fees and Charges,"* sections 9.4 and 9.5 "Interchange Reimbursement Fees," that fix uniform Interchange Fees for Visa payment cards, which are automatically implemented through Visa's BASE II network computer system.

As of December 5, 2013, Visa states on its website:

> "VISA U.S.A. Interchange Reimbursement Fees
> The following tables set forth the interchange reimbursement fees applied on Visa financial transactions completed within the 50 United States and the District of Columbia.
> Visa uses interchange reimbursement fees as transfer fees between financial institutions to balance and grow the payment system for the benefit of all participants. Merchants do not pay interchange reimbursement fees; merchants pay "merchant discount" to their financial institution. This is an important distinction, because merchants buy a variety of processing services from financial institutions; all these services may be included in their merchant discount rate, which is typically a percentage rate per transaction."

41.     For instance, the Visa U.S.A., Inc. *Operating Regulations* dated November 14, 2008 state:

> "Consumer Credit Transactions – Interchange Reimbursement Fee:
>
> Standard Interchange Reimbursement Fee – 2.70% of Net Sales plus $0.10 per item" (Visa *Operating Regulations* 9.5.A.1 November 15, 2008)

The updated version for 2010 online entitled "Visa U.S.A. Interchange Reimbursement Fees" states at page 3:

> "Visa U.S.A. Consumer Credit Interchange Reimbursement Fees, Rates Effective April 17, 2010:
>
> Standard Interchange Reimbursement Fee – 2.95% + $0.10 Fees paid to cardholder financial institution."

42.     Defendants adopted, ratified and agreed on the Visa *Operating Regulations* that fix Interchange Fees (and impose other anti-competitive restraints on interstate commerce, as described below), in San Francisco, California.

43.     Similarly, Defendants have collectively entered into membership agreements to fix MasterCard Interchange Fees and agreed to MasterCard's uniform *MasterCard Worldwide*

*U.S. and Interregional Interchange Rates, MasterCard Rules, MasterCard Consolidated Billing System Report*, among other agreements, which are automatically implemented through MasterCard's network computer system

44.    For instance, MasterCard's *MasterCard Worldwide U.S. and Interregional Interchange Rates* effective April 2010 states:

> "U.S. Interchange Rates MasterCard Consumer Credit Core Value Cards: 2.95% + USD 0.10"

45.    Defendants adopted and implemented the *MasterCard Worldwide U.S. and Interregional Interchange Rates* that fix Interchange Fees (and impose other anti-competitive restraints on interstate commerce, as described below), in San Francisco, California.

46.    No defendant or co-conspirator has made any affirmative withdrawal from the conspiracy, combination and agreement to fix the prices of Interchange Fees.

**THE PRICE-FIXED, UNIFORM INTERCHANGE FEES ARE ELECTRONICALLY IMPLEMENTED BY VISA'S BASE II COMPUTER NETWORK SYSTEM AND MASTERCARD'S COMPUTER NETWORKS**

47.    Pursuant to Visa's *Operating Regulations*, the MasterCard Worldwide U.S. and Interregional Interchange Rates agreements, and other agreements among Defendants and their co-conspirators that fix Interchange Fees, the Visa BASE II computer network system and MasterCard's computer network system automatically implement the Interchange Fees at the rates fixed by defendants and transfer the amounts of the Interchange Fees directly from the Cardholders' accounts to the Defendants in real time.

48.    For example, the BASE II system enables virtually simultaneous, multiple payments flowing from a Cardholder's single swipe of her card. If, say, a Cardholder uses her Visa or MasterCard Payment Card for a $100 purchase, Visa's BASE II network software and MasterCard's network software electronically implement and force the Cardholder to make three (3) virtually instantaneous and simultaneous payments: (a) a $3.05 Interchange Fee (i.e., 2.95% + US$ 0.10) paid directly from the Cardholder's account to the Defendants, as the Cardholders' payment card Issuer Banks, in a direct computer-generated transfer of the Cardholders's funds to Defendants; (b) a separate processing fee (say, $0.60 for illustrative purposes) paid directly from

1    the Cardholder's account to the Defendants, and passed on by Defendants to the merchant's

2    bank (i.e., the "Acquirer" bank); and (c) a $96.35 electronic payment of the Cardholder's funds

3    transmitted directly to the merchant's account at the Acquirer bank. It should be noted that much

4    (perhaps most) of the time, the Defendants and/or their co-conspirators are also the Acquirer

5    banks and thus the processing fee ($0.60 in the example above) is pocketed by them in addition

6    to the $3.05 Interchange Fee.

7              49.      In *United States v. Visa U.S.A., Inc. et al.* 344 F.3d 229 (2d Cir. 2003), the

8    Second Circuit acknowledged that Cardholders pay Interchange Fees and additional processing

9    fees directly to the Issuer banks. Based on the Interchange Fee rates agreed among the

10   Defendants and their co-conspirators that were then in force, the court found as follows:

11              When a consumer uses a Visa card or a MasterCard card to pay
                for goods or services, the accepting merchant relays the transaction
12              information to the acquiring bank with which it has contracted.
                The acquirer processes and packages that information and
13              transmits it to the network (Visa U.S.A. or MasterCard). The
                network then relays the transaction information to the cardholder's
14              issuing bank, which approves the transaction if the cardholder has
                a sufficient credit line. Approval is sent by the issuer to the
15              acquirer, which relays it to the merchant.

16              Payment requests are sent by the merchant to the acquirer, which
17              forwards the requests to the issuer. The issuer then pays the
                acquiring bank the amount requested, less what is called an
18              "interchange fee"—typically 1.4%. The acquirer retains an
                additional fee—approximately .6%. Thus, the issuing bank and the
19              acquirer withhold an aggregate of approximately 2% of the amount
                of the transaction from the merchant. This is known as the
20              "merchant discount." For a $100 sale, the merchant typically will
                receive $98, the issuing bank retaining $1.40, while the acquiring
21              bank retains 60 cents.

