1 Joseph M. Alioto (SBN 42680)
Theresa D. Moore (SBN 99978)
2 Jamie Miller (SBN 271452)
ALIOTO LAW FIRM
3 One Sansome Street, Suite 3500
San Francisco, California  94104
4 Telephone:  (415) 434-8900
Facsimile: (415) 434-9200
5 Email:  jmiller@aliotolaw.com
Email:  tmoore@aliotolaw.com
6

7 Lingel H. Winters, Esq. (State Bar No. 37759)
LAW OFFICES OF LINGEL H. WINTERS
8 275 Battery Street, Suite 2600
San Francisco, California 94111
9 Tel:  (415) 398-2941
Fax:  (415) 393-9887
10 Email:  sawmill2@aol.com

11 Attorneys for Plaintiffs
And All Others Similarly Situated
12 [ADDITIONAL COUNSEL APPEAR ON
LAST PAGE]
13

14 **UNITED STATES DISTRICT COURT**

15 **NORTHERN DISTRICT OF CALIFORNIA**

16 **OAKLAND DIVISION**

| | |
|---|---|
| 17 MELVIN SALVESON, an individual, EDWARD LAWRENCE, an individual 18 DIANNA LAWRENCE, an individual and WENDY M. ADAMS, an individual on 19 behalf of themselves and those similarly situated, 20 | Case No:  4:13-cv-05816-SBA **CLASS ACTION** **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT** |
| Plaintiffs, 21 v. | |
| 22 JP MORGAN CHASE & CO; J.P. MORGAN BANK, N.A.; BANK OF AMERICA 23 CORPORATION; BANK OF AMERICA N.A.; CAPITAL ONE F.S.B.; CAPITAL 24 ONE FINANCIAL CORPORATION; CAPITAL ONE BANK; HSBC FINANCE 25 CORPORATION; HSBC BANK USA, N.A.; HSBC NORTH AMERICAN HOLDINGS, 26 INC.; HSBC HOLDINGS, PLC, | Judge:         Hon. Saundra Brown Armstrong Date:          July 15, 2014 Time:          1:00 p.m. Courtroom:   1, 4th Floor |
| 27 Defendants. | |

28 ///

# TABLE OF CONTENTS

Page

I.   The Complaint Alleges That The Defendants Engaged In A Conspiracy To Fix Interchange Fees Based On Written Agreements And That Plaintiffs Are The Direct Victims Of It ................................................................................................................ 1

II.  The Complaint Sufficiently Alleges That The Cardholder Pays Price-Fixed Interchange Fees To Her Card Issuer Bank Directly From Her Account At Her Card Issuer Bank................................................................................................................... 3

III. Plaintiffs' Price Fixing Claims Meet *The Associated General Contractor ("AGC") Factors* ...................................................................................................................... 6

IV.  CONCLUSION............................................................................................................ 15

# TABLE OF AUTHORITIES

Page

**CASES**

*American Ad Mgmt, Inc. v. General Tel. Co. of Cal.*
   190 F.3d 1051 (9th Cir. 1999) ........................................................ 5, 6, 11, 12

*American Needle, Inc. v. National Football League*
   560 U.S. 183; 130 S.Ct. 2201, 176 L.Ed.2d 947 (2010).............................. 2

*Ashcroft v. Iqbal*
   129 S.Ct. 1937 (2009)...................................................................................... 1

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*
   241 F.3d 696 (9th Cir. 2001) ........................................................................ 12

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*
   459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)...................................... 6

*Beckler v. Visa U.S.A., Inc.*
   2004 WL 1475100 (Dist. Ct. N.D. Sept. 21, 2004) ...................................... 15

*Bell Atl. Corp. v. Twombly*
   550 U.S. 544 (2007).................................................................................... 1, 2

*Bennett v. Visa U.S.A., Inc.*
    198 S.W.3d 747 (Tenn. Ct. App. 2006) ....................................................... 14

*Blue Shield of Virginia v. McCready*
   457 U.S. 465, 102 S. Ct. 2540, 73 L.Ed.2d 149 (1982).................................. 5

*CFS N. Am., Inc.*
   No. 13-cv-349-BEN (DHB), 2013 WL 6055387 (S.D. Cal. Nov. 13, 2013) ............. 5

*Consiglio-Tseffos v. Visa U.S.A., Inc.*
   2004 WL 3030043 (Super. Ct. Ariz. Dec., 8, 2004) ..................................... 15

*Crouch v. Crompton Corp.*
   2004 WL 2414027 (Super. Ct. N.C. Oct. 28, 2004) ..................................... 15

*D.R. Ward Const. Co. v. Rohm & Haas Co.*
   470 F.Supp.2d 485 (E.D. Pa. 2006) .............................................................. 12

*Dooly v. Crab Boat Owners Ass'n.*
   No. C 02-0676 MHP, 2004 WL 902361 (N.D. Cal. Apr. 26, 2004)................ 8

*Eagle v. Star-Kist Foods, Inc.*
   812 F.2d 538 (9th Cir. 1987) .......................................................................... 8

*Erickson v. Pardus*
   551 U.S. 89, 127 S.Ct. 2197 (2007)................................................................ 1

# TABLE OF AUTHORITIES

Page

*Fucile v. Visa U.S.A., Inc.*
    2004 WL 3030037 (Vt. Super. Ct. Dec. 27, 2004) .................................................................... 15

*Goldberg v. Visa U.S.A., Inc.*
    2007 WL 2011732 (D.C. Super. Ct. March 2, 2007).................................................................. 15

*Gutzwiller v. Visa U.S.A., Inc.*
    2004 WL 2114991 (Dist. Ct. Minn. Sept. 15, 2004) ........................................................... 13, 15

*Ho v. Visa U.S.A., Inc.*
    No. 112316/00, 2004 WL 1118534 (N.Y. App. Div. 2005)................................................... 13, 15

*Illinois Brick Co. v. Illinois*
    431 U.S. 720 (1977)............................................................................................................ 1, 5, 11

*In re ATM Fee Antitrust Litigation*
    686 F.3d 741 (9th Cir. 2012) ..................................................................................................... 6

*In re Cathode Ray Tube (CRT) Antitrust Litigation ("CRT")*
    738 F.Supp.2d 1011 (N.D. Cal. 2010) ....................................................................................... 10

*In re DRAM Antitrust Litig.*
    516 F.Supp.2d 1072 (N.D. Cal. 2007) ....................................................................................... 10

*In Re Flash Memory Antitrust Litigation*
    643 F.Supp.2d 1133 (N.D. Cal. 2009) .................................................................................. passim

*In re Graphics Processing Units Antitrust Litig. ("GPU")*
    540 F.Supp. 2d 1085 (N.D. Cal. 2007) ..................................................................... 9, 10, 11, 12

*In re Intel Microprocessor Antitrust Litig.*
    496 F.Supp.2d 404 (D. Del. 2007).............................................................................................. 12

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*
    05-md-01720 (JG)(JO), 2013 WL 2038650 (E.D.N.Y. Feb. 24, 2006)........................................ 4

