**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

IN RE PAYMENT CARD
INTERCHANGE FEE AND MERCHANT
DISCOUNT ANTITRUST LITIGATION

Case No. 14-MD-01720 (JG) (JO)

---

This Document Applies to:

*Salveson, et al. v. JP Morgan Chase & Co., et al.*, Case No. 1:14-cv-03529

ORAL ARGUMENT REQUESTED

**DEFENDANTS' REPLY MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................1

ARGUMENT ..........................................................................................................................2

I.   PLAINTIFFS LACK STANDING TO ASSERT THEIR FEDERAL AND
     STATE ANTITRUST CLAIMS.................................................................................2

    A.   Plaintiffs' "Intertwined" Markets Theory Fails to Satisfy the First *AGC*
          Factor that Plaintiffs Participate in a Restrained Market. ......................................3

    B.   Plaintiffs' Traceability Argument—Offered in Response to the Second
          Through Fifth *AGC* Factors—Fails to Address the Speculative Nature of
          Any Injury to Cardholders or the Risk of Duplicative Recoveries. ........................5

    C.   The Complaint Should Be Dismissed for Failing to Allege Any
          Cognizable Injury.................................................................................................6

        1.   Plaintiffs Have Disavowed Any Overcharge for the Goods and
               Services They Purchased. .............................................................................6

        2.   Plaintiffs' Theory That They Were Directly Injured By Paying
               Interchange Fees is Foreclosed by the Pleadings and Case Law. ...............8

CONCLUSION.......................................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Associated Gen. Contractors v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983)....................................................................................3, 4, 5, 7

*Blue Shield v. McCready*,
  457 U.S. 465 (1982)......................................................................................4

*Daniel v. Am. Bd. of Emergency Med.*,
  269 F. Supp. 2d 159 (W.D.N.Y. 2003) *aff'd*, 428 F.3d 408 (2d Cir. 2005) .............................3

*Eagle v. Star-Kist Foods, Inc.*,
  812 F.2d 538 (9th Cir. 1987) .......................................................................3

*Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*,
  198 Cal. App. 4th 1366. (2011) ...................................................................7

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
  711 F.3d 68 (2d Cir. 2013).........................................................................7

*Ill. Brick Co. v. Illinois*,
  431 U.S. 720 (1977)...................................................................................2

*In re ATM Fee Antitrust Litigation*,
  686 F.3d 741 (9th Cir. 2012) ..................................................................9, 10

*In re Cathode Ray Tube (CRT) Antitrust Litigation*,
  738 F. Supp. 2d 1011 (N.D. Cal. 2010) ...................................................4, 5

*In re Digital Music Antitrust Litig.*,
  812 F. Supp. 2d 390 (S.D.N.Y. 2011).......................................................3, 8

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  536 F. Supp. 2d 1129 (N.D. Cal. 2008) ....................................................3

*In re Flash Memory Antitrust Litig.*,
  643 F. Supp. 2d 1133 (N.D. Cal. 2009) ....................................................5

*In re Graphics Processing Units Antitrust Litig.*,
  540 F. Supp. 2d 1085 (N.D. Cal. 2007) ....................................................5

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
  No. 05-md-1720, 2013 WL 6510737 (E.D.N.Y. Dec. 13, 2013) ..............................9

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) ....................................................5

*Kanne v. Visa U.S.A. Inc.*,
   272 Neb. 489 (2006) ................................................................................................5

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ...........................................................................6, 9

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) ..................................................................................4

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ..................................................................................................7

*Meyer v. Qualcomm Inc.*,
   No. 08CV655 WQH (LSP), 2009 WL 539902 (S.D. Cal. Mar. 3, 2009)................................3

*Nass-Romero v. Visa U.S.A. Inc.*,
   279 P.3d 772 (N.M. Ct. App. 2012)........................................................................5

*Paycom Billing Services, Inc. v. MasterCard Int'l, Inc.*,
   467 F.3d 283 (2d Cir. 2006).................................................................................6, 7

*Somers v. Apple, Inc.*,
   729 F.3d 953 (9th Cir. 2013) ...............................................................................7, 8

