**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION** | **Case No:  14-MD-01720 (MB) (JO)** |
| **This Document Applies to:** | ***SALVESON* PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR RECONSIDERATION AS TO STATE LAW CLAIMS** |
| ***Salveson, et al. v. JP Morgan Chase & Co., et al.*, Case No. 1:14-cv-03529** | |

**Introduction**

Defendants' cross-motion for reconsideration turns on the incorrect notion that a California State law Cartwright Act claim is identical to a Sherman Act claim.  That this is incorrect is shown in *California v. ARC America*, 490 U.S. 93 (1989), in which the U.S. Supreme Court departed from *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) by upholding the right of indirect purchasers to sue under the California Cartwright Act.  Likewise, in *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758 (2010), 2010 Cal. LEXIS 6620, the California Supreme Court also departed from *Illinois Brick* and *Associated General Contractors of California  Inc. v. Carpenters*, 459 U.S. 519 (1983) by confirming the right of indirect purchasers to sue under the Cartwright Act, but also by permitting *allocation* of damages between  direct claimants and indirect claimants under the Cartwright Act departing from *Associated General Contractors'* concerns with allegedly duplicative damages.  The differences between the Cartwright Act and the Sherman Act are further set forth in *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 985 (9th Cir. 1987), cited by defendants.

**1.       The U.S. Supreme Court Upholds State Law Indirect Purchaser Claims**

Subsequent to *Illinois Brick v. Illinois*, 431 U.S. 720, the California legislature enacted a repealer of *Illinois Brick* by amending sec. 16750(a) of the California Bus. & Prof. Code –the Cartwright Act-- to permit indirect purchasers to bring state antitrust claims "regardless of whether such injured person dealt directly or indirectly with the defendant."  Thereafter, in

*California v. ARC America*, 490 U.S. 93 (1989), a defendant challenged the right of indirect purchasers with state law claims to share in a settlement, citing *Illinois Brick* and *Associated General Contractors*, 459 U.S. 519 (1983). In upholding the right of indirect purchasers to bring state law claims under California's Cartwright Act, the U.S. Supreme Court in *ARC America* held that *Illinois Brick* and *Associated General Contractors* merely construe the scope of sec. 4 of the Clayton Act; they do not affect the right of indirect purchasers to sue under State antitrust laws, stating:

> "*Illinois Brick* was concerned that requiring direct and indirect purchasers to apportion the recovery under a single statute—sec. 4 of the Clayton Act—would result in no one plaintiff having sufficient incentive to sue under that statute. State indirect purchaser statutes pose no similar risk to the enforcement of the federal law.

A.   In *California v. ARC America*, The Supreme Court Held That *Associated General Contractors* And *Illinois Brick* Apply to Federal Claims, Not To State Antitrust Laws Such As The Cartwright Act

In *California v. ARC America*, *supra*, the High Court in discussing "multiple liability"—stated:

> But *Illinois Brick*, as well as *Associated General Contractors* and *Blue Shield* [*of Virginia v. McReady*, 457 U.S.465 (1982)], all were cases construing sec. 4 of the Clayton Act; *in none of those cases did the Court identify a federal policy against States imposing liability in addition to that imposed by federal law*. Ordinarily, state causes of action are not preempted solely because they impose liability over and above that authorized by federal law, see *Silkwood v. Kerr-McGee Corp.*, 464 U.S. at 257-258; *California v. Zook*, 336 U.S. 725, 736 (1949), and no clear purpose of Congress indicates that we should decide otherwise in this case. 490 U.S. 105-106.
>
> When viewed properly, *Illinois Brick* was a decision construing the federal antitrust laws, *not a decision defining the interrelationship between the federal and state antitrust laws*. The congressional purposes on which *Illinois Brick* was based provide no support for a finding that state indirect purchaser statutes are pre-empted by federal law. 490 U.S. 105-106. (Emphasis supplied).

The Court concluded that *Associated General Contractors* and *Illinois Brick* were limited to construing the *federal* antitrust laws, and that *Illinois Brick* did not define "the interrelationship between the federal and state antitrust laws," or impose limitations on state law. Thus the Court acknowledged the concurrent powers of the States to enact their own independent antitrust laws free from the limitations the Court imposed on the federal antitrust laws in

*Associated General Contractors* and *Illinois Brick*, and made it clear that duplicative damages are not an issue in an indirect purchaser case under State law since damages may be allocated. 490.U.S. 104-105.