22              50.      In *United States v. Visa U.S.A., Inc. et al.* 344 F.3d 229 (2d Cir. 2003), the

23   Second Circuit expressly held that Cardholders are "direct purchasers" for antitrust purposes:

24   "in the market for general purpose [credit cards], the issuers are the sellers, and the cardholders

25   are the buyers…"

26   ## DEFENDANTS ENGAGED IN NUMEROUS OTHER ANTI-
27   ## COMPETITIVE ACTS IN FURTHERANCE OF THE CONSPIRACY

28              51.      As described in the following paragraphs, Defendants in furtherance of their

conspiracy to fix Interchange Fees agreed to implement, impose and enforce other restraints on competition, such as "Exclusionary Rules" that prevent Visa and MasterCard member banks from offering competing payment cards; "No discount Rules"; "No Surcharge Rules"; "Honor All Cards Rules"; and "Non-disclosure Rules" (which mandate concealment of Visa and MasterCard Interchange Fees from Cardholders).  Also in furtherance of the conspiracy, Defendants employ such anti-competitive strategies as bundling Payment Guarantees and Network Process Servicing, and Anti-Steering restrictions that preclude merchants from (a) steering Cardholders to less expensive forms of payment, (b) negotiating  less expensive Interchange Fees, and/or (c) otherwise protecting Cardholders  from the supra-competitive, inflated Visa and MasterCard Interchange Fees and overcharges.

52.        Such trade restraints were incorporated in Visa's *Operating Instructions* and promulgated through the offices Visa has maintained in San Francisco, California and Foster City, California.  Similarly, such trade restraints were incorporated in MasterCard's Worldwide U.S. and Interregional Interchange Rates agreements and related agreements and promulgated through offices in San Francisco, California and nationwide.

### (1)   In Furtherance of the Interchange Price-Fixing Conspiracy, the Exclusionary Rules Were Adopted and Implemented in California and Enforced Nationwide

53.        In furtherance of the Interchange Fee price-fixing conspiracy, Defendants through Visa and MasterCard adopted, ratified and implemented exclusionary rules to exclude competition such as American Express and Discover from offering their cards through member banks of Visa and MasterCard.  As the District Court found in *United States v. Visa U.S.A., Inc.et al.*, 163 F.Supp.2d 322, 379 (SDNY 1991), aff'd 344 F.3d 229 (2d Cir. 2003), *cert. denied* 160 L.Ed 2d 14 (Oct. 2004) (hereinafter "the *DOJ Case*"):

> In 1991, Visa U.S.A. passed by-law 2.10(e).  It provides that "the *membership of any member shall automatically terminate* in the event it, or its parent, subsidiary or affiliate, issues, directly or indirectly, Discover Cards or American Express Cards, or any other card deemed competitive by the Board of Directors." (Ex. P-0647) (emphasis added.)

54.        Visa's By-law 2.10(e) was drafted in Visa's Legal Department in San

Francisco by Visa's Corporate Counsel Bennett Katz, adopted in March, 1991 in California on the votes of Defendants as members of the Visa Board of Directors and enforced through Visa from San Francisco, California as shown in Government Exhibit P-0647 in that case.

55.      In furtherance of the conspiracy to fix Interchange Fees, Defendants in utilizing Visa and MasterCard rules and regulations and technology such as BASE II implemented a strategy by which each Defendant knows that the other Defendants will and must comply with the price-fixed Interchange Fees promulgated by Visa and MasterCard and therefore adopts, ratifies and agrees to implement the price-fixed Interchange Fees. In furtherance thereof, Defendants adopted and enforced By-law 2.10(e) nationwide from San Francisco, California through Visa U.S.A., Inc. for the purpose of excluding American Express and Discover from offering their cards through Defendants to restrain price competition from American Express, Discover and others to protect their price-fixed Interchange Fees. In the *DOJ Case*, 163 F.Supp.2d at 406, the District Court held:

> "Since defendants' exclusionary rules [Visa's By-law 2.10(e) and MasterCard's CPP] undeniably reduce output and harm consumer welfare, ...these rules constitute agreements that unreasonably restrain interstate commerce in violation of Section 1 of the Sherman Act."

56.      MasterCard enacted its Competitive Practices Policy (CPP) in 1996 to plug the MasterCard loophole in Visa's pre-existing By-Law 2.10(e) in response to pressure from Defendants, in that members of Defendants threatened to move business away from MasterCard unless it also adopted the CPP policy to exclude American Express and Discover from offering their cards through Visa and MasterCard member banks.

57.      In 1996, MasterCard adopted its Competitive Practices Policy (CPP) as an extension of Visa's California-based scheme to exclude American Express and Discover with knowledge of the European Commission's concern about its illegality in response to pressure from Defendants.

58.      Joseph W. Saunders (herein "Saunders") is a resident of San Francisco, California and the San Francisco Bay Area. Defendant Saunders has actively engaged in the conspiracy to fix the price of Interchange Fees and as Chairman and a Director of MasterCard

19

1    from 1994-1997, advocated for and voted for the adoption of MasterCard's illegal Competitive
2    Practices Policy (CPP), which was adopted at a meeting of the MasterCard Board of Directors on
3    June 26, 1996 attended by Mr. Saunders.  The District Court in the *DOJ Case* found that: "The
4    CPP, applicable only in the United States, provides that with 'the exception of participation by
5    members in Visa, which is essentially owned by the same member entities, and [Diners Club and
6    JCB], members of MasterCard may not participate either as issuers or acquirers in competitive
7    general purpose card programs." 163 F.Supp.2d 322 at 381 (holding Visa's by-law 2.10(e) and
8    Visa's CPP illegal under section of the Sherman Act).

9         59.       During 1991-1997, when Mr. Saunders was CEO of Household Credit
10   Services, a predecessor of HSBC, he served on the MasterCard U.S. Region Business Committee
11   and the Visa marketing advisory committee.  Mr. Saunders was a member of the Board of
12   Directors of Visa U.S.A., Inc. and attended Board of Directors meetings in California during the
13   time Visa, U.S.A., Inc. was enforcing its exclusionary rule, By-law 2.10(e) to exclude American
14   Express and Discover from offering their payment cards through financial institutions that were
15   members of Visa. During the period 1994-1997 Mr. Saunders a member of the MasterCard
16   Board of Directors.

17        60.       Moreover, MasterCard's Chairman of the Board in 1996, Joseph W. Saunders,
18   while he was a member of both the MasterCard U.S. Region Business Committee, but also a
19   member of Visa USA's marketing committee, attended at least two Visa executive conferences
20   at Pebble Beach, California 10/28/04 as well as MasterCard Board of Directors meetings in
21   California, such as the MasterCard Board of Directors meeting in Marina del Rey California on
22   July 16, 1994 at which anticompetitive practices were discussed.  Mr. Saunders is presently
23   Chairman and CEO of Visa, Inc.