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*
    05-md-1720 (JG)(JO) Dkt.# 6124, 2013 WL 6510737 (E.D.N.Y. December 13, 2013) .............. 4

*In re Static Random Access Memory (SRAM) Antitrust Litig. ("SRAM")*
    580 F.Supp.2d 896 (N.D. Cal. 2008) ........................................................................................... 2

*In re TFT-LCD (Flat Panel) Antitrust Litig. ("TFT-LCD")*
    586 F.Supp.2d 1109 (N.D. Cal. 2008) .................................................................................. passim

*In re VisaCheck/MasterMoney Antitrust Litig.*
    192 F.R.D. 68 (E.D.N.Y. 2001)................................................................................................... 4

*In re Wholesale Elec. Anti-Trust Cases I & II*
    147 Cal.App.4th 1293 (2007) ..................................................................................................... 13

# TABLE OF AUTHORITIES

Page

*Johnson v. Riverside Healthcare System, LP*
 534 F.3d 1116 (9th Cir. 2008) ................................................................. 1

*Kanne v. Visa U.S.A., Inc.*
 723 N.W.2d 293 (Neb. 2006) ............................................................. 13, 14

*Kendall v. Visa U.S.A., Inc.*
 518 F.3d 1042 (9th Cir. 2008) ........................................................ 3, 12, 13

*Knevelbaard Dairies v. Kraft Foods, Inc.*
 232 F.3d 979 (9th Cir. 1987) ................................................................... 9

*Knowles v. Visa U.S.A., Inc.*
 No. 03 CV-03-707, 2004 WL 24752284 (Me. Super. Ct. Oct. 20, 2004) ................... 15

*Lazy Y Ranch Ltd. v. Behrens*
 546 F.3d 580 (9th Cir. 2008) ................................................................. 1

*Maloney v. Scottsdale Ins. Co.*
 256 F.App'x 29 (9th Cir. Cal. 2007) .......................................................... 5

*Marsh v. Anesthesia Servs. Med. Grp., Inc.*
 200 Cal.App.4th 480 (2011) ................................................................. 13

*Meyer v. Qualcomm, Inc.*
 No. 08CV655 WQH (LSP), 2009 WL 539902 (S.D. Cal. Mar. 3, 2009) ....................... 8

*Moore v. Visa U.S.A., Inc.*
 Nos. 03 CV 4086, 03 C 5002, 2004 WL 3030032 (Kan. Dist. Ct. Nov. 15, 2004) ............ 15

*NACS v. Bd. Of Governors of the Fed. Reserve Sys.*
 No. 13-5720, 2014 WL 1099633 (D.C. Cir. Mar. 21, 2014) ................................ 4

*Nass-Romero v. Visa U.S.A., Inc.*
 279 P.3d 772 (N.M. Ct. App. 2012) ......................................................... 13

*Nat'l Bankcard Corp. ("Nabanco") v. Visa U.S.A., Inc.*
 596 F.Supp. 1231 (S.D. Fla. 1984) ........................................................... 3

*NCAA v. Bd. Of Regents*
 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) ........................................ 2

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*
 467 F.3d 283 (2d Cir. 2006) .......................................................... 4, 12, 13

*Peterson v. Visa U.S.A.*
 2005 WL 1403761(D.C. Super. Ct. April 22, 2005) ..................................... 13, 14

*Reiter v. Sonotone*
 442 U.S. 330 (1979) ........................................................................... 5

# TABLE OF AUTHORITIES

*Page*

*Smith v. Visa U.S.A., Inc.*
  2005 WL 1936336 (Minn. Dist. Ct. July 12, 2005) ....................................................... 14

*Southard v. Visa U.S.A., Inc.*
  734 N.W.2d 192 (Iowa 2007) ....................................................... 14

*Stark v. Visa U.S.A., Inc.*
  2004 WL 1879003 (Cir. Ct. Mich. July 23, 2004) ....................................................... 15

*Strang v. Visa U.S.A., Inc.*
  2005 WL 1403769 (Wis. Cir. Ct. Feb. 8, 2005) ....................................................... 15

*Tackitt v. Visa U.S.A., Inc.*
  2004 WL 2475281 (Dist. Ct. Neb. Oct. 19, 2004) ....................................................... 15

*United States v. Andreas*
  216 F.3d 545 (7th Cir. 2000) ....................................................... 2

*United States v. Socony-Vacuum Oil Co.*
  310 U.S. 150, 92 L.Ed.2d 1129 (1940) ....................................................... 1

*United States v. Visa USA, Inc., et al.*
  163 F.Supp.2d 322 (S.D.N.Y. 2001); aff'd 344 F.3d 229 (2nd Cir. 2003); *cert. denied*, 543 U.S.
  811; 160 L.Ed.2d 14 (2004) ....................................................... passim

*Verizon Comm v. Trinko LLP*
  540 U.S. 398 (2004) ....................................................... 8

*Visa U.S.A., Inc. v. First Data Corp.*
  No. C02-0-1786, WL 131310448 (N.D. Cal. May 12, 2006) ....................................................... passim

*Vinci v. Waste Mgmt., Inc.*
  36 Cal.App.4th 1811 (1995) ....................................................... 8

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*
  396 F.3d 96 (2d Cir. 2005) ....................................................... 4

**STATUTES**

California Business & Professions Code section 16750(a) ....................................................... 5

Section 1 of the Sherman Act (15 USC § 1) ....................................................... 1, 2, 5

**I.      The Complaint Alleges That The Defendants Engaged In A Conspiracy To Fix Interchange Fees Based On Written Agreements And That Plaintiffs Are The Direct Victims Of It**

The Complaint in this class action alleges violations of Section 1 of the Sherman Act (15 USC § 1) and the Cartwright Act in that the Defendant payment card Issuer banks and their co-conspirators contracted, combined and conspired among themselves and others, *through written agreements*, to fix the Interchange Fees directly paid to Defendant payment card Issuer banks by their plaintiff cardholders each and every time the cardholders used their payment cards that displayed the logos of Visa or MasterCard.  (Compl. ¶¶ 39-46).  "A combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se."  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223, 92 L.Ed.2d 1129 (1940).  Defendants' Motion to Dismiss is limited to the issues of (1) *AGC* standing and (2) standing under the *Illinois Brick* doctrine.  (Def.'s Brief p. 4, lines 4-22.)

This Court stated the legal standard to be followed on a motion to dismiss in *In Re Flash Memory Antitrust Litigation*, 643 F.Supp.2d 1133, 1141 (N.D. Cal. 2009), stating:

> To survive a motion to dismiss for failure to state a claim, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what…the claim is and the grounds upon which it rests."  *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (internal quotation marks omitted; *Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1122 (9th Cir. 2008)… "In general, the inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff."  *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

*Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009) re-affirmed *Twombly*.