*Southard v. Visa U.S.A. Inc.*,
   734 N.W.2d 192 (Iowa 2007) ..................................................................................4

*United States v. Concentrated Phosphate Exp. Ass'n*,
   393 U.S. 199 (1968).................................................................................................8

*United States v. Visa U.S.A., Inc.*,
   344 F.3d 229 (2d Cir. 2003)....................................................................................9

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*,
   454 U.S. 464 (1982)................................................................................................7

## INTRODUCTION

Plaintiffs purport to represent a class of every person in the country who has used a credit card as payment in the last 14 years.  As defendants demonstrated in their opening brief,[1] these cardholder plaintiffs lack standing to bring their federal and state antitrust claims because cardholders do not purchase credit card network services or pay interchange fees.  Any downstream impact that interchange fees might have on the price cardholders do pay—the purchase price of innumerable retail goods and services sold by merchants (to both customers who pay by credit card and those who pay by cash)—is too remote to satisfy standing requirements.  (*See, e.g.*, Opening Br. at 6 n.5) (collecting more than 20 cases dismissing similar consumer claims for lack of standing).)

In opposition, plaintiffs argue that their complaint is unique because they are not claiming such a downstream impact; they eschew an allegation that they paid an inflated price for the goods and services purchased by credit card.  (Opp'n at 13, 14.)  Plaintiffs' awkward insistence that they paid the fair value of the goods they purchased, and not a penny more, requires dismissal of the complaint in its entirety for another reason:  Plaintiffs' failure to allege any cognizable injury.  If plaintiffs did not overpay for the goods and services they purchased, they could not have been injured by the antitrust conspiracy they allege.  Plaintiffs claim in their opposition that *cardholders* were injured by paying the allegedly wrongful interchange fees, but this argument is foreclosed by plaintiffs' own pleading, which recognizes that interchange fees are "transfer fees between *financial institutions*" (emphasis added).  (Compl. ¶ 40.)

The rest of plaintiffs' arguments fare no better.  Plaintiffs argue that the markets for card services and for network services are "inextricably linked and intertwined" (Opp'n at 8-10), but that is inconsistent with established interchange fee case law and does not solve the problem that plaintiffs pay no portion of the fees for network services.  Plaintiffs also assert that it is possible

---

[1] This case was originally filed in the United States District Court for the Northern District of California, Case No. 4:13-cv-05816-SBA.  On June 4, 2014, the United States Judicial Panel on Multidistrict Litigation transferred this case to the Eastern District of New York for inclusion in MDL 1720.  *See* Transfer Order (June 4, 2014), ECF No. 61.  Defendants' opening brief and Plaintiffs' opposition were filed in the Northern District of California before this case was transferred.  Those briefs appear as docket nos. 38 and 52, respectively.

to trace how much of the fees collected relate to their transactions.  That is irrelevant, because it does not suggest an *injury* to plaintiffs.  For all of these reasons, the motion to dismiss should be granted and plaintiffs' claims dismissed with prejudice.

## ARGUMENT

## I.  PLAINTIFFS LACK STANDING TO ASSERT THEIR FEDERAL AND STATE ANTITRUST CLAIMS[2]

Every time cardholders have brought antitrust suits based on the allegedly illegal setting of interchange fees—more than twenty cases and counting—they have been dismissed for lack of standing.  (*See* Opening Br. at 6 n.5.)  Because cardholders do not purchase network services or pay interchange fees, any alleged downstream impact on the price of retail consumer goods is, as a matter of law, derivative and too remote to confer standing under well-established antitrust standing principles.  Plaintiffs respond by asserting that they have standing either because they pay interchange fees directly in the payment card market or because the payment card market and the network services markets are intertwined and cardholder damages are traceable.  But they fail to explain why this Court should disregard the overwhelming body of case law that directly refutes each of these arguments.  Nor do they explain how the supposed "traceability" of interchange fees to a cardholder's account changes the fact that parties who stand closer to the alleged network services market could seek (and indeed have sought) to recover the same alleged damages at issue here.  Simply put, plaintiffs' claims are duplicative of—and more remote than—the merchant interchange claims over which this Court has presided since 2005.