In *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758 (2010), 2010 Cal. LEXIS, the California Supreme Court upheld the right of indirect purchasers to sue under the Cartwright Act, despite the fact the court restricted pass-on as a defense under state law. The Court stated:

> "For state antitrust purposes, the *Hanover Shoe* rule should apply *even as indirect purchasers are allowed to sue.* We therefore conclude, under the Cartwright Act as under federal law, that a pass-on defense generally may not be asserted. *Instead, in an antitrust price-fixing case, the presumptive measure of damages is the amount of the overcharge paid by the plaintiffs.*" 2010 Cal. LEXIS 6620 at p. 22 (Emphasis supplied).

Thus, in construing the Cartwright Act, the California Supreme Court agreed with *Hanover Shoe*, but deviated markedly from the U.S. Supreme Court's ruling in *Illinois Brick Co. v. Illinois.*

Thus, the California Supreme Court interpreted the Cartwright Act as departing from *Illinois Brick's total bar* of indirect purchaser claims under the Sherman Act, to permit recovery for indirect purchasers under state law and *allocation* of damages between direct purchasers for their federal law claims and indirect purchasers for their state law claims as stated in *ARC America*, 490. U.S. 104-105.

In *Clayworth v. Pfizer*, *supra*, the California Supreme Court completely departed from *Illinois Brick* and *Associated General Contractors* principles in interpreting the Cartwright Act, holding, for instance, that any issues regarding duplication of damages could be resolved through allocation of damages-- not prohibition. The Court created an exception for suits involving multiple levels of purchasers, stating:

> In instances where multiple levels of purchasers have sued, or where a risk remains they may sue, trial courts and parties have at their disposal and may employ joinder, interpleader, consolidation, and the like procedural devices to bring all claimants before the court. In such cases, if damages must be *allocated among the various levels of injured purchasers*, the bar on consideration of pass-on evidence must necessarily be lifted; the defendants may assert a pass-on defense as needed to avoid duplication in the recovery of damages. (Emphasis supplied) 2010 Cal. LEXIS 6620 at p. 22 (Emphasis supplied).

In *TFT-LCD (Flat Panel) Antitrust Litigation* MDL 07-1827, the Northern District of

California implemented this policy by certifying a direct purchaser class under the Sherman Act and an indirect purchaser class under State antitrust law, each of which settled separately. (*Salveson* Co-Lead Counsel represented the *TFT-LCD* indirect purchaser class in a $1.1 billion settlement (See Curricula Vitae at Dkt. #65 herein).

      **B.**    ***Associated General Contractors* Does Not Apply To Cartwright Act Cases, But Even If It Did, The *Salveson* Complaint Complies**

    In *Clayworth v. Pfizer*, *supra*, the California Supreme Court completely departed from *Illinois Brick* and *Associated General Contractors* principles in interpreting the Cartwright Act, holding, for instance, that indirect purchasers could sue under the Act, and that any issues regarding duplication of damages could be resolved through allocation of damages-- not prohibition. In *re TFT-LCD (Flat Panel) Antitrust Litig. ("TFT-LCD")*, 586 F.Supp.2d 1109, 1123-1124 (N.D. Cal. 2008), and in *In re Graphics Processing Units Antitrust Litigation*, 540 F.Supp.2d 1085 (N.D. Cal. 2007) the courts denied motions to dismiss, ruling that it was inappropriate to apply the *Associated General Contractors* test to plaintiffs' State claims under repealer statutes such as the Cartwright Act, in the absence of a clear directive from those states' legislatures or highest courts to do so, in disregard of *Vinci v. Waste Mgmt., Inc.* 36 Cal.App.4th 1811 (1995). But even these cases are superseded by the California Supreme Court's departure from *Associated General Contractors* ("*AGC*") in *Clayworth v. Pfizer*, *supra*. in 2010 in upholding the standing of indirect purchasers under the Cartwright Act and the approval of allocating damages between direct and indirect purchasers rather than denying damages to indirect purchasers as called for in *Illinois Brick* and *Associated General Contractors*. California Rule of Court Rule 8.1105(b) provides that unpublished Court of Appeal or Superior Court opinions such as *In re Credit/Debit Card Tying Cases*, No. J.C.C.P 4335, 2004 WL 2475287, and *Leisure Mktg. Inc. v. Camp Coast to Coast*, No. 14452, 1987 WL 92053 "must not be cited or relied on by a court or a party in any other actions." Thus, these trial court opinions have no authoritative value under California law. Moreover, *In re Credit/Debit Card Tying Cases*, No. J.C.C.P 4335, 2004 WL 2475287, is not final since a Petition for Review is pending in S222998 before the California Supreme Court.