24        61.       By way of enforcing their Exclusionary Restraints in furtherance of the
25   conspiracy to fix Interchange Fees, Defendants through Visa U.S.A., Inc. and MasterCard
26   actively engaged in litigation in Northern California to enforce By-law 2.10(e) and the CPP
27   against Advanta Bank, a non-California member bank and issuer of Visa and MasterCard cards,
28   to preclude Advanta from issuing Amex or Discover cards.  The District Court in the *DOJ Case*,

1   163 F.Supp.2d 322 at 385, found as follows:

2           "In an attempt to conform to By-law 2.10(e) and the CPP,
3       Advanta went forward with a "Rewards Accelerator" program that
        linked MasterCard usage on an Advanta bankcard with aspects of
4       American Express' rewards program. (See id. at 1292-93 (Hart).
        T]he program resulted in litigation between Visa, MasterCard and
5       Advanta; Visa and MasterCard claimed that the MasterCard link to
        American Express' rewards program violated By-law 2.10(e) and
6       the CPP. (See Tr. 1839 (Lockhart, MasterCard.) The litigation
        concluded with a settlement that terminated the Rewards
7       Accelerator program. (See Tr. 1293-95 Hart).)

8       62.      As the District Court for the Southern District of New York found, Visa and

9   MasterCard conducted the above litigation in the Northern District of California to enforce their

10  illegal exclusionary clauses. That litigation, entitled *Visa U.S.A., Inc. et al. v. American Express*

11  *Company, Advanta National Bank U.S.A. et al.*, action No. C-964260 CAL, and *MasterCard*

12  *International, Inc. v. American Express Company, Advanta National Bank U.S.A. et al.*, action

13  No. C-97-0647 SI (related cases per Related Case Order filed Feb. 25, 1997), was instituted and

14  conducted in the U. S. District Court for the Northern District of California in San Francisco,

15  California, to enforce the illegal nationwide exclusionary clauses, to protect the Interchange

16  price-fixing scheme from competition from American Express and Discover.

17      63.      The adoption of the illegal Interchange Fees price-fixing scheme and the

18  adoption of Visa U.S.A., Inc.'s illegal By-law 2.10(e) to exclude price competition and

19  enforcement thereof in furtherance of the price-fixing conspiracy occurred in and emanated from

20  San Francisco, California as to the entire United States as shown by the District Court's finding

21  in the *DOJ Case*, 163 F.Supp.2d at 384, that Visa enforced the exclusionary rules against Banco

22  Popular nationwide:

23          "In a September 1997 letter, Visa U.S.A. informed Banco Popular
24      that if it wanted to continue to issue Visa cards in the continental
        United States, it could neither issue cards nor solicit customers for
25      American Express in the continental United States." (See Tr. At
        175-76 (Kesler); Ex. P-0252)

26      64.      Visa U.S.A.'s letter enforcing illegal By-law 2.10(e) dated September 3,

27  1997, cited by the District Court, was written from Visa U.S.A., Inc.'s San Francisco, California

28  headquarters by Ronald J. Schmidt, Executive Vice-President of Visa U.S.A., Inc., acting as

agent for Defendants to Banco Popular in Puerto Rico threatening the loss of its Visa franchise or right to issue or process Visa cards if Banco Popular issued American Express cards through its mainland United States branches.  [DOJ Trial Ex. P-0252].  Thus, from San Francisco, California, Visa enforced the exclusionary rules as to the entire United States against, Banco Popular, Advanta Bank, and Bank One.  The District Court found that "Because of the [enforcement of exclusionary rules, the discussions [with American Express] were non-starter[s]" with the following banks: Capital One, Nations Bank, Metris (Fingerhut), Chemical, Manufacturers Hanover, Bank One, Union Bank, First Consumers National, Key Corp., First USA, MBNA, Dime, Mellon, Wachovia, Banco Popular North America, and Heartland Savings Bank kept in line in furtherance of the conspiracy to fix Interchange Fees. *DOJ Case*, 163 F.Supp.2d 322 at 384-387.

65.　　By engaging in their combination, agreement and conspiracy to fix Interchange Fees prices and to exclude competition in California, Defendants engaged in a California-based horizontal scheme to fix  and obtain Interchange Fees paid by Cardholders, exclude competition from American Express and Discover, and impose Trade Restraints on Cardholders, subjected  themselves to California law, including the California Cartwright Act and the California Unfair Competition Law.

66.　　Based on the finding that the exclusionary rules violated section 1 of the Sherman Act, American Express filed suit against Visa and MasterCard, which they settled for $4.05 billion.  (Visa Inc. 10K for 2012 at pp. 122-123)

67.　　When Discover filed suit, Visa and MasterCard settled for $2.8 billion making a combined total of $6.85 billion for Visa By-law 2.10(e) and MasterCard CPP exclusionary rule settlements to date. (Visa Inc. 10K for 2012 at pp. 122-123) (Master Card 2009 Annual Report at p. 119; MasterCard  10K for 2010 at p. 124.).

**(2)　In Furtherance of the Interchange Price-Fixing Conspiracy, the Defendants Engaged in Illegal Tying Practices**

68.　　In furtherance of their conspiracy to fix Interchange Fees, through their

"Honor All Cards" Acceptance Rules (Visa's *OpRegs* and *MasterCard Rules* 5.6.1 "Honor All

Cards"), Visa and MasterCard, as co-conspirators with Defendants have required merchants who accepted Visa and MasterCard credit cards to also accept Visa and MasterCard debit cards, and through their No-Surcharge Rule (Visa *OpRegs* 5.2.E; *MasterCard Rules* 5.9.2) and other Anti-Steering restraints, Visa and MasterCard have prevented merchants from providing information or incentives to Cardholders for using less expensive payment methods and thereby further suppressing competition.