The allegations in the Complaint meet the plausibility test as this is not the first time the banks have been involved in violating Section 1 of the Sherman Act through Visa and MasterCard. In *United States v. Visa USA, Inc., et al.*, 163 F.Supp.2d 322, 406 (S.D.N.Y. 2001); aff'd 344 F.3d 229 at 234, 244 (2nd Cir. 2003); *cert. denied*, 543 U.S. 811; 160 L.Ed.2d 14 (2004), (Compl. ¶¶ 49-67), the Court entered a final judgment, after 34 days of trial, affirmed on appeal, certiorari denied,

1

1   finding that the defendant member banks acting through Visa and MasterCard, who dominated the

2   payment card business, violated Section 1 of the Sherman Act by adopting, maintaining and

3   enforcing exclusionary rules to exclude competitors American Express and Discover from offering

4   their cards through member banks, resulting in harm to consumer welfare, stating:

5               These 20,000 banks set the policies of Visa U.S.A. and MasterCard.
                These competitors have agreed to abide by a restrictive exclusivity
6               provision to the effect that in order to share the benefits of their
                association by having the right to issue Visa or MasterCard cards, they
7               must agree not to compete by issuing cards of Amex or Discover.  The
                restrictive provision is a horizontal restraint adopted by 20,000
8               competitors…Each has agreed not to compete with the others in a
                manner which the consortium considers harmful to its combined
9               interests. Far from being "presumptively legal," such arrangements are
                exemplars of the type of anti-competitive behavior prohibited by the
10              Sherman Act.  *See e.g. NCAA v. Bd. Of Regents*, 468 U.S. 85, 99, 104
                S.Ct. 2948, 82 L.Ed.2d 70 (1984) ("Member institutions have created a
11              horizontal restraint—an agreement among competitors on the way in
                which they compete with one another"); [ Citations omitted].  *United*
12              *States v. Visa U.S.A., Inc.*, 344 F.3d 229, 242-243 (2d Cir. 2003).[1]

13          At the time, Defendant Bank of America was on Visa U.S.A, Inc.'s Board, and Capital One

14   and the Chase component of J.P. Morgan Chase and the Household component of HSBC were on the

15   MasterCard U.S. Region Board.  *United States v. Visa U.S.A., Inc.*, 163 F.Supp.2d 322, 370-71

16   (S.D.N.Y. 2001) (Compl. ¶ 59).

17          This analysis was recently confirmed by the U. S. Supreme Court in *American Needle, Inc. v.*

18   *National Football League*, 560 U.S. 183; 130 S.Ct. 2201, 176 L.Ed.2d 947 (2010). (NFL teams'

19   actions through the NFL constitute concerted actions subject to Section 1 of the Sherman Act)  The

20   instant Complaint alleges the furtherance of such horizontal agreements in an Interchange Fee price-

21   fixing conspiracy among Defendant banks and their co-conspirators, (Compl.  ¶¶ 39, 40-46, 51-70)

22   and other government findings relative to Interchange fee price-fixing (Compl. ¶¶ 71-77).  Evidence

23   of a prior conspiracy is "properly pleaded for the purpose of establishing the plausibility that [a

24   current] conspiracy existed" under *Twombly* and *Iqbel*.  *In re Flash Memory Antitrust Litig.*, 643

25   F.Supp.2d 1133, 1149 (N.D. Cal. 2009), citing *United States v. Andreas*, 216 F.3d 545 (7th Cir.

26

---

27   [1] The Complaint alleges substantial concentration of payment card banking in the hands of
28   Defendants since the 1980's.  (Compl. ¶ 95a-99.)

1    2000); *In re Static Random Access Memory (SRAM) Antitrust Litig.* ("SRAM"), 580 F.Supp.2d 896,

2    903 (N.D. Cal. 2008).

3    **II.   The Complaint Sufficiently Alleges That The Cardholder Pays Price-Fixed Interchange**
     **Fees To Her Card Issuer Bank Directly From Her Account At Her Card Issuer Bank**

4

5         First, the motion to dismiss is based on a false reading of the Complaint and *United States v.*

6    *Visa U.S.A., Inc. et al.*, 344 F.3d 229 (2d Cir. 2003) quoted at ¶ 49 of the Complaint.  The card,

7    issued to the payment cardholder by her Issuer Bank, operates as a traceable key imprinted with the

8    cardholder's account number, by which the cardholder enables her card Issuer bank, where her

9    account is located, to access the cash or credit in her account to pay itself Interchange Fees and

10   transmit the balance to the merchants' acquiring bank.  (Compl. ¶ 39-¶ 50). That the cardholder's

11   account is the source from which the Interchange Fees are paid to her card Issuer bank is made clear

12   by the finding in *United States v. Visa U.S.A., Inc. et al.*, 344 F.3d 229 at 235 that:

13            The network then relays the transaction information to the
              cardholder's issuing bank, which approves the transaction **if the**
14            **cardholder has a sufficient credit line."** (Compl. ¶ 49). (Emphasis
              supplied).
15

16        As the Complaint alleges, the cardholder pays Interchange Fees to her Defendant Issuer bank

17   directly from her account at her Defendant Issuer bank at rates agreed to in writing among Defendant

18   banks and their co-conspirators as a direct victim of the conspiracy to fix Interchange Fees. (Compl.

19   ¶¶ 6, 49, 50,104, 110).  In fact, ¶ 49 of the Complaint quotes *United States v. Visa U.S.A., Inc. et al.*,

20   344 F.3d 229, 235 (2d Cir. 2003), after 34 days of trial as follows:

21            The Issuer then pays the acquiring bank the amount requested, **less**
              **what is called an "interchange fee."** (Emphasis supplied). (Compl.¶
22            49, quoting *United States v. Visa U.S.A. Inc.*, 344 F.3d 229 at 235).

23        In *Nat'l Bankcard Corp. ("Nabanco") v. Visa U.S.A., Inc.*, 596 F.Supp. 1231 at 1238 (S.D.

24   Fla. 1984), after nine weeks of trial, the Court said the same thing, stating:

25            In the system at issue here, **the issuer bank withholds a small**
              **amount (called the "interchange fee")** from the monies due and
26            owing the merchant bank to cover the costs of the processing.
              (Emphasis supplied).
27

28        In *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 at 1045 (9th Cir. 2008), (motion to dismiss),

the Ninth Circuit stated:

> The issuing bank pays the acquiring bank the original amount **minus a fee of around two percent**. (Emphasis supplied).

In *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 286 (2d Cir. 2006), stated:

> The issuing bank bills the cardholder for the purchase amount and transmits the purchase price to the acquiring bank, **deducting an "interchange fee,"** the fee the issuer charges to process the transaction.