Moreover, in an effort to escape the overwhelming precedent holding that consumers lack standing to bring this type of claim, plaintiffs disavow any allegation that the prices of goods and services they purchased were inflated.  Plaintiffs' entire opposition rests on the assertion that interchange fees are realized from the funds extracted from their accounts and that the fees are

---

[2] Part I of Plaintiffs' opposition, asserting that their price-fixing allegations are sufficiently plead, has no bearing on defendant's motion to dismiss for lack of standing.  Plaintiffs also fail to address defendants' argument that their federal claims are barred by the *Illinois Brick* doctrine, which holds that only *direct* purchasers can recover damages for asserted antitrust violations (*see* Opening Br. at Section II; *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 737 (1977)), so defendants do not repeat that argument here.

"traceable" to their transactions.  (*See, e.g.*, Opp'n at 3-4 (only after "extracting the price-fixed 'interchange fee' directly from the cardholder's account," the card-issuing bank pays the merchant's acquiring bank); *see also id.* at 7, 11, 13.)  Plaintiffs' disavowal of any price inflation for goods and services is also fatal to their claims because, in the absence of purchase price inflation, cardholders cannot allege a cognizable injury.

### A. Plaintiffs' "Intertwined" Markets Theory Fails to Satisfy the First *AGC* Factor that Plaintiffs Participate in a Restrained Market.

As set forth in defendants' opening brief, because plaintiffs are not participants in the allegedly restrained market in which interchange fees are assessed, the first *AGC* factor weighs strongly against standing.  (*See* Opening Br. at 7-8, citing *Associated Gen. Contractors v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 538-45 (1983); *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 539-43 (9th Cir. 1987) (fishing boat employees lacked standing because they were not parties to their employer's agreements to sell fish and thus were neither consumers nor competitors in the relevant market).)  Plaintiffs acknowledge that they are not market participants in the network services market, but assert that the payment card market and the network services market are "inextricably intertwined."  (Opp'n at 5, 8-10.)  But "the simple invocation of [the phrase 'inextricably intertwined'] will not allow a plaintiff to avoid the fundamental requirement for antitrust standing that he or she have suffered" antitrust injury.  *Meyer v. Qualcomm Inc.*, No. 08CV655 WQH (LSP), 2009 WL 539902, at *7 (S.D. Cal. Mar. 3, 2009) (citation omitted) (dismissing claims for lack of standing and declining to apply the exception).

To qualify for the narrow "intertwined market" exception, a plaintiff must suffer a "direct" injury.  *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 403 (S.D.N.Y. 2011) (rejecting inextricably intertwined argument and dismissing claims where "the *conduct* was directed at an entirely separate group of plaintiffs, and any effect on [purchasers] was at best indirect" (emphasis added)).  *See also Daniel v. Am. Bd. of Emergency Med.*, 269 F. Supp. 2d 159, 186 (W.D.N.Y. 2003) *aff'd*, 428 F.3d 408 (2d Cir. 2005) (finding "[n]o similar intertwining" where "Plaintiffs' injuries are indirect"); *In re Dynamic Random Access Memory*

*(DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1139 (N.D. Cal. 2008).

Plaintiffs do not allege the type of direct harm through intertwined markets that has been held to fall within this limited exception.  For example, in *Blue Shield v. McCready*, 457 U.S. 465 (1982), plaintiff was a patient alleging defendant boycotted clinical psychologists so that patients bore the cost.  The Supreme Court found that the plaintiff had standing to sue on the grounds that she was a consumer in the allegedly restrained market, who suffered an injury that was direct rather than derivative, and that posed no risk of duplicative recovery or speculative damages.  *See id.* at 467, 474-81.  As the Supreme Court subsequently confirmed, the *Blue Shield* plaintiff "was a consumer of the psychotherapeutic services [alleging] that she had been injured by the defendants' conspiracy to restrain competition in the market for such services." *AGC*, 459 U.S. at 538.  *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000), involved defendant milk buyers who sought to fix the price of the very product—milk— that they were purchasing and plaintiffs were selling.  To achieve that end, the defendants allegedly rigged the price of a related product—bulk cheese—which directly depressed the price that the plaintiff milk producers could charge for milk.  *Id.*  In other words, the defendants' action in a related market led to direct economic loss to the plaintiffs in the very milk market in which defendants sought to fix prices.[3]