Defendants cite *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 1987), which denied dismissal of Cartwright claims, but the *Salveson* complaint even meets the pre-*Clayworth* standards set forth in *Knevelbaard Dairies*. With respect to the allegation of antitrust injury, the *Knevelbaard Dairies* court said:

> The extent to which antitrust injury is recognized under the Cartwright Act is enlarged, by statute, in comparison to federal law. The Act provides, atCalif. Bus. & Prof. Code sec 16750(a) (emphasis added):
>
>> Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefore …to recover three times the damages sustained by him or her…This action may be brought by any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, *regardless of whether such injured person dealt directly or indirectly with the defendant*.
>
>> The last clause was added by the California legislature following the Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431U.S. 720, 97 S.Ct. 2061, 52 L.Ed. 2d 707 (1977), which limited the ability of indirect purchasers to recover damages under the Sherman and Clayton Acts. As a result, "the more restrictive definition of '*antitrust injury*' under federal law does not apply" to the Cartwright Act. *Cellular Plus, Inc. v. Superior Court*, 14 Cal.App.4th 1224, 1234, 18 Cal. Rptr. 2d 308 (1993). The *Cellular Plus* court, affording standing to agents who allegedly lost sales due to prices having been artificially inflated by their principals' price-fixing, said that "[t]he exact parameters of 'antitrust injury' under section 16750 have not yet been established" but that "the scope of that term is broader" than under federal law. *Id.* ( 232 F.3d 991). (Emphasis added).

With respect to the allegation of antitrust injury, the *Knevelbaard Dairies* court stated:

> When horizontal price fixing causes buyers to pay more, or sellers to receive less, than the prices that would prevail in a market free of the unlawful trade restraint, *antitrust injury* occurs. This is seen most often in claims by overcharged buyers…(232 F.3d 988)…

Under this standard, the *Salveson* plaintiffs have adequately alleged antitrust injury under the Cartwright Act in that they allege that they "have paid more in Interchange Fees than they would have paid in the absence of Defendants' antitrust violations etc." (Compl ¶¶ 14-18, 104-121.) This is consistent with the California Supreme court's statement in *Claymore v. Pfizer*, *supra*, that "Instead, in an antitrust price-fixing case, the presumptive measure of damages is the amount

of the overcharge paid by the plaintiffs. 2010 Cal. LEXIS at p. 22.

The *Salveson* Complaint alleges that plaintiff cardholders are in privity with and in the same competitive market with their defendant card Issuer banks, who compete with each other for their business. (Compl. ¶¶4,39, 81, 82, 92-95).  In *United States v. Visa, U.S.A., Inc.*, 344 F.3d 229 at p. 238, the Second Circuit stated:

> Competition in the payment card industry takes place at the "*network*" *level*,  as well as  at the "issuing" and "acquiring" levels.  At the network level, the  four brands  compete with one another to establish brand loyalty in favor of the Visa, MasterCard, Amex, or Discover card.  At the issuing level, approximately twenty thousand *banks that issue* Visa and MasterCard cards to customers *compete with one another* and with Amex and Discover. (Emphasis supplied).

Thus, the Second Circuit described the card "issuing" sub-market where plaintiff cardholders participate with their card issuing banks, "acquiring" sub-market and  the card network services market.  The *Salveson* complaint alleges that the card Issuer banks compete with one another for card issuance to cardholders because it contractually entitles them to price-fixed Interchange Fees payable to them by cardholders.