69.     The above-said class actions have tolled the statute of limitations with respect to the instant action.  Thus, the Merchants Cases resulted in combined settlements of $7 billion in the Interchange Fee case and $3 billion in *In re Visa Check/MasterMoney Antitrust Litigation* (Visa, Inc. 10K for 2012 at pp. 124-127), for a combined Merchants Cases settlements total of over $10 billion.  When added to the American Express and Discover settlement totals of $6.85 billion, this produces a combined total of approximately $17 billion paid by Visa and MasterCard to settle antitrust claims by merchants and by competitors American Express and Discover.  The above-said class actions have tolled the statute of limitations with respect to the instant action.

**(3)     In Furtherance of the Conspiracy, Defendants Imposed Restrictions on Merchants That Prevented Cardholders from Learning of the Price-Fixed Interchange Fees and Excluded Competition by Payment Cards Other Than Visa and Mastercard**

70.     Defendants also agreed to impose restraints on merchants that forbid, among other things, the following types of actions that merchants could otherwise use at the point of sale to inform Cardholders regarding Interchange fees that Defendants' extracted from Cardholders' accounts and that would foster competition on Interchange Fees among Defendants:

a.     Informing the consumer by posting truthful information comparing the relative costs of different forms of payment.

b.     Promoting a less expensive general purpose card brand more actively than another general purpose card brand.

c.     Offering customers a discount or benefit for use of a general purpose card

1    brand that costs less to the Cardholder.

2         d.      Asking customers at the point of sale if they would consider using another
3    general purpose brand card in their wallets.

4         e.      Posting a sign encouraging use of, or expressing preference for, a general
5    purpose card brand that is less expensive for Cardholders.

6         f.      Posting the signs or logos for general purpose Payment Cards brands that
7    cost less for Cardholders more prominently than signs or logos of more costly general purpose
8    card brands.  But for these rules, Interchange Fees would be lower or non-existent.

9         g.      Disclosing Interchange Fees in Cardholder disclosure statements.

10                          **GOVERNMENT INVESTIGATIONS**

11

12   71.      Competition and regulatory authorities in the United States and around the
13   globe have concluded that Defendants' collectively-set and established uniform schedule of
14   Interchange Fees and other trade restraints promulgated through Visa and MasterCard are anti-
15   competitive and illegal.

16   72.      Defendants' anticompetitive and exclusionary has been the subject of
17   investigation by the Federal Trade Commission. Visa Inc.'s 10K for 2012 at p. 132 states:

18        "On September 21, 2012, the Bureau of Competition of the United
19        States Federal Trade Commission  (the "Bureau") requested that
          Visa provide on a voluntary basis documents and information
          regarding potential violations of certain regulations associated with
20        the Dodd-Frank Act, particularly Section 920(b)(1)(B) of the
          Electronic Funds Transfer Act, 15 U.S.C. 1693o-2, and Regulation
21        II, 12 C.F.R. sec. 235.7(b) (commonly known as the "Durbin
          Amendment" and regulations)." (10K for 2012 at p. 132)

22

23   73.      In addition to the *DOJ Case* discussed above, Defendants' anticompetitive
24   and exclusionary conduct has been further investigated by the Antitrust Division of the
25   Department of Justice. Visa Inc.'s 10K for 2012 at p. 132 states:

26        "On March 13, 2012, the Antitrust Division of the United States
          Department of Justice the "Division") issued a Civil Investigative
27        demand, or "CID," to Visa Inc. seeking documents and
          information regarding a potential violation of Section 1 or 2 of the
          Sherman Act, 15 U.S.C. sec. 1, 2.  The CID focuses on PIN-
28        Authenticated Visa Debit and Visa's competitive responses to the
          Dodd-Frank Act, including Visa's Set, fix and established Acquirer

24

Network fee." (Visa Inc.'s 10K for 2012 at p. 132).

74.       On April 10, 2013, the EU announced that it is opening an investigation into the anticompetitive practices of Visa and MasterCard stating:

> "When a U.S. tourist uses a MasterCard to make purchases in the [European Economic Area], these fees can be quite high, generally much higher than those paid [by a European consumer] in Europe," Mr. Colombani, a commission spokesman said." "The commission also is looking into MasterCard's honor-all-cards rule, which requires merchants to accept all of the company's cards."(Wall St. Journal April 10, 2013 p. C2).

75.       The European Commission ruled that MasterCard's cross border Interchange Fees violate the E.C. Treaty, its counterpart to the U.S. antitrust laws.  On March 25, 2008, the E.C announced that it was launching an antitrust investigation into the setting of the same fees for Visa. Visa has since settled with the E.C.

76.       Similarly, in 2007 the antitrust enforcement body in the United Kingdom, the Office of Fair Trading, concluded that MasterCard's domestic Interchange Fees violated their antitrust laws.

77.       The Reserve Bank of Australia (RBA) has also extensively investigated its payment card industry, as a result of that investigation, the RBA ordered Visa and MasterCard to reduce domestic Interchange Fees from a weighted average of about 0.95 to about .05.  The data since the reforms indicate that the card issuance and transactions volumes are up.

## DEFENDANTS HAVE MAINTAINED CONTROL OVER VISA AND MASTERCARD IN IMPLEMENTING THEIR INTERCHANGE FEE PRICE-FIXING AGREEMENTS AND TRADE RESTRAINTS

78.       Defendants have agreed to and have engaged in a scheme whereby they and their co-conspirators fix the payment card Interchange Fees processed through Visa and MasterCard, using Visa and MasterCard to publish and promulgate the price-fixed Interchange Fees with the agreement and the knowledge that their fellow member banks have agreed to Visa's and MasterCard's price-fixing and anticompetitive Interchange Fees, bylaws, rules regulations and policies, and have and will comply with them..