In *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 05-md-1720 (JG)(JO) Dkt.# 6124 at p. 2, 2013 WL 6510737 at *1 (E.D.N.Y. December 13, 2013) (motion to approve settlement), the court stated:

> The issuing bank then transmits to the acquiring bank the amount of the purchase **minus the interchange fee**. (Emphasis supplied).[2]

In other words, the cardholder's card Issuer bank, which has direct access to the cardholder's account, first pays itself an Interchange Fee from the cardholder's account, before it transmits any cash or credit to the merchant's acquiring bank. This direct payment of Interchange Fees to the Issuer bank right out of the cardholder's account gives the cardholder, who is in direct privity with her Issuer bank through card issuance under the cardholder agreement, standing to sue her Issuer Bank for agreeing with the other banks to fix the Interchange Fees. This direct privity between Issuer banks and cardholders is further corroborated in *United States v. Visa U.S.A., Inc. et al.*, 344 F.3d 229, 239 (2d Cir. 2003) in that the Second Circuit expressly held: "Whereas in the market for general purpose cards, the issuers are the sellers, and cardholders are the buyers." (Compl. ¶ 50);

---

[2] This is consistent with the earlier statement in *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 102 (2d Cir. 2005) (motion to approve settlement) that "The card issuing bank charges an "interchange fee" each time it provides funds to the acquiring bank as payment to a merchant for the cardholder's purchase." In *NACS v. Bd. Of Governors of the Fed. Reserve Sys.*, No. 13-5720, 2014 WL 1099633 (D.C. Cir. Mar. 21, 2014), the Court, in reversing a summary judgment, acknowledged that the interchange fee comes out of the cardholder's account. ("After settlement, *the cardholder's account has been debited*, the merchant's account has been credited." (Emphasis supplied). *In re VisaCheck/MasterMoney Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2001), involves a motion to certify a class action in which the court recites the allegations in the complaint, not findings of fact after trial. *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 05-md-01720 (JG)(JO), 2013 WL 2038650 (E.D.N.Y. Feb. 24, 2006) involves a motion to appoint lead counsel.

4

1    thus, *Maloney*, 256 F.App'x at 31 and *CFS N. Am., Inc.*, No. 13-cv-349-BEN (DHB), 2013 WL

2    6055387, at 9* (S.D. Cal. Nov. 13, 2013) are inapposite. The payment of inflated Interchange Fees

3    by payment cardholders to their Issuer banks, who "paid more than they would have paid in the

4    absence of such antitrust violations" (Compl. ¶¶ 104,105) through the extraction of the Interchange

5    Fees directly from cardholders' accounts by their Issuer banks constitutes injury and damages under

6    the Sherman Act as well as the Cartwright Act. *American Ad Mgmt, Inc. v. General Tel. Co. of Cal.*,

7    190 F.3d 1051 (9th Cir. 1999).

8         But all of this is evident because *the cardholder is the first and only person who pays*

9    *anything*, and as the first payer, the cardholder has standing to sue the direct recipient of her

10   Interchange Fee payment—her card Issuer banks—Defendants J.P. Morgan Chase & Co., Bank of

11   America, Capital One and HSBC and their affiliates for fixing the Interchange Fees. *Illinois Brick*

12   *Co. v. Illinois*, 431 U.S. 720 (1977) holds that as the first payer of the price-fixed overcharges, the

13   cardholder is the only one who has standing to sue under the Sherman Act. A consumer payer of

14   overcharges has standing to sue for overcharges under the Sherman Act. *Reiter v. Sonotone*, 442

15   U.S. 330 (1979). In *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S. Ct. 2540, 73 L.Ed.2d

16   149 (1982), the Supreme Court found standing for a group insured plaintiff, who was neither a

17   competitor, nor a direct purchaser since her employer paid the premium, on the ground that her

18   injury was *inextricably intertwined* with the injury the conspirators sought to inflict on psychologists

19   and the psychotherapy market. In *American Ad Mgmt.*, 190 F.3d 1051 at 1057-1058 (9th Cir. 1999),

20   the Ninth Circuit rejected the notion that a Sherman Act plaintiff need be a consumer or competitor,

21   stating:

22              "The Supreme Court has never imposed a "consumer or competitor"
             test but has instead held the antitrust laws are not so limited… It is not
23           the status as a consumer or competitor that confers antitrust standing,
             but the relationship between the defendant's alleged unlawful conduct
24           and the resulting harm to plaintiff."

25        As the direct first payer of price-fixed Interchange Fees to her Issuer bank from her account

26   at her Issuer bank, plaintiff cardholder has standing to sue under the Sherman Act as well as under

27   the Cartwright Act, which also contains an *Illinois Brick* repealer for indirect purchasers. (Calif.

28   Bus. & Prof. C. sec. 16750(a)).

1   By contrast, ATM cards, which permit one to withdraw cash from one's own ATM card

2   issuer bank or from a "foreign ATM," not owned by his bank, which issued him the ATM card),

3   operates on a special ATM network such as STAR, not Visa or MasterCard. *In re ATM Fee*

4   *Antitrust Litigation*, 686 F.3d 741 (9th Cir. 2012). In the *ATM Fee* case, the Court said: "Foreign

5   ATM transactions generate four fees. The cardholder must pay two of these fees – one to the ATM

6   owner for use of the ATM (known as a "surcharge") and one to the card issuing bank (known as a

7   "foreign ATM fee"). The card-issuing bank also pays two of these fees—one to the [STAR] ATM

8   network that routed the transaction (known as a "switch fee") and one to the ATM owner (known as

9   an "interchange fee")."

10   In the *ATM Fee* case, plaintiffs alleged price-fixing with respect to the "interchange fee" paid

11   on "foreign ATM" transactions, not at their own bank; "[h]owever, Plaintiffs **conceded that they**

12   **have never directly paid [ATM] interchange fees**," which resulted in the District Court finding

13   plaintiffs were indirect purchasers and granting summary judgment on their Sherman Act claims,

14   and the Ninth Circuit affirming. However, even apart from plaintiffs' dispositive admission, the

15   sharp difference between the "foreign ATM transaction" and the instant payment card transactions is

16   that in the instant payment card transactions, the payment cardholder has an account at her card

17   Issuer bank from which the Issuer bank can directly pay itself the payment card interchange fees,

18   whereas the ATM cardholder has no account at a "foreign ATM" from which to directly pay the

19   ATM interchange fee.

20   **III.    Plaintiffs' Price Fixing Claims Meet *The Associated General Contractor ("AGC")***
         ***Factors***

21

22   As this Court said in *In re Flash*, 643 F.Supp.2d 1133, at 1151, supra:

23        "[T] he Supreme Court in AGC [*Associated General Contractors of*
          *California, Inc. v. California State Council of Carpenters*, 459 U.S.
24        519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)] identified certain factors
          for determining whether a plaintiff who has borne an injury has
25        antitrust standing. These factors include: (1) the nature of the
          plaintiff's alleged injury; that is whether it is the type the antitrust laws
26        were intended to forestall; (2) the directness of the injury; (3) the
          speculative measure of the harm; (4) the risk of duplicative recovery;
27        and (5) the complexity in apportioning damages." *American Ad Mgmt,*
          *Inc. v. General Tel. Co. of Cal.*, 190 F.3d 1051, at 1055 (9th Cir. 1999)
28        (citing AGC, 459 U.S. at 535). *"To conclude that there is antitrust*

6

*standing, a court need not find in favor of the plaintiff on each factor."*
*Id*.  Instead, courts are to balance the factors, "giving great weight to
the nature of plaintiff's alleged injury."  *Id*. (Emphasis supplied).