The "inextricably intertwined" argument is also contrary to well-established precedent establishing that payment cards and network services are distinct markets.  Each of the prior consumer suits holds that because consumers do not participate in the network services market, they lack standing to challenge conduct in that market.  *See, e.g*, *Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192, 199 (Iowa 2007) (holding that consumers "are neither consumers of the defendants' products nor competitors of the defendants . . . [and] [t]herefore, . . . not 'participants

---

[3] In *In re Cathode Ray Tube (CRT) Antitrust Litigation*, purchasers of televisions and computer monitors alleged that the defendants fixed the price of cathode ray tubes and "monitored the prices of televisions and computer monitors in order to police their price fixing agreement."  738 F. Supp. 2d 1011, 1024 (N.D. Cal. 2010).  Here, the analogy would be if the credit card networks policed the price of goods and services sold by all merchants that accepted credit cards.  Needless to say, that is not what is alleged.

in the relevant market'") (*quoting AGC*, 459 U.S. at 538).[4]

Plaintiffs' remaining cases—offered in support of their "intertwined" argument as well as to assert that interchange fees are "traceable" (*see* Opp'n at 9-10, 11, 12, 13)—are irrelevant. They all involve claims under state laws that are not barred by *Illinois Brick*, and in each the plaintiff could trace his injury because the claimed overcharge was clearly passed through. *See In re CRT Antitrust Litig.*, 738 F. Supp. 2d at 1023 (alleged overcharge for cathode ray tubes significantly intertwined and traceable through market for televisions and computer monitors that contain cathode ray tubes); *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1098-99 (N.D. Cal. 2007) (market for GPUs and market for computers that contain GPUs); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123-24 (N.D. Cal. 2008) (market for TFT-LCD panels and market for finished products containing TFT-LCD panels); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1150-56 (N.D. Cal. 2009) (market for NAND flash memory and finished products containing NAND flash memory). In each case, the court considered whether the overcharge to the ultimate consumer could be traced through the stream of commerce to the finished product. Here, because plaintiffs expressly disavow reliance on an overcharge pass-through theory, or a claim that the prices they paid for goods and services were inflated at all, (Opp'n at 13-14), these cases are beside the point.

### B. Plaintiffs' Traceability Argument—Offered in Response to the Second Through Fifth *AGC* Factors—Fails to Address the Speculative Nature of Any Injury to Cardholders or the Risk of Duplicative Recoveries.

On the fifth *AGC* factor, defendants' opening brief demonstrated a serious risk of duplicative recovery from both the merchant-class settlement and the ongoing lawsuits by merchants who chose to opt out of the class settlement and are now pursuing claims in this litigation. Those merchants seek to recover for the same interchange fees on the same transactions that are the subject of plaintiffs' suit. (*See* Opening Br. at 12.) Plaintiffs respond by stating throughout their brief that because their "damages are traceable by cardholder account

[4] *See also, e.g., Kanne v. Visa U.S.A. Inc.*, 272 Neb. 489, 494 (2006); *Nass-Romero v. Visa U.S.A. Inc.*, 279 P.3d 772, 778 (N.M. Ct. App. 2012).

number, there is no risk of duplicative recovery."  (Opp'n at 13.)  But this argument misses the point.  It is irrelevant whether one can "trace" the amount of interchange that may be related to an individual cardholder's payment card purchase:  Even if true, it would be duplicative to permit cardholders to recover the same interchange fees that merchants also seek (and have recovered in settlement) from the same defendants.  Moreover, plaintiffs have failed to allege that cardholders were *injured* by those payments.  (*See* Section I.C.)[5]

## C.    The Complaint Should Be Dismissed for Failing to Allege Any Cognizable Injury

Plaintiffs ask this Court to ignore the more than twenty state and federal courts and the complaint itself—all of which recognize that interchange fees are "transfer fees between financial institutions" (Compl. ¶ 40), not a fee paid by the cardholder.  Ultimately, plaintiffs' contention is that when a consumer pays an admittedly uninflated sticker price for a good or service received, he has been injured if, based on the payment method, the *merchant* receives something less than that full sticker price.  This theory has no support in law and violates basic common sense.  The Court should reject it.