In addition, cardholders have standing on a motion to dismiss not only in the card issuing sub-market, but also in the network market since their cards are  "inextricably linked" to the network and the product costs "can easily be traced." (Compl. ¶ 6).  As alleged in the merchants' Second Consolidated Amended Class Action Complaint (Dkt #1153 in No. 05-1720 E.D.N.Y. at ¶8a, the Payment Card  is an "Access Device" – "that may be used by a consumer to initiate a General Purpose or Debit Card transaction."  Since cards are inextricably linked to the network as access devices and since the *Salveson* complaint alleges  that "The supracompetitive Interchange Fees fixed by Defendants and paid directly by Visa And MasterCard Cardholders are traceable through the application of economic analyses to the computerized bank records of Defendants…," (Compl. ¶ 6),  the *Salveson* plaintiffs allege that they participate in both the card issuing sub-market and the network services market with defendants.  *In re TFT-LCD (Flat Panel) Antitrust Litig.("TFT-LCD")*, 586 F.Supp.2d 1109, 1123-1124 (N.D. Cal. 2008); *In re Graphics Processing Units Antitrust Litig.* ("GPU") 540 F.Supp. 2d 1085, 1098-1099 (N.D. Cal. 2007); *In re Flash Memory Antitrust Litig.*, 643 F.Supp.2d 1133, 1150-1156 (N.D. Cal. 2009)

*supra*, 643 F.Supp.2d at 1154; *In re Cathode Ray Tube (CRT) Antitrust Litigation ("CRT")*, 738 F.Supp.2d 1011, 1023-1024 (N.D. Cal. 2010) 738 F.Supp.2d at 1024.

Confronted with the argument that plaintiffs were in a milk market and defendants were in a separate  cheese market, the *Knevelbaard Dairies* court looked at the allegations of the complaint and stated: "the complaint's allegations unmistakably place all parties in the milk market—the defendants as buyers and the plaintiffs as sellers—and even have them transacting business with each other.  For present purposes [12(b)(6)] those allegations must be accepted." Likewise, the instant *Salveson* complaint alleges that plaintiff Cardholders and defendant Card Issuers are participants in the "Visa and MasterCard general purpose Credit cards and Debit cards" market in which plaintiffs and defendants participate and in the "Visa and MasterCard credit card network services and Debit card network services" market in which plaintiffs and defendants participate. (*Salveson* Compl. ¶94 - ¶¶92-95).  Thus, under *Knevelbaard Dairies*, the *Salveson* complaint sufficiently alleges plaintiffs participation in the card issuing market and the network services market with defendants. (Compl. ¶¶14-20, 39-50, 92-95.).[1]

---

[1] In *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 985 (9th Cir. 1987), cited by defendants, the Court reversed a motion to dismiss as to both  a Sherman Act claim and a Cartwright Act claim and described the significant differences between the two:

> The California statute's goal is described in *Exxon Corp. v. Superior Court*, 51 Cal.App.4th 1672, 1680, 60 cal. Rptr 2d 195 (1997):
>
> > The Cartwright Act (Bus. & Prof. Code sec. 16700 et seq.), as the Sherman Act (15 U.S.C. sec 1 et seq.), was enacted to promote free market competition and to prevent conspiracies or agreements in restraint or monopolization of trade.
>
> There are, however differences in statutory wording and legislative history that lead, in some respects, to different results.  In *State of California ex rel Van de Kamp v. Texaco, Inc.*, 46 cal. 3d 1147, 1164, 252 Cal Rptr 221, 762 P.2d 385 (1988), the court held:
>
> > Admittedly, in past statements we have suggested that the Cartwright Act is patterned after the Sherman Act.  As shown above, however, historical and textual analysis reveals that the Act was patterned afer the 1889 Texas act and the 1899 Michigan act, and not the Sherman Act.  Hence judicial interpretation of the Sherman Act, while often helpful, is not directly probative of the Cartwright drafters' intent, given the different genesis of the provision under review.

In *Knevelbaard Dairies*, the court said:

When a per se violation such as horizontal price fixing has occurred, there is no need to define a relevant market or to show that the defendants had power within the market." (citations omitted). At 232 F.3d 986.