79.       In 1996,  approximately nineteen banks had a representative on the board of directors of one network and on at least one important committee of the other network, twelve of

25

1  the twenty-one banks represented on Visa's Board of Directors were also represented on

2  MasterCard's Business Committee.  Seventeen of the twenty-seven banks on MasterCard's

3  Business Committee had representatives on Visa's Marketing Advisors Committee.  Seven of the

4  twenty-two banks represented on MasterCard's Board of Directors were also represented on

5  Visa's Marketing Advisors Committee.

6         80.         In response to the Second Circuit's characterization of the networks as

7  consortia of competitors, Defendants and their co-conspirator member banks, acting through the

8  networks' boards of directors restructured the networks, but designed the restructurings to

9  continue the practice of the networks continuing to set uniform schedules of Interchange Fees

10 and continue to enforce the trade restraints as before.  Defendants and their member banks

11 engaged in a series of transactions in which the networks acquired the banks' ownership shares,

12 and issued new classes of preferred stock to the banks that entitled the banks to elect a minority

13 of each network's board of directors and to veto certain extraordinary transactions.  The member

14 banks caused each network to set aside a majority of common shares to be sold to the public, but

15 put in place restrictions to protect interchange fees by imposing restrictions that prevented any

16 single public shareholder or groups of shareholders from acquiring more than 15% of the equity

17 in the restructured networks as found by the European Commission.  The networks financed their

18 acquisition of the shares previously held by the banks with proceeds from the IPOs (held on May

19 26, 2006 for MasterCard and on March 18, 2008 for Visa).

20        81.         Cardholders participate in the Visa and MasterCard Payment Card market in

21 that they are issued payment cards by their Issuer Banks (i.e., by Defendants and their co-

22 defendants).  These payment cards, which are trademarked with the "Visa" or "MasterCard"

23 logo, are the keys that activate Visa's BASE II computer network system and MasterCard's

24 computer network system, thereby enabling virtually simultaneous, multiple payments  from a

25 Cardholder's account via a single swipe of her card, comprising  (a) Interchange Fees paid

26 directly to the Cardholder's Card Issuer bank as a computer generated transfer of funds; (b) an

27 additional fee paid directly to the merchant's bank (the Acquirer) as a computer generated

28 transfer of funds; and (c) and the remaining balance paid directly to the merchant as a computer-

1  generated transfer.

2      82.      Defendants promote and market their trademarked "Visa" payment cards and

3  "MasterCard" payment cards directly to Cardholders through national advertising on television,

4  in newspapers, periodicals and on the Internet to maintain their Cardholder base as a source of

5  Interchange Fees and other fees.

6      83.      Defendants acting by and through the Board of Directors and Committees of

7  Visa and MasterCard have set similar uniform Interchange Fees for all Visa and MasterCard

8  payment card transactions that they agreed to impose. Since 1976, Visa's and MasterCard's'

9  rules have permitted banks to be members of both Visa and MasterCard and to issue both brands

10  of credit cards.

11      84.      Through their common control of both Visa and MasterCard, Defendants and

12  their co-conspirators have stifled competition between Visa and MasterCard and have thwarted

13  competition from smaller competitor networks such as American Express and Discover.  This

14  reduction in competition among general purpose payment card networks has resulted in higher

15  Interchange Fees, hindered and delayed the development and implementation of improved

16  network products and services, and has lessened consumer choice.

17      85.      Visa and MasterCard, who publish and promulgate the fixed Interchange Fees

18  are financed through fees and assessments levied on Defendants, including a share of the

19  Interchange Fees.

20      86.      Under Visa's *Operating Regulations* and MasterCard's Rules, By-laws and

21  related rules, a Member Bank in either Visa or MasterCard has the right to issue payment cards

22  bearing the network's trademark and to offer card acceptance services for the network's payment

23  cards.  Defendants also became owners of the networks and received rights similar to those of a

24  shareholder in a corporation.  These rights at various times have  included the opportunity to vote

25  for a board of directors, participate in the governance of the network, and share in the network's

26  assets upon dissolution, and serve on key committees.  Voting and dissolution rights are

27  apportioned according to the dollar volume of transactions that the member bank has transmitted

28  through each network.  Defendants have made agreements to abide by Visa's and MasterCard's

1   price-fixing and anticompetitive bylaws, rules, regulations, and policies.

2       87.       Despite this overlap in ownership and governance, neither Visa nor

3   MasterCard has enforced the safeguards necessary to prevent one network from obtaining

4   confidential competitive information about the other. Both Visa and MasterCard have rules with

5   Defendants whereby if a member bank determines it was harmed by the uniform schedules of

6   Interchange Fees, it is prevented from suing Visa and MasterCard.

7       88.       Visa and MasterCard, the Defendant, and their co-conspirators exchange data

8   and sensitive information on a continuous basis and act as information conduits for the sharing of

9   pricing and other competitive information between the Visa and MasterCard networks ensuring

10  that Visa's and MasterCard's Interchange Fees are essentially the same on similar transactions

11  and continue to increase in parallel and step-lock fashion.

12      89.       Defendants have acted and continue to act as information conduits for the

13  sharing of pricing and other competitive information between Visa and MasterCard, thereby

14  ensuring that Visa's and MasterCard's Interchange Fees continue to increase in parallel and step-

15  lock fashion. Such information exchanges among Visa, MasterCard and their members have led

16  to Interchange Fees that are essentially the same on similar transactions.

17      90.       Visa and Defendants have executed several agreements to ensure that

18  Defendants would retain significant control over Visa's competitive decisions, including but not

19  limited to the Retrospective Responsibility Plan under which Defendants have agreed to

20  indemnify Visa for liabilities incurred.

21      91.       MasterCard and Defendants have executed several agreements to ensure that

22  Defendants would retain significant control over MasterCard's competitive decisions in order to

23  continue to prevent MasterCard from becoming a legitimate competitor to the market power of

24  Visa. For example, MasterCard and its member banks, including Defendants, enacted a

25  restriction to prevent an investor (for example a merchant or group of merchants) from acquiring

26  a controlling stake in MasterCard and deciding to operate as a lower-priced Interchange Fees

27  competitor to Visa.

28                          **RELEVANT MARKET**

CLASS ACTION COMPLAINT

92.     Payment cards are payment means that a Cardholder can use to make purchases from a wide variety of merchants.  There are two principal types of Visa and MasterCard payment cards that operate through their network services:

a.     Credit cards—that usually permit the cardholder to either (i) pay all charges within a set period after a monthly bill is rendered, or (ii) pay only a portion of the charges within that time and pay the remainder in monthly installments, including interest; as to which Interchange Fees apply and

b.     Debit cards that enable the cardholder to directly access the funds in his/her own bank account to pay for goods or services as to which Interchange Fees apply.

93.     Defendants and their co-conspirators issue Visa and MasterCard payment cards to Cardholders and provide the services that enable merchants to accept them for the purchase of goods or services nationwide.

94.     Visa and MasterCard general purpose Credit cards and Debit cards and Visa and MasterCard credit card network services and Debit card network services are the relevant markets.