### a.   Nature of the Injury

#### A.   Since Plaintiff Cardholders' Issuer Banks Withdraw And Withhold The Price-Fixed Interchange Fees Directly From The Cardholder's Account, The Issuer Bank Inflicts Injury And Damages On His Cardholder Within The Ambit Of The Card Market

First, the Complaint alleges that the infliction of the price-fixed Interchange Fee injury on payment cardholders occurs in the Issuer-cardholder card market because the cardholder pays the Issuer directly from the cardholder's account at her Issuer bank before the Issuer pays the merchant's acquirer bank as follows:

The Issuer then pays the acquiring bank the amount requested, **less what is called an "interchange fee"** (Compl. ¶ 49 quoting *United States v. Visa U.S.A., Inc.*, 344 F.Supp. 2d at 235).

By extracting the price-fixed "interchange fee" directly from the cardholder's account, (Compl. ¶ 49), and keeping it, the Issuer bank inflicts injury and damage on the cardholder within the same bank, within the same market, the Issuer-cardholder card market. (¶ 81). The Complaint alleges that the Defendant Issuers "transfer the amounts of the Interchange fees directly from the cardholders' accounts to the Defendants in real time." (Compl. ¶ 47). The cardholder thus pays the Issuer directly from her cardholder account, which is at the Issuer bank "(a) a $3.05 Interchange fee (i.e., 2.95% + US$ 0.10) paid directly from the Cardholder's account to the Defendants, as the Cardholders' payment card Issuer Banks" (Compl.¶ 48); ("Visa U.S.A. Interchange Reimbursement Fees" effective  4/17/10; *MasterCard Worldwide U.S. and Interregional Interchange Rates* effective April, 2010 (Compl. ¶¶ 41-46)). "The Issuer then pays the acquiring bank the amount requested "less what is called an 'interchange fee'" (Emphasis supplied).  (Compl. ¶49). Thus, in withdrawing and withholding supracompetitive interchange fees directly from the cardholder's account at the Issuer bank, the Issuer inflicts injury or damage on his cardholder within the ambit of the card market in which "**the issuers are the sellers, and cardholders are the buyers**."  (Compl. ¶ 50, quoting *United States v. Visa U.S.A. Inc.*, 344 F.3d at 239.  (Emphasis supplied).

Unlike the payment cardholder whose payments are directly extracted from her account, the

1  cell phone purchaser in *Meyer v. Qualcomm, Inc.*, No. 08CV655 WQH (LSP), 2009 WL 539902

2  (S.D. Cal. Mar. 3, 2009), claimed that because Qualcomm declined to license its patent to standards

3  determining organizations ("SDOs") he paid supracompetitive prices for his cell phone, which the

4  court "traced through three levels of the supply chain—chipset manufacturers, cell phone

5  manufacturers, and vendors" then to plaintiff.  *Meyer* is distinguishable in that the Court listed three

6  levels in the supply chain, (but counting the SDOs and plaintiff, there were really five levels), and

7  concluded plaintiff's claim was too remote and in a separate market.  *Eagle v. Star-Kist Foods, Inc.*,

8  812 F.2d 538 (9th Cir. 1987) is inapposite because it  holds that crab boat employees lack standing

9  because, unlike cardholders, they are not parties to their employer's fish selling agreement.

10  Likewise, *Dooly v. Crab Boat Owners Ass'n.*, No. C 02-0676 MHP, 2004 WL 902361, *12 (N.D.

11  Cal. Apr. 26, 2004), which also rules that crab boat crewmembers lack standing, does not apply.[3]

12              **B.     Since The Card And Network Markets Are "Inextricably Linked And
                        Intertwined" And Traceability Is Alleged, Plaintiffs Have Sufficiently
13                      Alleged That The Card Market and The Network Market Are The Same
                        Market For Antitrust Standing  On A Motion To Dismiss.**
14

15         The reality is that without the card with its card number, the network is inoperable.  The

16  magnetic strip is critical to network operation because it identifies the account from which payment

17  is to be made, which is located in the cardholder's Issuer bank. Without the cardholders's account

18  number, no network transaction can take place.  The card with its account number is an essential

19  element or component of the network because it permits the payments to be ***traced***, as alleged in the

20  Complaint as follows:

21                  The supracompetitive Interchange Fees fixed by Defendants and paid
                    directly by Visa and MasterCard Cardholders are ***traceable*** through
22                  the application of economic analyses to the computerized bank records
                    of Defendants, their bank co-conspirators, and their co-conspirators
23

24  ──────────────────────
25  [3] *Vinci v. Waste Mgmt., Inc.*, 36 Cal.App.4th 1811, 1814 (1995) also holds that a "plaintiff is not a
     proper party to bring an action for antitrust violations by his employer."  Since the *Vinci* court
26  recognized that plaintiff employee's proper remedy was a "wrongful termination action," the *AGS*
     factors were beside the point.  In *Verizon Comm v. Trinko LLP*, 540 U.S. 398, at 410 (2004), an
27  AT&T customer sued Verizon for failing to share its network with AT&T in violation of section 2
     of the Sherman Act.  The Court held "Verizon's alleged insufficient assistance in the provision of
28  service to rivals is not a recognized antitrust claim under this Court's refusal-to-deal precedents."

1    Defendants assert that the alleged fixing of interchange fees occurred only in the network

2    services market, in which Visa, MasterCard, American Express and Discover compete, not in the

3    card market in which "the issuers are the sellers, and cardholders are the buyers." (Def.'s Brief p. 8

4    lines 13-14), and in which plaintiff cardholders participate with their card Issuers.  In *Knevelbaard*

5    *Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 1987), the Ninth Circuit found that milk

6    producers had standing under both the Sherman Act and the Cartwright Act to sue *cheese* buyers for

7    conspiring to rig the price of bulk cheese in that the plaintiffs' injury was sufficiently direct even

8    though it rigged prices in multiple markets, rejecting defendants' separate markets argument.

9    Such separate market arguments were also rejected by Judge Alsup in *In re Graphics*

10   *Processing Units Antitrust Litig.* ("GPU") 540 F.Supp. 2d 1085, 1098-1099 (N.D. Cal. 2007).  In

11   that case, direct purchasers alleged they purchased GPUs as components directly from manufacturers

12   in a GPU market, while indirect purchasers alleged they purchased finished products that contained

13   GPUs.  Defendants moved to dismiss the indirect purchasers' claims on the ground that they were

14   not participants in the GPU relevant market because the market they "participated" in was the

15   separate market for the finished product that contained GPUs, as opposed to the market for GPUs

16   themselves.  The *GPU* Court denied defendants' motion to dismiss, and ruled that the complaint

17   "ha[d]… alleged that GPUs are separate components of a computer and that any costs attributable to

18   them are traceable through the chain of distribution."

19   Likewise, in *In re TFT-LCD (Flat Panel) Antitrust Litig. ("TFT-LCD")*, 586 F.Supp.2d

20   1109, 1123-1124 (N.D. Cal. 2008), the defendant manufacturers argued that the indirect purchasers

21   of LCD panels installed in finished products were not participants in the separate market for LCD

22   panels. The Court per Judge Illston rejected this argument on the grounds that the market for LCD

23   panels and the market for the finished products in which they are put are "inextricably linked and

24   intertwined" and traceable and that plaintiffs had standing to sue.