### 1.    Plaintiffs Have Disavowed Any Overcharge for the Goods and Services They Purchased.

As discussed in defendants' opening brief, the complaint alleges that defendants' conduct resulted in "*increased retail prices for goods and services* paid by Cardholders."  (Compl. ¶ 101(h) (emphasis added).)   Now, to avoid dismissal on either standing or *Illinois Brick* grounds, like all prior cardholder cases premised on the allegedly illegal setting of network interchange

---

[5] Plaintiffs cite *Kendall v. Visa* and *Paycom Billing Services v. MasterCard* to argue that apportioning damages would not be complex and that no risk of duplicative recovery exists because the merchant and acquirer banks are in a worse position to bring suit.  (*See* Opp. at 12, 13-14.)  The cases do not support their argument; in fact, they conclude that even merchants lack antitrust standing because it is the acquiring banks that pay the interchange fees.  *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1050 (9th Cir. 2008) (stating that merchants "failed to allege any facts establishing that there is no realistic possibility acquiring banks will not sue Visa or MasterCard").  The plaintiff in *Paycom* stood in the same position as the merchants in *Kendall*.  Paycom, a merchant, brought an antitrust suit against MasterCard challenging the network's supracompetitive setting of chargeback fees on payment card purchases.  *See Paycom Billing Serv., Inc. v. Mastercard Int'l., Inc.*, 467 F.3d 283, 288 (2d Cir. 2006).  Like interchange fees, chargebacks are fees paid by acquiring banks to card issuing banks.  *Id.* at 286-87.  The Second Circuit held plaintiff Paycom to be an indirect purchaser whose claims were barred because it paid chargebacks only in the event the issuer chose to assess a chargeback fee, and then only if the acquirer passed that chargeback fee on to the merchant.  *Id.* at 285-287.

fees, plaintiffs insist that their injury is "*not the inflated price of goods and services* from merchants," but rather stems from the fact that money is withdrawn from their accounts. (Opp'n at 13 (emphasis added).)  They say:

> Since *Plaintiffs' claims do not allege damages from the inflated price of goods and services purchased from merchants*, merchant prices are not involved, per-store calculations regarding the merchant prices of goods and services, and pass-on is not involved, nor are merchant costs or competitive pricing at other stores or substitutes involved.

(*Id*. (emphasis added).)  Again, on the following page, plaintiffs insist that construing the complaint to allege price inflation "is a distortion of the allegations of the Complaint, which does not allege that Plaintiffs' damages are based on inflated costs to merchants which the merchants passed on to Plaintiffs by charging higher prices for goods and services."  (*Id.* at 14.)

Plaintiffs' express disavowal of any overcharge for the goods and services they purchased requires dismissal of their claims for failure to allege any injury.  Antitrust injury is a threshold requirement for standing.  *See AGC*, 459 U.S. at 538-45; *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013).[6]  A sufficient allegation of antitrust injury requires four elements:  "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent."  *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (*citing Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1056 (9th Cir. 1999)).  *See also Paycom*, 467 F.3d at 290. The same requirement applies to claims brought under the Cartwright Act.  *Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc*., 198 Cal. App. 4th 1366, 1378. (2011).[7]

---

[6] The factors that determine antitrust standing are whether (1) the plaintiff is a competitor or consumer in the allegedly restrained market; (2) the injury alleged is a direct, first-hand impact of the restraint alleged; (3) there are more directly harmed plaintiffs with motivation to sue; (4) the damages are too speculative; and (5) the plaintiff's claims risk duplicative recovery and would require a complex apportionment of damages.  *AGC*, 459 U.S. at 538-45; *see also* Opening Br. at 7.

[7] For the same reasons, Plaintiffs fail to allege a basis for Article III standing, a threshold requirement for federal jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-560 (1992).  At a constitutional minimum, standing requires a party invoking federal jurisdiction to show that she has "suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision."  *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982) (citations omitted).