In fact even where market analysis is required, as in monopolization cases, the question of market definition or separate markets even for "functionally linked products at least one of which is useless without the other…should be resolved by the trier of fact." Eastman Kodak Co. v. Image Technical Services, Inc. 504 U.S. 451, 463 (1992) (affirming denial of summary judgment).

## III. Jurisdiction

As the U.S. Supreme Court stated in *California v. ARC America*, a federal court has discretion whether to entertain a supplemental state claim, after dismissing federal claims, or to

---

Thus, federal antitrust precedents are properly included in a Cartwright analysis, but their role is limited; they are "often helpful" but not necessarily decisive. 232 F.3d 979, 985 (9th Cir. 1987), cited by defendants, the Court reversed a motion to dismiss as to both a Sherman Act claim and a Cartwright Act claim and described the significant differences between the two:

The California statute's goal is described in *Exxon Corp. v. SuperiorCourt*, 51 Cal.App.4th 1672, 1680, 60 cal. Rptr 2d 195 (1997):

The Cartwright Act (Bus. & Prof. Code sec. 16700 et seq.), as the Sherman Act (15 U.S.C. sec 1 et seq.), was enacted to promote free market competition and to prevent conspiracies or agreements in restraint or monopolization of trade.

There are, however differences in statutory wording and legislative history that lead, in some respects, to different results. In *State of California ex rel Van de Kamp v. Texaco, Inc.*, 46 cal. 3d 1147, 1164, 252 Cal Rptr 221, 762 P.2d 385 (1988), the court held:

Admittedly, in past statements we have suggested that the Cartwright Act is patterned after the Sherman Act. As shown above, however, historical and textual analysis reveals that the Act was patterned afer the 1889 Texas act and the 1899 Michigan act, and not the Sherman Act. Hence judicial interpretation of the Sherman Act, while often helpful, is not directly probative of the Cartwright drafters' intent, given the different genesis of the provision under review.

Thus, federal antitrust precedents are properly included in a Cartwright analysis, but their role is limited; they are "often helpful" but not necessarily decisive.

dismiss it without prejudice: "Moreover, federal courts have the discretion to decline to exercise pendent jurisdiction over state indirect purchaser claims, even if those claims are brought in the first instance in federal court.  See *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725-726 (1966)." See also *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 357 (1988); *Brzak v. United Nations*, 597 F.3d 107, 113-114 (2d Cir. 2010).  Thus, the Court has discretion as to whether to decline jurisdiction by dismissing the *Salveson* state law claims without prejudice or to entertain them.

Further, as to the *Salveson* case, this Court is a transferee court of limited jurisdiction.   *In re Lexecon v. Milberg Weiss Bershad Hynes & Lerach*, 526 U.S. 26 (1998) (holding that a multidistrict transferee court may not assign a transferred case to itself for trial.)

Accordingly, if the Court continues to decline jurisdiction, the Memorandum and Order and Judgment should be amended to dismiss the state claims "without prejudice."

Defendants have cited the Not Recommended for Publication opinion in *Clark v. Lender Processing Servs*, 562 F. App'x 460 (6th Cir. 2014), which does not depart from the above rule that this Court has discretion to accept jurisdiction of state claims, or to  decline jurisdiction and dismiss them without prejudice.  In *Clark*, the Sixth Circuit upheld the district court's acceptance of jurisdiction, but the Court of Appeals did not address the district court's alternative to decline jurisdiction and dismiss the state claims without prejudice.

///

///

///

///

///

///

///

///

///

///

**Conclusion**

For the above reason, defendants' cross-motion for reconsideration should be denied, defendants' motion to dismiss should be denied and the judgment revised accordingly.

Respectfully submitted,

Dated:  February 5, 2015          **ALIOTO LAW FIRM**

_____
                                  */s/ Joseph M. Alioto*
                         By:   JOSEPH M. ALIOTO
                               *Salveson* Interim Co-Lead Counsel


Dated:  February 5, 2015          **LAW OFFICES OF LINGEL H. WINTERS**

_____
                                  */s/ Lingel H. Winters*
                         By:   Lingel H. Winters, Esq.
                               *Salveson* Interim Co-Lead Counsel