95.     As specified in Visa OpRegs Sec. 9.5 and as found by the District Court and affirmed by the Second Circuit in *United States v. Visa U.S., Inc.*, the United States is the relevant geographic market.

## MARKET POWER

a.     Visa and MasterCard each has significant market power in the highly concentrated Network Services market and the general purpose Credit Card and Debit Card Payment Card markets. In affirming a finding of their market power  the Second Circuit stated: "In 1999, Visa U.S.A. members accounted for  approximately 47% of the dollar volume of credit and charge card transactions, while MasterCard members accounted for approximately 26%." *U.S. v. Visa U.S.A., Inc.*, 344 F.3rd 229, 239-240 (2nd Cir. 2003).

96.     Due to consolidations and mergers, Defendants J.P Morgan Chase, Bank of America, Capital One and HSBC collectively and individually have market power in the Visa/MasterCard Payment Card markets. Even in the face of frequent and significant increases in

1  Interchange Fees, Cardholders have no choice but to continue to use Visa's and MasterCard's

2  dominant payment cards because they would face serious economic consequences if they ceased

3  to use them. Said markets are characterized by concentration in both Issuing and Acquiring

4  Banks and low and decreasing transactional costs, thus, the economic characteristics of these

5  relevant markets has changed materially since the early 1980's in that (A) Credit card

6  transactions have grown over 20,000 per cent from approximately $8 billion per year then to

7  more than $1.7 trillion in 2004 generating the highest proft margins of all banking services (B) in

8  the early 1980's only about 16% of consumers had payment cards, but by 2004 that figure had

9  materially changed to about 78%; (C)  In the early 1980's the top ten issuing banks issued about

10 35% of the cards issued.  By contrast to the early 1980's, the top ten  issuing banks issued about

11 82% of the cards issued, and the top 25 issuing banks issued about 98% of the card issued and

12 the trend is toward further consolidation. In 2009, Defendants J.P. Morgan Chase, Bank of

13 America, Capital One and HSBC accounted for more than 60% of the Purchase Volume on Visa

14 and MasterCard credit cards. (C) In the early 1980's card transactions were primarily paper and

15 authorizations were person-to-person.  By 2004, virtually all steps in card authorization and

16 processing were conducted electronically and almost instantaneously with resulting cost savings

17 and rapidly declining costs and rising increase in Interchange Fees.  In the 1980's interstate

18 banking was in its incipiency while today it is the norm.(D) In the early 1980" Visa attempted to

19 justify its interchange fees based on cost, but by 2004 Visa claims that interchange fees are profit

20 maximizing.  (E) in the early 1980's member banks were free to by-pass the Visa system and the

21 interchange fee was not mandatory, but by 2004, member banks treat interchange as mandatory.

22 (F) Debit Payment Cards, which are commonplace today, did not even exist in the early 1980's.

23          97.          Visa's and MasterCard's acceptance among U.S. retailers is widespread. Visa

24 and MasterCard are accepted at over 8.2 million merchant locations in the U.S.

25          98.          Significant barriers to entry and expansion protect Visa's and MasterCard's

26 market power and Defendants' market power  and have contributed to their ability to maintain

27 high Interchange Fees for years without the threat of price competition by new entry or

28 expansion in the market. These barriers to entry and expansion include the prohibitive cost of

1  establishing a physical network over which general purpose cards transactions can run,

2  developing a widely recognized brand, and establishing a base of merchants and a base of

3  cardholders. Visa, MasterCard and Defendants who achieved these necessities early in the

4  history of the industry, obtained substantial early mover advantages over prospective subsequent

5  entrants. Successful subsequent entry would be difficult and expensive. In the presence of these

6  barriers, the only successful market entrant since the 1960's has been Discover. Even so,

7  Discover's market share historically has been, and remains, very small. In 2009, Discover's

8  market share based on dollar volume of purchases placed on general purpose credit cards was

9  approximately 6%.

10      99.      The trade restraints adopted by Defendants and their co-conspirators in

11  furtherance of their Interchange Fee price fixing scheme heighten these barriers to competitors'

12  expansion and entry.  Merchants' inability to encourage their customers to use less costly general

13  purpose card networks makes it even harder for existing or potential competitors to threaten

14  Visa's and MasterCard's  market power.

15              **ANTICOMPETITIVE PURPOSE AND EFFECT**

16      100.      The purpose of the agreement among and between Defendants is to extract

17  supra-competitive Interchange Fees from Cardholders.  Defendants know and understand that the

18  prices charged for Interchange Fees in the United States, including California, are excessive and

19  they would not be able to charge such high non-competitive fees were it not for the illegal

20  agreement, combination and conspiracy between and among themselves to set, fix and establish

21  and maintain the higher Interchange Fees charged.

22      101.      The combination, agreement and conspiracy  is aimed at restraining

23  competition, from competing with the price-fixed Interchange Fees, and in fact harms

24  competition by:

25          a.      Causing increased prices for Interchange Fees;

26          b.      Denying consumers information about the relative costs of  Defendants

27  J.P. Morgan Chase, Bank of America, Capital One, and HSBC  payment card usage compared to

28  other card usage that would cause more consumers to choose lower cost payment methods;

1        c.       Harming the competitive process and disrupting the proper functioning of

2 the price-setting mechanism of a free market;

3        d.       Stifling innovation in network services and card offerings that would

4 emerge if competitors were forced to compete for merchant business at the point of sale;

5        e.       Restraining merchants from competing and offering lower prices;

6        f.       Insulating each Defendant from competition from rival networks that

7 would otherwise encourage merchants to favor use of those network's cards;

8        g.       Inhibiting other networks from competing on price at merchants that

9 accept each Defendants J.P. Morgan Chase, Bank of America Capital One, and HSBC and their

10 Co-conspirators general purpose Payment Cards; and

11        h.       Causing increased retail prices for goods and services paid by

12 Cardholders.

13 **FRAUDULENT CONCEALMENT**

14     102.       Until shortly before the filing of this complaint, Plaintiffs and members of the

15 Plaintiff Cardholder Class had no knowledge that Defendants were violating the antitrust laws as

16 alleged herein.  Plaintiffs and the members of the class could not have discovered any other

17 violations at any time prior to this date by the exercise of due diligence because of fraudulent and

18 active concealment of the conspiracy by Defendants.  Although Defendants disclose their finance

19 charges to Cardholders in Cardholder disclosure statements, they uniformly do not disclose their

20 Interchange Fees to Cardholders in their Cardholder disclosure statements in furtherance of the

21 conspiracy.