25   In *In re Flash Memory Antitrust Litig.*, 643 F.Supp.2d 1133, 1150-1156, *supra*, this Court per

26   Judge Armstrong, citing *GPU*  and *LCD* denied a motion to dismiss based on the contention that

27   indirect purchasers of  products that contained NAND flash memory lacked standing because

28   products that contained NAND flash memory were in a separate market from the market for NAND

9

1   flash memory.  The Court found that "while the markets for NAND flash memory and products that

2   contain NAND flash memory technically may be different, in practice both markets are inextricably

3   intertwined" and that "[as] in *GPU [I]* and *TFT-LCD*, Plaintiffs have alleged sufficient facts that

4   they, as Indirect Purchasers of NAND flash memory-based products, are in the "same market" as

5   Direct Purchasers. … For purposes of the instant motion to dismiss, Plaintiffs have alleged sufficient

6   facts to show that they are market participants for purposes of AGC." 643 F.Supp.2d at 1154.

7           In *In re Cathode Ray Tube (CRT) Antitrust Litigation ("CRT")*, 738 F.Supp.2d 1011, 1023-

8   24 (N.D. Cal. 2010), Judge Conti denied a motion to dismiss that claimed CRTs are in separate

9   markets from CRT finished products on the ground that the products are "inextricably linked" and

10  that the product costs "can easily be traced." 738 F.Supp.2d at 1024.

11          By contrast, Judge Hamilton, in an earlier opinion, in *In re DRAM Antitrust Litig.*, 516

12  F.Supp.2d 1072, 1093 (N.D. Cal. 2007) granted a motion to dismiss, finding that products that

13  include DRAM memory chips are separate from the market for products that include DRAM.

14  However, in a second opinion, in *In re DRAM Antitrust Litig.*, 536 F.Supp.2d 1129, 1137-38 (N.D.

15  Cal. 2008), the *DRAM* court stated that in a section 1 price-fixing case, such as the instant case,

16  unlike a section 2 case, plaintiffs need not allege "reasonable interchangeability of use or cross-

17  elasticity of demand factors to the market participation requirement" to satisfy the "inextricably

18  linked and intertwined" test; Judge Hamilton's assessment was cited by Judge Illston in *TFT-LCD*,

19  586 F.Supp.2d at 1118.  However, in *In re DRAM Antitrust Litig.*, 536 F.Supp.2d at 1138, the Court

20  reluctantly persisted in finding separate markets, stating: "if ever there were a situation in which two

21  related markets should be declared tantamount to the same market, this is likely it."

22          *GPU* , *TFT-LCD*, *Flash* and *CRT* support the proposition that payment cards and networks

23  involve the "same market" for purposes of *AGC* standing, and that cardholders have standing on a

24  motion to dismiss since in practice both markets are "inextricably intertwined" and there is

25  traceability.  (Compl. ¶ 6).  As this Court observed in *In re Flash*, 643 F.Supp.2d at 1154: "However,

26  it bears noting that the actual determination of whether indirect purchasers are "participants" in the

27  same "relevant market" for purposes of antitrust standing is better suited to resolution upon a fuller

28  record.  *See TFT-LCD*, 586 F.Supp.2d at 1123."

### b.   The Directness Of The Injury

"The second [AGC] factor looks to whether [the] alleged injury was the direct result of [defendants'] allegedly anticompetitive conduct…To assess the directness of this injury, we look to the chain of causation between[the] injury and the alleged restraint in the market[.]  *American Ad Management*, 190 F.3d 1051, 1058-59 (9th Cir. 1999).  Defendants contend that "Plaintiffs claim only derivative and remote injuries through their purchases from the merchants of a variety of retail goods that Visa and MasterCard neither manufactured or sold."  (Def.'s Brief p. 10 lines 6-8.).

Remarkably, this is a false characterization of the allegations of the Complaint.  What the Complaint alleges is that the payment cardholder pays the price-fixed Interchange Fee to her card Issuer bank directly from her account, which is located at the Issuer bank ¶¶ 47-49).  The Complaint alleges that the Defendant Issuers "transfer the amounts of the Interchange fees directly from the Cardholders' accounts to the Defendants in real time."  (Compl. ¶ 47). The Issuer thus withdraws and withholds for itself directly from the cardholder's account, which is at the Issuer bank "(a) a $3.05 Interchange fee (i.e., 2.95% + USD$ 0.10) paid directly from the Cardholder's account to the Defendants, as the cardholders' payment card Issuer Banks, in a direct computer-generated  transfer of the cardholders' funds to Defendants…"  (Compl.¶ 48).  By withdrawing the price-fixed "interchange fee" from the cardholder's account, (Compl. ¶ 49), and keeping it, the Issuer bank inflicts direct injury and damage on the cardholder  since the cardholder's card bears her cardholder account number making the amounts withheld directly traceable. (Compl. ¶ 6).

In *In re Flash*, 643 F.Supp.2d 1133 at 1155, *supra*, as in *TFT-LCD*, 586 F.Supp.2d at 1124, *supra*, *GPU*, 540 F.Supp.2d at 1098 *supra*, and *CRT*, 738 F.Supp.2d at 1024, *supra*, the courts found allegations of traceability, as alleged in ¶ 6 of the instant Complaint, were "adequate to show that there is a chain of causation between Defendants' allegedly anticompetitive conduct and Plaintiff's injury," consisting of the plaintiff's overpayment of price-fixed Interchange Fees.  *In re Flash*  at 1155.  Since plaintiff cardholders pay the Interchange Fees direct from their accounts to their Issuer banks before the acquirer banks and merchants are paid the balance, the cardholders are the first payers of the price-fixed Interchange Fees under *Illinois Brick*, *supra*, and no other parties are more directly harmed.

11

1

    **c.**   ***Speculative Nature of Harm and Complexity in Apportioning Damages***

2

    The third and fifth *AGC* factors – the speculative nature of the harm and the complexity in

3

apportioning damages may be considered together.  *Flash*, 643 F.Supp.2d 1133 at 1155.  *See DRAM*

4

*[I]*, 516 F.Supp.2d at 1092 (citing *American Ad Management*, 190 F.3d at 1054-55).

5

    In re *Flash*, 643 F.Supp.2d at 1155 and *TFT-LCD*, 586 F.Supp.2d at 1124, and *CRT*, 738

6

F.Supp.2d at 1024, the Courts concluded that traceability of damages, as alleged in ¶ 6 of the instant

7

Complaint, constitutes a sufficient allegation that damages are non speculative and apportionable to

8

survive a motion to dismiss.  In *GPU*, 540 F.Supp.2d at 1098, *supra*, the court acknowledged that

9

"Plaintiffs note that some courts have declined to find damages to be too speculative at the pleading

10

stage because determining damages is an intensely factual process.  *See D.R. Ward Const. Co. v.*

11

*Rohm & Haas Co.*, 470 F.Supp.2d 485, 504 (E.D. Pa. 2006)." As the *TFT-LCD* court stated at 586

12

F.Supp.2d 1124: "Moreover, the Court finds that it would be inappropriate to determine 'complex

13

and intensely factual' damages issues without "a more fully developed factual record."  *[In re] Intel*

14

*[Microprocessor Antitrust Litig.]* 496 F.Supp.2d [404] at 410 [D. Del. 2007]; *see also GPU [II]*, 540

15

F.Supp.2d at 1098."