1143022

Where they do not allege any price impact, consumers' antitrust claims should be dismissed for failure to allege the second element—causing an injury to the plaintiff. *See Somers*, 729 F.3d at 964. The plaintiff in *Somers* alleged that Apple's anticompetitive conduct caused inflated music prices. The Ninth Circuit affirmed dismissal on the grounds that the plaintiff failed to adequately allege antitrust injury because the plaintiff's own allegations demonstrated that the price per song did not change after Apple allegedly gained a monopoly in the market. "Unfortunately for Somers, her own allegations do not square with her overcharge theory. Somers claims that the price for music downloads remained the same (99 cents) since it entered the market in 2003, *before* it obtained monopoly in the audio download market, and *after* it allegedly acquired monopoly in that market in 2004." *Id.* (emphasis in original). *See also In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d at 402 (dismissing antitrust claims for lack of standing where the complaint "contains no nonconclusory allegations about" an effect on pricing").

The need for dismissal is even clearer here because plaintiffs not only fail to allege facts that would support an overcharge theory, they expressly disavow it. (Opp'n at 13-14.)

### 2. Plaintiffs' Theory That They Were Directly Injured By Paying Interchange Fees is Foreclosed by the Pleadings and Case Law.

Plaintiffs' newly minted theory that they are directly injured by interchange fees not only defies logic, but also cannot be reconciled with their own pleading, their opposition, or the extensive body of interchange fee case law.

The complaint itself concedes the economic reality that cardholders do not pay interchange fees.[8] Rather, when a cardholder uses his or her Visa or MasterCard payment card for a $100 purchase, exactly $100 is deducted from the cardholder's account. (Compl. ¶ 48.) Discussing the same credit card transaction and interchange fee structure, the Ninth Circuit has explained that when "[a] customer purchases dinner for $100 from a merchant using his Visa

---

[8] When "interpreting the antitrust laws, . . . [w]e must look at the economic reality of the relevant transactions." *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 208 (1968) (looking to where the "burden of noncompetitive pricing fell" to determine whether an exemption to the antitrust laws applied).

credit card . . . [a]t the end of the transaction, the customer and his family are fed, for which he pays $100 to the issuing bank . . . . [and the] merchant receives $97 for the dinner." *Kendall*, 518 F.3d at 1045-46 (affirming dismissal of complaint alleging that setting of interchange rates violates Sherman Act). *See also United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 235 (2d Cir. 2003) (for a $100 sale, "the merchant typically will receive $98, the issuing bank retaining $1.40, while the acquiring bank retains 60 cents," an aggregate of exactly $100 withdrawn from cardholder's account). In other words, cardholders pay no transaction fee on top of the purchase price.

Moreover, any change in the interchange fee would have no impact on the cardholder because the original purchase price is owed to the acquiring bank, less any interchange fees contractually agreed upon between the two banks. (*See* Opp'n at 3-4 ("the issuer bank withholds a small amount (called the 'interchange fee') *from the monies due and owing the merchant bank*") (emphasis added) (quoting *Nat'l Bancard Corp.* ("*NaBanco*") *v. Visa U.S.A., Inc.*, 596 F. Supp. 1231, 1238 (S.D. Fla. 1984)); *id.* at 4 ("the issuing bank *pays the acquiring bank the original amount minus a fee* of around two percent") (emphasis added) (quoting *Kendall*, 518 F.3d at 1045; *id.* (the "issuing bank . . . *transmits the purchase price to the acquiring bank, deducting* an 'interchange fee'") (emphasis added) (quoting *Paycom*, 467 F.3d at 286); *see also* Compl. ¶ 49 ("[t]he issuer then pays the acquiring bank the amount requested, less [the interchange fee]"); *accord In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, No. 05-md-1720, 2013 WL 6510737, at *1 (E.D.N.Y. Dec. 13, 2013). In other words, whatever is left over after the issuing bank accounts for its interchange fee, it is obligated to "transmit the balance to the merchants' acquiring bank" (Opp'n at 3), so there is no but-for world in which the cardholder would benefit or gain from a change in the interchange fee, other than through a change in its purchase price, a theory plaintiffs expressly disavow here.