22     103.       The affirmative actions of Defendants hereinbefore alleged were wrongfully

23 concealed and carried out in a manner which precluded detection.  Plaintiffs had no knowledge

24 of the antitrust violations herein alleged or any facts that might have led to their discovery.

25 Plaintiffs could not have uncovered the violations alleged herein at an earlier date inasmuch as

26 the means for discovering their causes of action were not reasonably ascertainable due to the

27 fraudulent concealment of activities through various means and methods designed to avoid

28 detection.  Defendants secretly conducted activities in furtherance of the conspiracy and

1   attempted to confine information concerning the conspiracy to key officials and engaged in

2   conduct giving rise to an estoppel to assert the statute of limitations.

3   **DAMAGES**

4       104.       During the period of time covered by the antitrust violations by Defendants,

5   Plaintiffs and each member of the class they represent made payments with Visa and MasterCard

6   payment cards in which Plaintiffs and the Plaintiff Cardholder Class members paid supra-

7   competitive price-fixed Interchange Fees to Defendants.  In 2010 alone, Defendants J.P. Morgan

8   Chase, Bank of America, Capital One, HSBC and their co-conspirators collected more than

9   $40,000,000,000 in supra-competitive, price-fixed Interchange Fees from Cardholders based on

10  more than $1,800,000,000,000 in Cardholder Visa and MasterCharge transactions.

11      105.       By reason of the antitrust violations herein alleged, plaintiffs and each

12  member of the Plaintiff Cardholder Class paid more than they would have paid in the absence of

13  such antitrust violations.  As a result, Plaintiff and each member of the class they represent have

14  been injured and damaged in an amount presently undetermined.

15  **VIOLATIONS ALLEGED**

16  **FIRST CLAIM FOR RELIEF**

17  **(Price-Fixing, Violation of Section 1 of the Sherman Act)**

18      106.       Plaintiffs incorporate and re-allege, as though fully set forth herein, each and

19  every allegation set forth in the preceding paragraphs of this Complaint.

20      107.       Beginning at a time currently unknown to plaintiffs, but at least as early as

21  January 1, 1991, and continuing through  class certification, the exact dates being unknown to

22  plaintiffs, Defendants J.P. Morgan Chase, Bank of America, Capital One, and HSBC entered into

23  a continuing combination, agreement, and conspiracy in restraint of trade artificially to set, fix

24  and establish, raise, stabilize, and peg payment card Interchange Fees in the United States, in

25  violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

26      108.       In formulating and carrying out the alleged combination, agreement, and

27  conspiracy,  Defendants J.P. Morgan Chase, Bank of America,  Capital One, and HSBC  did

28  those things that they combined and conspired to do, including but not limited to the acts,

33

1  practices, and course of conduct set forth above, and the following, among others:

2          a.      Setting, fixing  and establishing, raising, stabilizing, and pegging the

3  Interchange Fees paid by Cardholders directly to them through Visa's *Operating Regulations*,

4  Bank Agreements, and other agreements and implemented through Visa's BASE II computer

5  network system and *MasterCard's Interchange Rates* and other agreements and implemented

6  through MasterCard's computer network system;

7          b.      Imposing Trade Restraints to Protect their Combination, Agreement and

8  Conspiracy to Fix Prices;

9          c.      Allocating Payment Card market share among themselves and collusively

10  excluding competition.

11          109.    The combination and conspiracy alleged herein has had the following effects,

12  among others:

13          a.      Interchange Fees paid by Cardholders have been set, fixed and

14  established, raised, maintained and stabilized at artificially high, non-competitive levels

15  throughout the 50 United States by Defendants J.P. Morgan Chase, Bank of America, Capital

16  One, and HSBC;

17          b.      Price competition in the 50 United States plus D.C. has been restrained,

18  suppressed, and/or eliminated with respect to Interchange Fees;

19          c.      Interchange Fees  have been set, fixed and established, raised, maintained

20  and stabilized at artificially high, non-competitive levels throughout the United States by

21  Defendants J.P. Morgan Chase, Bank of America,  Capital One, and HSBC; and

22          d.      Visa and MasterCard Cardholders have been deprived of the benefits of

23  free and open competition by Defendants J.P. Morgan Chase, Bank of America, Capital One, and

24  HSBC and their Co-conspirators.

25          110.    Plaintiffs and other Plaintiff Cardholder Class members have been injured

26  and will continue to be injured in their businesses and property by paying higher Interchange

27  Fees than they would have paid and will pay in the absence of the combination and conspiracy.

28          111.    Plaintiffs and the Plaintiff Cardholder Class are entitled to damages, treble

1  damages, attorneys' fees and costs, and an injunction against defendants, preventing and
2  restraining the violations alleged herein.

3  ### SECOND CLAIM FOR RELIEF

4  ### (California Cartwright Act)

5  ### (Trust To Set, Fix and Establish Prices And Restrain Trade)

6  112.  Plaintiffs incorporate and re-allege all paragraphs in this Complaint, as
7  though fully set forth below.

8  113.  Plaintiffs allege this Claim on behalf of themselves and the class of all others
9  similarly situated.

10  114.  Beginning at least as early as 1991 and continuing up to and including the date
11  of the filing of this Complaint, Defendants J.P. Morgan Chase, Bank of America, Capital One,
12  and HSBC and their co-conspirators have continuously combined, conspired, and agreed among
13  themselves and others, and are members of, acted with or in pursuance of, or aided or assisted in
14  carrying out a combination of acts with the purpose and effect to create or carry out restriction of
15  commerce and restraints of trade by agreeing to fix high non-competitive, supracompetitive
16  Interchange Fees, imposed on Cardholders in the Visa and MasterCard networks in the 50 States
17  of the United States plus D.C. and have collectively adopted and enforced trade restraints such
18  as Exclusionary Rules, No Discount Rules, Honor All Cards Rules, No Surcharge Rules and
19  Anti-Steering Rules to prevent and prohibit competition, which would have the effect of lower,
20  competitively priced Interchange Fees to protect the supracompetitive Interchange Fees fixed by
21  the Interchange Fees price-fixing conspiracy among Defendants.