16

    As downstream parties, the merchants and acquirers are not better positioned to assert injury

17

to cardholders because they are not direct payers as held in *Kendall v. Visa U.S.A., Inc.*, 518 F.3d

18

1042 at 1049 (9th Cir. 2008). ("… nor are they charged the interchange fee directly.") and *Paycom*

19

*Billing Servs., Inc. v. MasterCard Int'l*, 467 F.3d 283, 286-87 (2d Cir. 2006)  *See* Def.'s Brief

20

footnote 9 which states:  "*See Interchange* MDL, 2013 WL 6510737 at *13 (noting uncertainty that

21

merchants could establish direct purchaser status)."  The Complaint alleges that the approximate

22

annual transactions by consumers in the United States using payment cards issued by defendants'

23

and their co-conspirators, with the logos of Visa and MasterCard, is approximately $1.8 trillion.

24

(Compl. ¶¶ 1-2). The average standard price-fixed Interchange Fee alleged in the Complaint is

25

approximately 2.95% + US$0.10 of each transaction.  (Compl.  ¶¶ 44, 45-48). Consequently, on an

26

average, the annual amount of Interchange Fees charged by the Defendant banks and their co-

27

conspirators is approximately $54 billion per year [(2.95% + USD$ 0.10) X $1.8 trillion] (Compl. ¶¶

28

1-2). ( $40 billion  in 2010  Compl. ¶¶104-105).  Thus, *Ass'n of Wash. Pub. Hosp. Dists. v. Philip*

*Morris Inc.*, 241 F.3d 696, 703 (9th Cir. 2001), in which hospitals, who claimed a conspiracy in the tobacco industry to suppress less harmful tobacco resulted in unreimbursed costs to them for treating patients suffering from tobacco related illnesses, has no bearing on the instant cardholder claims for interchange fees extracted from their accounts.

Since Plaintiffs' allege overpayment of Interchange Fees directly withdrawn and withheld by their Issuer banks from their accounts located at their Issuer banks, and *not* the inflated price of goods and services from merchants, the damages calculations are based on the records of Defendant banks and Visa and MasterCard as alleged in ¶ 6 of the Complaint.  Since Plaintiffs' claims do not allege damages from the inflated price of goods and services purchased from merchants, merchant prices are not involved, per-store calculations regarding the merchant prices of goods and services, and pass-on is not involved, nor are merchant costs or competitive pricing at other stores or substitutes  involved; thus, *Nass-Romero*, 279 P.3d at 779 is inapposite.  Nor is guesswork or speculation involved since the damages will be derived from Defendants and Visa and MasterCard's own records in which each class member's account is directly traceable by cardholder account number; thus, *Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal.App.4th 480, 502 (2011); *Gutzwiller*, 2004 WL 14991, at *9 and *In re Wholesale Elec. Anti-Trust Cases I & II*, 147 Cal.App.4th 1293, 1309 (2007), *Ho*, 2004 WL 1118534, at *2, *Peterson*, 2005 WL 1403761; *Kanne*, 272 Neb. at 496  have no bearing.

### d. *Duplicative Recovery*

Since damages are traceable by cardholder account number, there is no risk of duplicative recovery.  In *Flash*, 643 F.Supp.2d at 1156, the Court said:

> In any event, the Court notes that Plaintiffs have alleged that the alleged overcharges by Defendants are distinct and traceable…[instant Compl. ¶ 6]…In such instances, courts have acknowledged that the risk of duplicative recovery is less of a concern.  *TFT-LCD*, 586 F.Supp.2d at 1124; *GPU [II]*, 540 F.Supp.2d at 1098.

Thus, since damages are alleged to be traceable (Compl. ¶ 6) and payments are traceable by cardholder account number, duplicative recovery is less of a concern.  Second, the merchants and their acquirer banks lack standing.  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 at 1049 (9th Cir. 2008) and *Paycom Billing Servs., Inc. v. MasterCard Int'l*, 467 F.3d 283, 286-87 (2d Cir. 2006).

1   Third, any ongoing suits by merchants who allegedly elected to opt out do not increase the danger of

2   duplication of evidence, facts and damages because the Plaintiffs claims herein are traceable and

3   apportionable and are not based on any pass-on from any merchants.  (Compl. ¶¶ 39-50); all fees are

4   alleged to be automatically apportioned, traceable and accounted for by computer.

5       Plaintiffs sue herein for direct payment by them to their Issuer banks of price-fixed

6   Interchange Fees. Since the cardholder's Issuer bank directly withdraws and withholds the price-

7   fixed amounts from the cardholder's account at her Issuer bank, the alleged injury and damage is

8   direct. (Compl. ¶¶ 39-50).  Defendants have ignored the plainly labeled "Damages" allegation in ¶¶

9   47-50, 104-105, 110, 120 of the Complaint that: "Plaintiffs and the Plaintiff Cardholder Class

10  members paid supra-competitive price-fixed Interchange Fees to Defendants," (e.g. Compl. ¶104).

11  Defendants have looked only at ¶ 101 entitled "Anticompetitive Purpose and Effect," which alleges

12  one of eight anticompetitive purposes and side effects as "101(h) causing increased retail prices for

13  goods and services paid by Cardholders," but there  are no allegations in 101(h) that any damages

14  flowed from the inflated prices of goods and services purchased from merchants, and there are no

15  pass-through allegations of merchant pass-through of costs, fees or monies of any kind, so there is no

16  basis for the Defendants' false characterization that "Plaintiffs seek recovery based on merchants

17  costs, let alone merchant costs that were allegedly the basis of a merchant settlement in *Interchange*

18  *MDL*, 2013 WL 6510737, at *27."  (Defs' Brief  p. 12 lines 8-15.)  Defendants' assertion is a

19  distortion of the allegations of the Complaint, which does not allege that Plaintiffs' damages are

20  based on inflated costs to merchants which the merchants passed on to Plaintiffs by charging higher

21  prices for goods and services, which was alleged in the state cases[4] against Visa U.S.A., Inc.