Plaintiffs' effort to distinguish *In re ATM Fee Antitrust Litigation* ("*ATM Fee*"), 686 F.3d 741 (9th Cir. 2012), also misses the mark. Plaintiffs say that *In re ATM Fee* is inapposite because it involved "the 'interchange fee' paid on 'foreign ATM' transactions, not at [a

cardholder's] own bank."  (Opp'n at 6.)  That is a distinction without a difference.  The cardholders in that case were, if anything, less remote from the fees about which they complained than the interchange fee here, because there the cardholders dealt with a second bank (the ATM operator or "acquiring bank") that paid the interchange fee and not with a merchant who contracted with an acquirer that paid the interchange fee.  In any event, the ATM interchange fees were paid from the card-issuing bank to the foreign ATM owner, and the plaintiff ATM cardholders contended that the issuing banks passed on these interchange fees to the cardholders as part of separate "foreign ATM fees."  *ATM Fee*, 686 F.3d at 746.  By the plaintiffs' logic here, the ATM cardholders were the direct payors of those interchange fees because the money was "extracted" from their account.  But the Ninth Circuit held the ATM cardholders claims were barred because they do not pay the allegedly unlawful fee directly (their ATM card-issuing banks do).  *Id.* at 750-51.

Lastly, plaintiffs' argument is contradicted by plaintiffs' own allegations.  The complaint acknowledges that interchange fees are "transfer fees between financial institutions."  (Compl. ¶ 40.)  With respect to the logistics of processing those fees, the complaint recognizes that banks utilize "net daily account settlement of payment card transactions among Defendants and their co-conspirator Visa and MasterCard members."  (*Id.* ¶ 36.)  In other words, the interchange fees are settled daily between institutions and not actually processed by extracting the interchange fee for each transaction from each cardholder's account on a transaction-by-transaction basis.

## CONCLUSION

For the reasons set forth above, defendants respectfully request that the Court dismiss the complaint with prejudice.

1143022

Dated:  June 10, 2014.                         Respectfully submitted,

                                               **MORRISON & FOERSTER LLP**

                                               By:  /s/ Mark P. Ladner
                                                      Mark P. Ladner
                                                      Michael B. Miller
                                                      250 West 55th Street
                                                      New York, NY  10019
                                                      Telephone: (212) 468-8000
                                                      Facsimile:  (212) 468-7900
                                                      Email:  mladner@mofo.com

                                                      *Attorneys for Defendants*
                                                      *BANK OF AMERICA CORPORATION;*
                                                      *BANK OF AMERICA, N.A.*


                                               **SKADDEN, ARPS, SLATE, MEAGHER**
                                               **& FLOM LLP**

                                               By:  /s/ Peter E. Greene
                                                      Peter E. Greene
                                                      Peter S. Julian
                                                      Boris Bershteyn
                                                      Four Times Square
                                                      New York, NY  10036
                                                      Telephone: (212) 735-3000
                                                      Facsimile:  (212) 735-2000
                                                      Email:  peter.greene@skadden.com

                                                      *Attorneys for Defendants*
                                                      *JPMORGAN CHASE & CO.;*
                                                      *JPMORGAN BANK, N.A.*

                                               **O'MELVENY & MYERS LLP**

                                               By:  /s/ Abby F. Rudzin
                                                      Andrew F. Frackman
                                                      Abby F. Rudzin
                                                      Times Square Tower
                                                      7 Times Square
                                                      New York, NY  10036
                                                      Telephone: 212-326-2000
                                                      Facsimile:  212-326-2061
                                                      Email: afrackman@omm.com
                                                      Email: arudzin@omm.com

                                                      *Attorneys for Defendants*
                                                      *CAPITAL ONE F.S.B.;*
                                                      *CAPITAL ONE FINANCIAL*
                                                      *CORPORATION;*
                                                      *CAPITAL ONE BANK*

1143022

**WILMER CUTLER PICKERING
HALE AND DORR LLP**

By: /s/ David Lesser
      David Lesser
      7 World Trade Center
      250 Greenwich Street
      New York, New York  10007
      Telephone: 212-230-8800
      Facsimile: 212-230-8888
      Email:  david.lesser@wilmerhale.com

*Attorneys for Defendants*
*HSBC FINANCE CORPORATION;*
*HSBC BANK USA, N.A.*

12

1143022