22  115.  Defendants, acting by and through their co-conspirators, Visa and
23  MasterCard, engaged in a California-based horizontal scheme to fix Interchange Fees paid by
24  Cardholders, to exclude competition from American Express and Discover from offering their
25  cards through the banks, and impose trade restraints on Cardholders and merchants to protect the
26  conspiracy to fix Interchange Fees, subjected themselves to California law, including the
27  California Cartwright Act and the California Unfair Competition Law.

28  116.  In furtherance of the aforesaid combination and conspiracy, Defendants J.P.

Morgan Chase, Bank of America, Capital One, and HSBC and their co-conspirators have taken action in concert to enforce the maintenance of higher, non-competitive Interchange Fees in the United States, by, *inter alia*, agreeing to maintain artificially high Interchange Fees in the United States and by taking collective action to stop potential erosion of the high, non-competitive fees by continuing to impose and enforce trade restraints that prevent competition.

117.    Said combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among Defendants J.P. Morgan Chase, Bank of America, Capital One, and HSBC to maintain the high supra-competitive prices of Interchange Fees imposed on Visa and MasterCard Cardholders.

118.    Defendants J.P. Morgan Chase, Bank of America, Capital One, and HSBC participated in overt acts in furtherance of the conspiracy alleged and have participated in conspiratorial activities and attended conspiratorial meetings on a frequent and regular basis. These anti-competitive agreements were made and implemented by personal meetings and communications among and between Defendants J.P. Morgan Chase, Bank of America, Capital One, and HSBC.

119.    The specific conduct of Defendants as alleged in this Complaint violates Sections 16700 *et seq.*, 16720 *et seq.* of the California Business and Professions Code.

120.    As a result Plaintiffs Dr. Melvin Salveson, Wendy M. Adams, Edward Lawrence, and Dianna Lawrence and all other Visa and MasterCard Cardholders similarly situated, have been injured by being forced to pay higher Interchange Fees than they would pay in the absence of the price-fixing conspiracy alleged herein.

121.    Plaintiffs and the Plaintiff Visa and MasterCard Cardholder Class are entitled to damages, treble damages, attorneys' fees and costs and an injunction against defendants, preventing and restraining the violations alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand:

1      A.      That the Court determines that this action may be maintained as a class action

2 pursuant to the Federal Rules of Civil Procedure Rule 23;

3      B.      With respect to the First and Second Claims:

4           a.      that the alleged combination and conspiracy among Defendants J.P.

5 Morgan Chase, Bank of America,  Capital One, and HSBC  be adjudged and decreed to be an

6 illegal combination and trust, and an unreasonable restraint of trade in violation of the Sherman

7 Act Section 1 , and California Business & Professions Code Sections 16700 *et seq.*, 16720 *et*

8 *seq.*, §16727 *et seq.*;

9           b.      that judgment be entered against Defendants and in favor of Plaintiffs and

10 each member of the class they represent for injunctive relief;

11           c.      that judgment be entered against Defendants J.P. Morgan Chase, Bank of

12 America, Capital One, and HSBC and in favor of Plaintiffs and each member of the class they

13 represent for threefold the damages determined to have been sustained by them

14           d.      that Defendants, successors, assignees, subsidiaries and transferees, and

15 their respective officers, directors, agents and employees, and all other persons acting or

16 claiming to act on behalf thereof or in concert therewith, be perpetually enjoined and restrained

17 from, in any manner, directly or indirectly, continuing, maintaining or renewing the aforesaid

18 combination, conspiracy, agreement, understanding or concert of action, and adopting or

19 following any practice, plan, program or design having a similar purpose or effect in restraining

20 competition;

21           e.      that Plaintiffs be awarded reasonable attorneys' fees and costs.

22      D.      That Plaintiffs and members of the class be allowed to recover pre-judgment and

23 Post-judgment interest on the above sums at the highest rate allowed by law; and

24      E.      That the Court order such other and further relief as may appear necessary and

25 appropriate.

26                              **JURY DEMAND**

27 Plaintiffs respectfully demand a trial by jury of all issues so triable.

28                         Respectfully Submitted,

1

2      Dated: December 16, 2013

3

4

5

6      Dated: December 16, 2013

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ALIOTO LAW FIRM

By: _____
    JOSEPH M. ALIOTO
    Attorneys for Plaintiffs

LAW OFFICES OF LINGEL H. WINTERS

By: _____
    LINGEL H. WINTERS
    Attorneys for Plaintiffs

RECEIVED TIME  DEC 16  12:24PM

1

**PLAINTIFF'S COUNSEL**

2
Joseph M. Alioto, SBN 42680
Theresa D. Moore, SBN 99978
3   Jaime Miller
ALIOTO LAW FIRM
4   225 Bush Street, 16th Floor
San Francisco, CA  94104
5   Telephone: (415) 434-8900
Facsimile:  (415) 434-9200
6   Email:        jmiller@aliotolaw.com
Email:        tmoore@aliotolaw.com
7

8   Jeffery K. Perkins, SBN 57996
LAW OFFICES OF JEFFERY K. PERKINS
9   1550-G Tiburon Boulevard, Box 344
Tiburon, CA 94920
10  Telephone: (415) 302-1115
Facsimile:  (415) 435-4053
11  Email:        jefferykperkins@aol.com

12  John H. Boone SBN 44876
LAW OFFICE OF JOHN H. BOONE
13  4319 Sequoia Dr.
Oakley, CA 94561
14  Telephone: (415) 317-3001
Email:     deacon38@gmail.com
15

16  Lawrence G. Papale SBN 67068
Law Offices of Lawrence G. Papale
The Cornerstone Building
17  1308 Main Street, Suite 117
St. Helena, CA  94574
18  Telephone: (707) 963-1704
Email: lapapale@papalelaw.com

19  Lingel H. Winters, SBN 37759
LAW OFFICES OF LINGEL H. WINTERS
20  275 Battery St. Suite 2600
San Francisco, CA 94111
21  Telephone: (415) 398-2941
Facsimile: (415) 393-9887
22  Attorneys for Plaintiff

23

24

25

26

27

28

CLASS ACTION COMPLAINT