22

23  [4] *See  Southard v. Visa U.S.A., Inc.*, 734 N.W.2d 192, 194 (Iowa 2007) [plaintiffs alleged that
    "merchants were forced to pay inflated fees for processing debit transactions" and that "these

24  magnified costs were passed along to all consumers in the form of higher prices for the goods sold
    by the merchants"]; *Kanne v. Visa U.S.A., Inc.*, 723 N.W.2d 293, 296 (Neb. 2006) [plaintiffs alleged

25  that the "tying arrangement caused merchants to pay 'supra-competitive, artificially inflated costs'
    for their debit card processing services, and as a result, the merchants passed these costs to

26  consumers through inflated prices for goods"]; *Bennett v. Visa U.S.A., Inc.*, 198 S.W.3d 747, 751
    (Tenn. Ct. App. 2006) [plaintiffs alleged that "tying arrangement" caused merchants to pay higher

27  processing costs which resulted in higher prices "for tangible goods".) *Smith v. Visa U.S.A., Inc.*,
    2005 WL 1936336(Minn. Dist. Ct. July 12, 2005), at *8 [plaintiffs alleged that they paid "inflated

28  prices for goods" as a result of unlawful tying arrangement]; *Peterson v. Visa U.S.A.*, 2005 WL
    1403761(D.C. Super. Ct. April 22, 2005), at *1 [plaintiffs alleged that "they were overcharged on all

14

Instead, the instant Complaint plainly alleges that Plaintiff cardholders' damages consist of inflated direct payments by them from their accounts to their defendant Issuer banks of price-fixed Interchange Fees. (Compl. ¶¶ 39-50; 104-105, 110, 120).

## IV.    CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss should be denied.

Respectfully Submitted,

**ALIOTO LAW FIRM**

Dated:  May 15, 2014              By:  _____ */s/ Joseph M. Alioto*_____
                                        JOSEPH M. ALIOTO
                                        Attorneys for Plaintiffs

**LAW OFFICES OF LINGEL H. WINTERS**

Dated:  May 15, 2014              By:  _____ */s/ Lingel H. Winters*_____
                                        LINGEL H. WINTERS
                                        Attorneys for Plaintiffs

---

consumer goods" because merchants passed on supra-competitive rates "for debit card transactions" as a result of unlawful tying arrangement]; *Goldberg v. Visa U.S.A., Inc.*, 2007 WL 2011732 (D.C. Super. Ct. March 2, 2007) [plaintiffs alleged that merchants "passed on" artificially inflated fees for debit transactions "to consumers by increasing the prices of goods in their establishments"]; *Strang v. Visa U.S.A., Inc.*, 2005 WL 1403769 (Wis. Cir. Ct. Feb. 8, 2005), at *4 [plaintiff alleged that "merchants paid excessive fees for ... debit card services and those costs were passed on to her in the form of inflated prices for goods that she purchased"]; *Fucile v. Visa U.S.A., Inc.*, 2004 WL 3030037 (Vt. Super. Ct. Dec. 27, 2004), at *1 [plaintiff alleged that "merchants were forced to pay higher costs for the use of debit cards" and "passed these costs along to consumers through the price of the goods they sold"]; *Consiglio-Tseffos v. Visa U.S.A., Inc.*, 2004 WL 3030043 (Super. Ct. Ariz. Dec., 8, 2004), at *1 [plaintiffs sought "to recover damages for alleged increased prices on all goods sold by merchants who offered Defendants' credit and debit services"]; *Crouch v. Crompton Corp.*, 2004 WL 2414027 (Super. Ct. N.C. Oct. 28, 2004), at *4 [plaintiff alleged that merchants were "compelled to pay supracompetitive prices" which they passed on to consumers "by raising the price of goods"]; *Tackitt v. Visa U.S.A., Inc.*, 2004 WL 2475281 (Dist. Ct. Neb. Oct. 19, 2004), at *2 [plaintiff alleged a "connection between the purchases made by the plaintiff of general consumer goods and the defendant's alleged unlawful tying of debit services to their credit cards"]; *Beckler v. Visa U.S.A., Inc.*, 2004 WL 1475100 (Dist. Ct. N.D. Sept. 21, 2004), at *1 ["Plaintiffs are consumers who allege that they have paid higher prices on every good that they purchased ... as a claimed consequence of the allegedly excessive debit fees that the merchants paid"]; *Gutzwiller v. Visa U.S.A., Inc.*, 2004 WL 2114991 (Dist. Ct. Minn. Sept. 15, 2004), at *2 [plaintiff alleged that merchants passed on "supra-competitive prices" for debit card services to consumers "in the price of all goods bought by consumers"]; *Stark v. Visa U.S.A., Inc.*, 2004 WL 1879003 (Cir. Ct. Mich. July 23, 2004), at *1-2 [plaintiff alleged that merchants passed on higher costs from unlawful tying arrangement to all "consumers who purchased goods"].); *Ho v. Visa U.S.A., Inc.*, No. 112316/00, 2004 WL 1118534 (N.Y. App. Div. 2005 motion for leave to appeal denied, 833 N.E. 2d 708 (June 14, 2005) (same); *Moore v. Visa U.S.A., Inc.*, Nos. 03 CV 4086, 03 C 5002, 2004 WL 3030032 (Kan. Dist. Ct. Nov. 15, 2004) (same); *Knowles v. Visa U.S.A., Inc.*, No. 03 CV-03-707, 2004 WL 24752284 (Me. Super. Ct. Oct. 20, 2004) (same).

1

**<u>PLAINTIFF'S COUNSEL</u>**

2

3

Joseph M. Alioto, SBN 42680
Theresa D. Moore, SBN 99978
Jaime Miller
ALIOTO LAW FIRM
225 Bush Street, 16th Floor
San Francisco, California 94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
Email: jmiller@aliotolaw.com
Email: tmoore@aliotolaw.com

4

5

6

7

8

Jeffery K. Perkins, SBN 57996
LAW OFFICES OF JEFFERY K. PERKINS
1550-G Tiburon Boulevard, Box 344
Tiburon, California 94920
Telephone: (415) 302-1115
Facsimile: (415) 435-4053
Email: jefferykperkins@aol.com

9

10

11

12

John H. Boone SBN 44876
LAW OFFICE OF JOHN H. BOONE
4319 Sequoia Dr.
Oakley, California 94561
Telephone: (415) 317-3001
Email: deacon38@gmail.com

13

14

15

Lawrence G. Papale SBN 67068
Law Offices of Lawrence G. Papale
The Cornerstone Building
1308 Main Street, Suite 117
St. Helena, California 94574
Telephone: (707) 963-1704
Email: lapapale@papalelaw.com

16

17

18

19

Lingel H. Winters, SBN 37759
LAW OFFICES OF LINGEL H. WINTERS
275 Battery St. Suite 2600
San Francisco, California 94111
Telephone: (415) 398-2941
Facsimile: (415) 393-9887
Attorneys for Plaintiff

20

21

22

23

Theodore Schwartz
Schwartz & Schwartz
7751 Carondelet Avenue, Suite 204
Clayton, Missouri 63105
Telephone: (314) 863-4444
Facsimile: (314) 862-4357
Email: Theodore@schwartz-schwartz.com

24

25

26

27

28

16

**ECF ATTESTATION**

I, Lingel H. Winters, am the ECF User whose ID and Password are being used to file this:

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

In compliance with Civil L.R. 5-1(i)(3), I hereby attest that Joseph M. Alioto concurred in this filing.

**LAW OFFICES OF LINGEL H. WINTERS**

Dated: May 15, 2014                By: _____ */s/ Lingel H. Winters* _____

LINGEL H. WINTERS
Attorneys for Plaintiffs