UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

MARVIN SALVESON, EDWARD LAWRENCE,
DIANNA LAWRENCE and WENDY M. ADAMS,
on behalf of themselves and all others similarly
situated,

                    Plaintiffs,

          v.

JP MORGAN CHASE & CO., J.P. MORGAN
BANK, N.A., BANK OF AMERICA
CORPORATION, BANK OF AMERICA N.A.,
CAPITAL ONE F.S.B., CAPITAL ONE
FINANCIAL CORPORATION, CAPITAL ONE
BANK, HSBC FINANCE CORPORATION, HSBC
BANK USA, N.A., HSBC NORTH AMERICAN
HOLDINGS, INC. and HSBC HOLDINGS, PLC,

                    Defendants.

__MEMORANDUM & ORDER__
14-CV-3529 (MKB)

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiffs Marvin Salveson, Edward Lawrence, Dianna Lawrence and Wendy M. Adams

commenced this putative antitrust class action on December 16, 2013, in the United States

District Court for the Northern District of California against Defendants, financial institutions

who issue general purpose payment cards that consumers use to purchase goods and services,

and the affiliates of such institutions.[1]  On behalf of a putative nationwide class of consumers

using payment cards issued by Defendants, Plaintiffs assert claims pursuant to Sections 4 and 16

of the Clayton Act, 15 U.S.C. §§ 15 and 26, and pursuant to the Cartwright Act, California

---

[1]  On June 4, 2014, the Clerk of Court for the Northern District of California entered a
Transfer Order from the United States Judicial Panel on Multi District Litigation, transferring
this case to the Eastern District of New York.  (MDL Transfer Order, Docket Entry No. 61.)

Business and Professions Code § 16750(a).  Defendants moved to dismiss all of Plaintiffs' claims, and by Memorandum and Order filed on November 26, 2014, the Court granted Defendants' motion (the "November 26, 2014 Decision").[2]  The Clerk of Court entered judgment on December 4, 2014.  (Dec. 4, 2014 J., Docket Entry No. 86.)

Plaintiffs now move to vacate the judgment and, pursuant to Local Civil Rule 6.3, for reconsideration of the dismissal of their federal claim.   Defendants cross-move for reconsideration pursuant to Rule 59(e) of the Federal Rules of Civil Procedure and Local Civil Rule 6.3, seeking reconsideration of the Court's refusal to exercise supplemental jurisdiction over Plaintiffs' California state law claim.  For the reasons set forth below, Plaintiffs' reconsideration motion is denied.  The Court grants Defendants' reconsideration motion and, on reconsideration, dismisses Plaintiffs' state law claim.

## I.   Background

The Court assumes familiarity with the facts and procedural background as set forth in the November 26, 2014 Decision.  (Nov. 26, 2014 Memorandum and Order ("M&O"), Docket Entry No. 83.)  The Court summarizes only the pertinent facts.

According to Plaintiffs, in the course of issuing payment cards to consumers, Defendants and their affiliates knowingly participated in an anticompetitive conspiracy to fix fees related to those payment cards.  (Compl. ¶¶ 26–29.)  These fees are known as interchange fees.  (*See id.* ¶¶ 40, 48.)  Plaintiffs contend that consumers like Plaintiffs and the putative class used the payment cards to purchase goods and services and "paid supracompetitive [i]nterchange [f]ees to Defendants and their co-conspirators."  (*Id.* ¶¶ 19–20.)

---

[2]  On December 18, 2014, the United States Judicial Panel on Multidistrict Litigation, with the consent of the Court, ordered that the case be reassigned from Judge John Gleeson to the undersigned.  (Order Reassigning Litigation, Docket Entry No. 88.)

Plaintiffs allege that each time a consumer uses a payment card, the following sequence of events occur: the merchant accepts the payment card from the cardholder and relays the transaction information to the merchant's "acquiring bank"; the acquiring bank then transmits the transaction information to the payment card's network — either Visa or MasterCard; and the network then relays the transaction information to the cardholder's "issuing bank" for approval of the transaction. (*Id.* ¶ 49 (quoting *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 235 (2d Cir. 2003)).) If the issuing bank determines the consumer has sufficient credit and approves the transaction, it conveys its approval to the acquiring bank and the acquiring bank then relays its approval to the merchant. (*See id.*) Finally, the issuing bank — in this case, one of the Defendants — pays the acquiring bank an amount representing the price of the goods or services purchased by the consumer in the underlying transaction, less an "interchange fee," the fee at issue in this case. (*See id.*)

Plaintiffs allege that Defendants' participation in an anticompetitive conspiracy has injured cardholders by causing them to "pa[y] supracompetitive price-fixed [i]nterchange [f]ees to Defendants" that were higher "than [the fees] they would have paid in the absence of . . . antitrust violations" by Defendants. (*Id.* ¶¶ 104–105.) Plaintiffs contend that a cardholder "pays the gross amount of the transaction, including fees, directly to the [issuing bank], which keeps the [i]nterchang [f]ee and passes on a separate transaction fee to the [acquiring bank] and the net amount to the merchant via the Visa or MasterCard network." (*Id.* ¶ 38.) According to Plaintiffs, the interchange fee is paid "directly" by the cardholders. (*Id.* ¶ 6.) Plaintiffs specifically allege that the initial payment in the transaction is made by cardholders, that the issuing bank "keep[s]" the interchange fee from that payment, and that the payments made by

cardholders are "comprise[d]" of the "balance" due to the merchant plus the interchange fee and

other fees.  (*Id.* ¶¶ 47–48, 81.)

## II.   Discussion

### a.   Standards of review

#### i.   Reconsideration

The standard for granting a motion for reconsideration is strict, and "[r]econsideration

will generally be denied unless the moving party can point to controlling decisions or data that

the court overlooked — matters, in other words, that might reasonably be expected to alter the

conclusion reached by the court." *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.,*

*Ltd.*, --- F. App'x ---, ---, 2015 WL 5999215, at *3 (2d Cir. 2015) (quoting *Shrader v. CSX*

*Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)); *Bank of Am. Nat'l Ass'n v. AIG Fin. Prods.*

*Corp.*, 509 F. App'x 24, 27 (2d Cir. 2013) ("The standard for granting such a motion is

strict . . . ." (quoting *Shrader*, 70 F.3d at 257)), *as amended* (Apr. 5, 2013); *see also* Local Civ.

R. 6.3 (The moving party must "set[] forth concisely the matters or controlling decisions which

counsel believes the Court has overlooked.").

It is thus "well-settled" that a motion for reconsideration is "not a vehicle for relitigating

old issues, presenting the case under new theories, securing a rehearing on the merits, or

otherwise taking a 'second bite at the apple.'" *Analytical Surveys, Inc. v. Tonga Partners, L.P.*,

684 F.3d 36, 52 (2d Cir. 2012) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir.

1998)), *as amended* (July 13, 2012).  A motion for reconsideration is "neither an occasion for

repeating old arguments previously rejected nor an opportunity for making new arguments that

could have previously been made." *Simon v. Smith & Nephew, Inc.*, 18 F. Supp. 3d 423, 425

(S.D.N.Y. 2014) (citation and internal quotation marks omitted).  In order to prevail on a motion

for reconsideration, "the moving party must demonstrate that the Court overlooked controlling decisions or factual matters that were put before the Court on the underlying motion." *Lichtenberg v. Besicorp Grp. Inc.*, 28 F. App'x 73, 75 (2d Cir. 2002) (citations and internal quotation marks omitted); *see also Stoner v. Young Concert Artists, Inc.*, No. 11-CV-7279, 2013 WL 2425137, at *1 (S.D.N.Y. May 20, 2013) ("A motion for reconsideration is an extraordinary remedy, and this Court will not reconsider issues already examined simply because a party is dissatisfied with the outcome of his case. To do otherwise would be a waste of judicial resources." (alteration, citations and internal quotation marks omitted)); *Henderson v. City of New York*, No. 05-CV-2588, 2011 WL 5513228, at *1 (E.D.N.Y. Nov. 10, 2011) ("In order to have been 'overlooked,' the decisions or data in question must have been put before [the court] on the underlying motion . . . and which, had they been considered, might have reasonably altered the result before the court." (citations and internal quotation marks omitted)).

### ii.   Motion to dismiss for failure to state a claim

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)); *see also Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 320 (2d Cir. 2009)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson*, 631 F.3d at 63 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009)); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013). Although all allegations contained in the complaint are assumed true, this principle is "inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

### b. Plaintiffs' motion for reconsideration of the dismissal of the federal claim

In the November 26, 2014 Decision, the Court granted Defendants' motion to dismiss the Complaint. The Court determined that Plaintiffs are indirect purchasers and therefore the dismissal of the federal claim was appropriate because the claim is barred by the rule set forth in *Illinois Brick Company v. Illinois*, 431 U.S. 720 (1977), which denies standing to indirect purchasers' under Section 4 of the Clayton Act. (M&O 6–8.)

### i. The November 26, 2014 Decision

The Court explained in the November 26, 2014 Decision that, pursuant to the Supreme Court decision in *Illinois Brick*, "indirect purchasers — individuals or entities that do not make purchases directly from the defendants alleged to have violated antitrust laws — do not have standing to sue under § 4 of the Clayton Act." (*Id*. at 5.) As the Court stated, "only direct purchasers have standing under § 4 of the Clayton Act to seek damages for antitrust violations." (*Id*. (internal quotation marks omitted) (quoting *Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1120–21 (9th Cir. 2008)).) The Court further explained that the presumption against recovery for plaintiffs who are "not the immediate buyers from the alleged antitrust violations" includes cases "in which immediate buyers pass on 100 percent of their costs to their customers." (*Id*. (internal quotation marks omitted) (quoting *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 207–208 (1990)).)

The Court determined that Plaintiffs failed to allege that they are direct purchasers or that their federal claim came within an exception to the *Illinois Brick* doctrine. (*Id*. at 5–7.) The Court stated that Plaintiffs' allegations — including the allegation that the payments made by cardholders as part of each credit card transaction represented direct payments of the "supracompetitive" interchange fees to Defendants — were insufficient to plead that cardholders are direct purchasers with standing. (*Id*. at 6.)

### ii. Plaintiffs' arguments in support of their reconsideration motion

In seeking reconsideration, Plaintiffs argue, in substance, that the Court overlooked the standard applicable to a motion to dismiss by failing to accept Plaintiffs' allegations as true. (Mem. in Support of Pls. Mot. ("Pls. Mem.") 4, Docket Entry No. 91.) Plaintiffs argue that, "[t]here is no question that the cardholders repeatedly alleged that they were the direct payors or purchasers" and that the allegation that cardholders pay the interchange fee is not only plausible but also "manifest and self-evident." (*Id*.) Plaintiffs further argue that the Court overlooked their pleadings as to the role of cardholders in the payment transactions containing the interchange fee.[3] (*Id*. ("[T]his Court explained the structure of the network. . . . Although the

---

[3]  In support of their argument that cardholders directly pay interchange fees, Plaintiffs file a declaration and exhibits in support of their motion. (Decl. of Joseph M. Alioto, Docket Entry No. 92; *see also* Pls. Reply 1, Docket Entry No. 103 (arguing that the "dispositive charts" in the exhibits "showed that the cardholder paid the money, which included the interchange fee" and that the "charts also showed, in support of the plausibility of the allegations in [P]laintiffs' complaint, that the cardholder paid the issuing bank, which kept the interchange fee and passed on the remainder to the acquiring bank, which kept its fee and in turn passed on the remainder to the merchant").) The Court declines to consider these documents as they were not attached to the Complaint and were not otherwise before the Court when it decided Defendants' motion to dismiss, and, therefore, these documents are not properly before the Court on Plaintiffs' motion for reconsideration. *See Drapkin v. Mafco Consol. Grp., Inc.*, 818 F. Supp. 2d 678, 695 (S.D.N.Y. 2011) (explaining that a moving party seeking reconsideration may "not advance new facts, issues or arguments not previously presented to the Court" (internal quotation marks and citation omitted)). Moreover, Local Civil Rule 6.3 specifies that on a motion for reconsideration "[n]o affidavits shall be filed by any party unless directed by the Court." Local Civil Rule 6.3.

[C]ourt included the so-called 'issuing bank,' the 'acquiring bank,' and the merchant, the cardholder consumer was omitted.").)

### iii.    Plaintiffs fail to satisfy the standard for reconsideration

The Court neither overlooked Plaintiffs' allegations that the interchange fees are paid directly by cardholders nor ignored the obligation to credit Plaintiffs' factual allegations. Because Plaintiffs have not shown (1) that the Court overlooked critical facts or (2) that the Court overlooked any relevant controlling decisions, there is no basis for the Court to reconsider the dismissal of Plaintiffs' federal law claim for failure to state a claim. *See Shrader*, 70 F.3d at 257 (holding that a party seeking reconsideration must identify overlooked "controlling decisions or data"); *Analytical Surveys*, 684 F.3d at 52 (explaining that a motion for reconsideration is not a vehicle for relitigation of issues already addressed by the court); *Bey v. City of New York*, No. 13-CV-9103, 2015 WL 5473155, at *1 (S.D.N.Y. Sept. 16, 2015) (construing plaintiff's motion for relief from court's order as a motion for reconsideration).

In the Complaint, Plaintiffs quote *United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003), in describing the structure of the transactions giving rise to the incursion and payment of the interchange fee. (Compl. ¶ 48.)  Plaintiffs specifically quote a portion of the Second Circuit decision stating "[w]hereas in the market for general purpose *cards,* the issuers are the sellers, and cardholders are the buyers, in the market for general purpose card *network services,* the four networks themselves are the sellers, and the issuers of cards and merchants are the buyers." [4]  (*Id.* ¶ 48 (quoting *Visa U.S.A.*, 344 F.3d at 239).)  Thus, based on the allegations,

---

[4]  Plaintiffs selectively quote the Second Circuit's explanation in *United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003) that, "in the market for general purpose [credit cards], the issuers are the sellers, and the cardholders are the buyers" to inaccurately plead that this phrase demonstrates that "the Second Circuit expressly held that Cardholders are 'direct

Plaintiffs recognize that there is a distinction between two markets: one for payment cards (the "Payment Card Market"), in which consumers participate by purchasing cards from issuing banks, and another for network services (the "Card Network Services Market"), in which merchants purchase services to facilitate the use of those cards. Plaintiffs also allege that the interchange fee is exchanged between financial institutions in the Card Network Services Market. (*Id.* ¶ 48.) In rejecting their claim, the Court determined that Plaintiffs' "facile contention that cardholders pay interchange fees directly is refuted by their own allegations about how transactions over these two networks occur" and that Plaintiffs' conclusory and contradictory pleadings did not plausibly allege that the cardholders are direct purchasers. (M&O 6–7.)

Plaintiffs argue that the Court failed to credit the allegations that cardholders are the direct payors of interchange fees and, in so doing, overlooked controlling law, namely the standard applicable to a motion to dismiss. Although the Court may not have expressly referenced the pleading standard in stating that Plaintiffs failed to allege that cardholders are direct purchasers, the Court's determination was based on its rejection of the direct purchaser allegations as conclusory, contradictory and insufficient to support an inference that cardholders are the payors of interchange fees. (*Id.* at 6–7.) "Although factual allegations of a complaint are normally accepted as true on a motion to dismiss, . . . that principle does not apply to general

_____

purchasers' for antitrust purposes." (Compl. ¶ 50 (quoting *Visa U.S.A.*, 344 F.3d at 239).) The *Visa U.S.A* decision contains no such holding. The standing of cardholders to bring antitrust claims, as direct or indirect purchasers, was not at issue in *Visa U.S.A.* In the phrase cited by Plaintiffs, the Second Circuit was explaining its determination that the district court had correctly found that the payment card networks "compete with one another in a market for 'network services.'" *Visa U.S.A.*, 344 F.3d at 239. In doing so, the Second Circuit described that consumers are "buyers" of payment cards, not payers of interchange fees, and did so to provide an explanatory contrast. *Id.* (emphasis in original).

allegations that are contradicted 'by more specific allegations in the Complaint.'" *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 151–52 (2d Cir. 2014) (citations omitted); *see also Sherman v. Town of Chester*, 752 F.3d 554, 568 n.5 (2d Cir. 2014) (declining to credit allegation that an appeal was timely filed where the complaint also "explicitly state[d]" contradictory allegations); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995) ("[T]he [c]omplaint's attenuated allegations of control are contradicted both by more specific allegations in the Complaint and by facts of which we may take judicial notice . . . .").

The Court accepted Plaintiffs' factual allegations and drew "all reasonable inferences in [P]laintiffs' favor." (M&O 5 (citing *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994)). However, the Court was not obligated to credit Plaintiffs' allegation that cardholders are the direct payors of interchange fees, as this allegation is directly contradicted by the specific allegations about the Payment Card and Card Services Markets and the transactions involving the interchange fee. *DPWN Holdings*, 747 F.3d at 152. The Court considered the applicable standard and determined that Plaintiffs' allegations did not permit a reasonable inference that cardholders are direct payors, given that such a conclusion is at odds with the allegations regarding the structure of the relevant transactions. (M&O 5); *see also Matson*, 631 F.3d at 63 (A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (quoting *Iqbal*, 556 U.S. at 678)). Plaintiffs have not identified any controlling law that the Court overlooked.

Plaintiffs also argue that the Court specifically overlooked allegations that cardholders pay interchange fees directly by initiating the chain of events that occurs as part of each transaction. The Court considered and rejected this claim. *See, e.g., Boyd v. J.E. Robert Co.*, No. 05-CV-2455, 2013 WL 5436969, at *2 (E.D.N.Y. Sept. 27, 2013) (denying reconsideration

where "[p]laintiffs' motion . . . merely attempts to relitigate and rehash arguments already considered and rejected by the court"), *aff'd*, 765 F.3d 123 (2d Cir. 2014); *PAB Aviation, Inc. v. United States*, No. 98-CV-5952, 2000 WL 1240196, at *1 (E.D.N.Y. Aug. 24, 2000) ("Because PAB's motion involves only reformulations of arguments already considered and rejected, reconsideration is not warranted."), *aff'd*, 169 F. App'x 61 (2d Cir. 2006). Plaintiffs disagree with the Court's outcome and are attempting to "relitigat[e] old issues," which is not a basis for reconsideration. *See Analytical Surveys*, 684 F.3d at 52.

Plaintiffs have failed to identify controlling law or allegations that the Court overlooked. The Court therefore declines to reconsider its determination that Plaintiffs are barred from asserting claims under § 4 of the Clayton Act by the *Illinois Brick* doctrine. Plaintiffs' reconsideration motion is denied.

### c. Defendants' cross-motion for reconsideration of the state law claim

In the November 26, 2014 Decision, the Court declined to exercise supplemental jurisdiction over Plaintiffs' state law claim and dismissed the claim without prejudice. (M&O 8.) Defendants seek reconsideration of this determination, arguing that the Court overlooked the fact that it had original jurisdiction over Plaintiffs' state law claim pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), ("CAFA"), and that the Court should therefore have addressed the merits of the state law claim. (Defs. Opp'n & Mem. 5, Docket Entry No. 98.) Defendants further argue that on reconsideration of the underlying motion to dismiss, the Court should dismiss the Cartwright Act claim because Plaintiffs have failed to allege a cognizable antitrust injury. (*Id*. at 7–8.)

### i. The Court's jurisdiction pursuant to CAFA

Defendants argue that CAFA provides the Court with original jurisdiction over Plaintiffs' Cartwright Act claim because the claim is asserted on behalf of a nationwide class against diverse Defendants and the damages sought are sufficient that "no permissive or mandatory exceptions apply." (*Id*. at 5.) Plaintiffs oppose Defendants' motion primarily by arguing against the dismissal of the state law claim on the merits. (Pls. Mem in Opp'n to Defs. Mot. ("Pls. Opp'n") 8–9, Docket Entry No. 104.) Plaintiffs do not address Defendants' argument that CAFA provides original jurisdiction over the state law claim. (*Id*. at 8.) Plaintiffs also fail to address the argument that because the Court overlooked this controlling law, there are grounds to reconsider Defendants' motion to dismiss. (*Id*.) Instead, Plaintiffs argue that "a federal court has discretion whether to entertain a supplemental state claim, after dismissing federal claims," and appear to argue that the Court should not exercise its discretion to exercise jurisdiction. (*Id*.)

CAFA provides federal district courts "with 'original jurisdiction' to hear a 'class action' if the class has more than 100 members, the parties are minimally diverse, and the 'matter in controversy exceeds the sum or value of $5,000,000.'" *Standard Fire Ins. Co. v. Knowles*, 562 U.S. ---, ---, 133 S. Ct. 1345, 1348 (2013) (quoting 28 U.S.C. § 1332(d)(2), (d)(5)(B)); *see also Estate of Pew v. Cardarelli*, 527 F.3d 25, 30 (2d Cir. 2008) ("CAFA amends the diversity jurisdiction statute by adding § 1332(d), which confers original federal jurisdiction over any class action with minimal diversity (*e.g.*, where at least one plaintiff and one defendant are citizens of different states) and an aggregate amount in controversy of at least $5 million (exclusive of interest and costs).").

CAFA provides three exceptions to original jurisdiction: "the so-called 'local controversy,' 'home state controversy,' and 'interests of justice' exceptions." *Mattera v. Clear*

*Channel Commc'ns, Inc.*, 239 F.R.D. 70, 77 (S.D.N.Y. 2006). The local controversy and home state exceptions to CAFA jurisdiction mandate that district courts decline jurisdiction if certain elements are present that identify a case with primarily in-state class members seeking relief principally for in-state harm by citizens of the same state.[5] *Id.* (citing 28 U.S.C. § 1332(d)(4)(A) and (d)(3)); *see also Hart v. Rick's N.Y. Cabaret Int'l, Inc.*, 967 F. Supp. 2d 955, 962 (S.D.N.Y. 2014) ("The mandatory exceptions are designed to draw a delicate balance between making a federal forum available to genuinely national litigation and allowing the state courts to retain cases when the controversy is strongly linked to that state. . . . [T]hese exceptions are intended to keep purely local matters and issues of particular state concern in the state courts." (internal quotation marks and citation omitted)). A district court may also, in the "interest of justice," decline jurisdiction after considering a set of factors "designed to address similar concerns regarding truly local controversies in cases where neither mandatory exception applies." *Sorrentino v. ASN Roosevelt Ctr., LLC*, 588 F. Supp. 2d 350, 355 (E.D.N.Y. 2008); *see also Mattera*, 239 F.R.D. at 77 (listing the statutory factors); *Hart*, 967 F. Supp. 2d at 962–69 (finding that neither mandatory exception applied to class claims asserted under New York state law, and declining to invoke the interest of justice exception).

Plaintiffs allege that the Court has original jurisdiction over their state law claim pursuant to section 1332(d) and that the claim is asserted on behalf of a nationwide class against diverse Defendants, seeking damages in excess of $5,000,000. (Compl. ¶ 8.) While Plaintiffs do not expressly plead that the class would number more than 100 members, the parties appear to

---

[5] The local controversy and home state exceptions have distinct requirements, but both are similarly tailored to address claims involving in-state harms. Plaintiffs have not argued either of these exceptions, and it is clear that this is not a state or local issue, thus the exceptions are not applicable.

concede that a nationwide class of Visa and Mastercard cardholders would exceed 100 members. (*Id.* ¶¶ 1, 8.) Plaintiffs do not seek relief for primarily in-state class members to remedy in-state harm by citizens of the same state, and thus, the claim does not fall within either of the mandatory exceptions to CAFA's grant of original jurisdiction. 28 U.S.C. § 1332(d)(4)(A), (d)(3). Neither party argues to the contrary. Finally, it is not in the interests of justice to consider declining jurisdiction, as it is apparent that Plaintiffs' allegations relate to the nationwide practices of national financial institutions affecting consumers in every state, as opposed to allegations regarding to a "truly local" controversy. *Sorrentino*, 588 F. Supp. 2d at 355.

In declining to exercise supplemental jurisdiction in the November 26, 2014 Decision, the Court overlooked controlling law, specifically, CAFA's provision of original jurisdiction over the state law Cartwright Act claim. The Court therefore grants reconsideration of Defendants' motion to dismiss Plaintiffs' state law claim.

### ii. Reconsideration of Defendants' motion to dismiss Plaintiffs' state law claim

Plaintiffs allege that Defendants violated California's Cartwright Act, which "enumerates a relatively broad array of anticompetitive and conspiratorial conduct" and "provides a private right of action to '[a]ny person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter.'" (Compl. ¶ 112–121); *AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1110 (9th Cir. 2013) (quoting Cal. Bus. & Prof. Code § 16720(a)); *see also Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 986 (9th Cir. 2000) (The Cartwright Act "prohibits, among other things, any combination '[t]o prevent competition in [the] sale or purchase of . . . any commodity' or to '[a]gree in any manner to keep the price of . . . [any] commodity . . . at a fixed or graduated figure.'" (quoting Cal. Bus. & Prof.

Code § 16720(c) and (e)(2))); *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 770 (2010) (stating that the Cartwright Act "authorizes anyone injured in his or her business or property by actions forbidden" by the statute to seek to recover treble damages (internal quotation marks and citation omitted)); *Asahi Kasei Pharma Corp. v. CoTherix, Inc.*, 138 Cal. Rptr. 3d 620, 625 (Ct. App. 2012) (explaining that the Cartwright Act "generally outlaws any combinations or agreements which restrain trade or competition or which fix or control prices" (citations omitted)). Stating a claim under the Cartwright Act requires a plaintiff to allege: "(1) the formation and operation of the conspiracy; (2) illegal acts done pursuant thereto; and (3) damage proximately caused by such acts." *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1126 (N.D. Cal. 2012) (internal quotation marks omitted) (quoting *Kolling v. Dow Jones & Co.,* 187 Cal. Rptr. 797, 803 (Ct. App. 1982); *Asahi*, 138 Cal. Rptr. 3d at 626–27 (same).

### 1. Standing to recover as direct purchasers

Defendants move to dismiss Plaintiffs' Cartwright Act claim, arguing that Plaintiffs have failed to adequately plead an antitrust injury and thus lack standing to recover. (Defs. Not. of Mot. and Mem in Support of Mot. to Dismiss ("Defs. MTD") 12–18, Docket Entry No. 38.) As with the federal claim, Plaintiffs' state law claim is based on allegations that cardholders are the direct payors of interchange fees that were inflated through anti-competitive behavior. (*See, e.g.*, Compl. ¶ 114 (alleging that Defendants with their co-conspirators have acted "to create or carry out restriction of commerce and restraints of trade by agreeing to fix high non-competitive . . . [i]nterchange [f]ees imposed on [c]ardholders in the Visa and MasterCard networks"); *id*. ¶ 115 (stating that Defendants "engaged in a California-based horizontal scheme to fix [i]nterchange [f]ees paid by [c]ardholders").) The Complaint alleges that the named

Plaintiffs have "been injured by being forced to pay higher [i]nterchange [f]ees than they would pay in the absence of the price-fixing conspiracy alleged herein."[6]  (*Id.* ¶ 120.)

Defendants contend that Plaintiffs lack standing to bring a Cartwright Act claim because Plaintiffs cannot satisfy the requirements for an antitrust injury as established by *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*").  Defendants argue that Plaintiffs lack standing to recover because, according to Plaintiffs' pleadings, the alleged fixing of interchange fees only occurs in the Card Network Services Market, in which financial institutions provide services to facilitate card transactions, while cardholders participate only in the Payment Card Market, in which consumers purchase payment cards.  (MTD Mem. 8.)  Defendants argue that cardholders do not purchase network services or pay interchange fees and thus "any alleged downstream impact on the price of retail consumer goods is . . . derivative and too remote to confer standing under well-established antitrust standing principles."  (Defs. Reply in Support of Defs. MTD ("MTD Reply") 2, Docket Entry No. 63.)  Plaintiffs respond that they have pled a direct, rather than downstream, antitrust injury that confers standing and disagree that the *AGC* factors apply to the California claim, an argument presented for the first time in their motion for reconsideration.  (Pls. MTD Opp'n 13; Pls. Cross Mot. Opp'n 3–4.)

---

[6]  Plaintiffs also allege that the anti-competitive conspiracy causes "increased retail prices for goods and services paid by [c]ardholders."  (Compl. ¶ 101(h)).  However, in response to Defendants' motion to dismiss, Plaintiffs expressly state that they plead an injury that is "not . . . damages from the inflated price of goods and services purchased from merchants."  (Pls. Opp'n to Defs. MTD ("Pls. MTD Opp'n) 13, Docket Entry No. 52).  Plaintiffs also state that construing the Complaint to allege price inflation "is a distortion of the allegations" because the Complaint "does not allege that Plaintiffs' damages are based on inflated costs to merchant which the merchants passed on the Plaintiffs by charging higher prices for goods and services." (*Id.* at 14.)

### A. Standard applicable to determining antitrust standing for a Cartwright Act claim

The Cartwright Act grants a private right of action to "[a]ny person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter." Calif. Bus. & Prof. Code § 16750(a). The Clayton Act uses similar language, entitling "[a]ny person who [is] injured in his business or property by reason of anything forbidden in the antitrust laws" to receive treble damages for those injuries. 15 U.S.C. § 15; *see also Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013). The Supreme Court has explained that the federal statutory language is limited because "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Gatt Commc'ns*, 711 F.3d at 75 (quoting *AGC*, 459 U.S. at 534); *see also Knevelbaard*, 232 F.3d at 987–92 ("The Supreme Court has held that Congress did not intend to afford a remedy to everyone injured by an antitrust violation simply on a showing of causation. The plaintiff must have 'antitrust standing.'" (citing *AGC*, 459 U.S. at 534–35)). Courts consider the following factors, identified in *AGC*, in order to determine whether a federal plaintiff has antitrust standing:

> [W]hether the plaintiff's alleged injury is of the type that the antitrust statute was intended to forestall; . . . the directness or indirectness of the asserted injury; . . . the extent to which the plaintiff's asserted damages are speculative; . . . the potential for duplicative recovery or complex apportionment of damages; . . . and the existence of more direct victims of the alleged conspiracy . . . .

*Gatt Commc'ns*, 711 F.3d at 76 (internal quotation marks and citations omitted) (quoting *AGC*, 459 U.S. at 535, 542, 545); *see also Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121–22 (2d Cir. 2007). The Second Circuit has "distilled these factors into two imperatives": that an antitrust plaintiff allege (1) that "it suffered a special kind of 'antitrust

injury,'" and (2) that "it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws." *Gatt Commc'ns*, 711 F.3d at 76 (citations omitted).

Consistent with standing more generally, "antitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement," the claim must be dismissed as a matter of law. *Id.* at 75 (internal quotation marks omitted) (quoting *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc)); *see also Port Dock*, 507 F.3d at 121, 126–27 (dismissing Clayton Act Section 4 claim for lack of antitrust standing); *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 290–95 (2d Cir. 2006) (evaluating the suitability of an antitrust plaintiff by "efficient enforcer" factors, the second through fifth factors articulated in *AGC*). The importance assigned to these factors "will necessarily vary with the circumstances of particular cases." *Daniel*, 428 F.3d at 443.

Where a plaintiff asserts a state law antitrust claim, the "threshold question presented" is whether the *AGC* factors also apply to establish the antitrust injury. *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1151 (N.D. Cal. 2009). In the absence of a clear rule provided by state law, federal courts analyzing "unsettled areas of state law" must "carefully predict how the state's highest court would resolve the uncertainties," so as to avoid "distort[ing] established state law." *Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009) (quoting *Travelers Ins. Co. v. Carpenter*, 411 F.3d 323, 329 (2d Cir. 2005)); *see also Empire City Capital Corp. v. Citibank, N.A.*, No. 10-CV-2601, 2011 WL 4484453, at *2 (S.D.N.Y. Sept. 28, 2011) (explaining that the court "construe[s] and appl[ies] state law as it believes the state's highest court would" (quoting *Liddle & Robinson, LLP v. Garrett*, 720 F. Supp. 2d 417, 424 (S.D.N.Y. 2010)).

In predicting how a state's highest court would resolve the issue, courts must "give the fullest weight to pronouncements of the state's highest court . . . while giving proper regard to relevant rulings of the state's lower courts." *Runner*, 568 F.3d at 386 (quoting *Carpenter*, 411 F.3d at 329); *see also Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 133 (2d Cir. 2007) (explaining that lower state court's decisions, while not "strictly" binding, may be "helpful indicators of how the [state's highest court] would decide" an issue), *certified question accepted*, 9 N.Y.3d 1020, *and certified question answered*, 11 N.Y.3d 80 (2008); *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 210 (2d Cir. 2006) ("[T]he judgment of an intermediate appellate state court 'is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" (quoting *Comm'r v. Estate of Bosch*, 387 U.S. 456, 465 (1967))); *Ryman v. Sears, Roebuck and Co.*, 505 F.3d 993, 994 (9th Cir. 2007) (If "there is relevant precedent from the state's intermediate appellate court, the federal court must follow the state intermediate appellate court decision unless the federal court finds convincing evidence that the state's supreme court likely would not follow it."). While decisions of federal courts construing state law may also be considered, "no deference" is owed to a "district court's interpretation" of state law. *Reddington*, 511 F.3d at 133.

California's highest court has not directly addressed whether the *AGC* factors should be applied to determine whether a plaintiff has alleged antitrust injury under California law. *In Re Flash Memory*, 643 F. Supp. at 1151–52. The California Supreme Court has recently stated that "'[i]nterpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states around the turn of the

20th century.'"[7]  *Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1195 (2013); *see also In re Cipro Cases I & II*, 61 Cal. 4th 116, 142 (2015).

At least one California intermediate appellate court has applied the *AGC* factors to a state antitrust claim.  *Vinci v. Waste Mgmt., Inc.*, 43 Cal. Rptr. 2d 337, 338–39 (Ct. App. 1995).  This decision is due particular weight.  *See Schoenefeld v. New York*, 748 F.3d 464, 469 (2d Cir.) (explaining that "the absence of authority from New York's highest court does not provide us license to disregard lower court rulings nor to analyze the question as though we were presented with a blank slate"), *certified question accepted*, 23 N.Y.3d 941 (2014) *and certified question answered*, 25 N.Y.3d 22 (2015); *Statharos v. N.Y. City Taxi & Limousine Comm'n*, 198 F.3d 317, 321 (2d Cir. 1999) ("[T]he ruling of an intermediate appellate state court . . . is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (internal quotation marks and citation omitted)).  In *Vinci*, a California intermediate appellate court observed that "the Cartwright Act has objectives

---

[7]  Plaintiffs argue, for the first time in seeking reconsideration, that the application of the *AGC* factors to claims under the Cartwright Act is precluded by the California Supreme Court's decision in *Clayworth*.  (Pl. Opp'n to Defs. Cross Mot. for Reconsideration ("Pls. Cross Mot. Opp'n"), 3–4, Docket Entry No. 104.)  Plaintiffs argue that in *Clayworth*, the California Supreme Court "departed" from *AGC*'s "principles in interpreting the Cartwright Act."  (*Id*. at 3.) Because Plaintiffs did not rely on this authority in their initial motion, they cannot do so on reconsideration.  *Lichtenberg*, 28 F. App'x at 75 (explaining that a Court on reconsideration considers only overlooked decisions "that were put before the Court on the underlying motion").  In any event, the issue addressed by the California Supreme Court in *Clayworth* is not before this Court.  The issue in *Clayworth* involved the assertion of the so-called "pass-through defense" by alleged antitrust conspirators, who asserted that claims brought by manufacturers were barred because the manufacturers conceded that they had passed the cost of the direct antitrust injury on to their customers.  *Clayworth*, 49 Cal. 4th at 774.  In deciding the case, the California Supreme Court did not address antitrust standing or the sufficiency of an antitrust injury under the Cartwright Act.  *Id*. (noting that *AGC* and *Vinci*, as cases that dealt with antitrust causation, have "nothing to say on the general topic that concerns us: when (as here) causation *has* been properly alleged, how are antitrust damages to be measured?" (first citing *AGC*, 459 U.S. at 535; and then citing *Vinci*, 43 Cal. Rptr. 2d at 338)).

identical to the federal antitrust acts," and noted that, in the past, California courts construing the Cartwright Act have looked to cases construing federal antitrust laws for guidance. *Vinci*, 43 Cal. Rptr. 2d at 338 n.1.

It is also instructive that the Ninth Circuit, although without explanation, has applied the *AGC* factors to an antitrust claim brought under the Cartwright Act. *Knevelbaard*, 232 F.3d at 987 (holding, after applying the *AGC* factors, that "all elements of antitrust standing are satisfied on the face of the present complaint"). However, despite applying the *AGC* factors, the Ninth Circuit has noted that, "California law grants antitrust standing more liberally than does federal law." *Theme Promotions, Inc. v. News Am. FSI*, 35 F. App'x 463, 466–67 (9th Cir. 2002) (citing *Knevelbaard*, 232 F.3d at 987) (reversing the dismissal of federal antitrust claims for failure to allege injury to competition and thus "also revers[ing] the dismissal of the broader, more liberal state antitrust claims"); *see also In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012). In *Knevelbaard*, the Ninth Circuit applied the "directness of the injury" *AGC* factor and explained that the "extent to which antitrust injury is recognized under the Cartwright Act is enlarged, by statute, in comparison to federal law." *Knevelbaard*, 232 F.3d at 991 (As a result of the *Illinois Brock* repealer statute, "the more restrictive definition of 'antitrust injury' under federal law does not apply" to the Cartwright Act. (quoting *Cellular Plus, Inc. v. Superior Court*, 18 Cal. Rptr. 2d 308 (Cal. Ct. App. 1993))).

District courts presented with the issue of whether to apply the *AGC* factors in a Cartwright Act case have reached differing conclusions. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 9-CV-3690, 2015 WL 3988488, at *8 (N.D. Ill. June 29, 2015) (applying the *AGC* factors to antitrust claims brought under the Cartwright Act); *In Re Flash Memory*, 643 F. Supp. at 1151–52 (finding the *AGC* factors to be applicable to an analysis of

antitrust standing for a Cartwright Act claim); *In re TFT–LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1120–24 (N.D. Cal. 2008) (stating that a clear directive from state legislature or high court was necessary to apply the *AGC* factors, but nevertheless finding that plaintiffs had standing by considering factors); *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1097 (N.D. Cal. 2007) (declining to apply *AGC* because, while "some [state] appellate courts have used the *AGC* test," that "is not the same as showing that *AGC* has been adopted").

Giving the "fullest weight to pronouncements of the state's highest court," *Runner*, 568 F.3d at 386, and mindful that the California Supreme Court has not addressed whether the *AGC* factors may be applied to a Cartwright Act claim and has recently reiterated that federal law provides only guidance for state antitrust law, *Aryeh*, 55 Cal. 4th at 1195, and because there is no California law contrary to the state appellate court's application of the *AGC* factors in *Vinci*, the Court applies the *AGC* factors to Plaintiffs' claim. The decision of both an intermediary court and the Ninth Circuit remain the best predictor of the state's highest court's action on the issue, and the Court is not "convinced" to "disregard" this data by any other indication that "the highest court of the state would decide otherwise." *Nat'l Serv. Indus., Inc.*, 460 F.3d at 210; *see also In re Dairy Farmers*, 2015 WL 3988488, at *8 (applying *AGC* factors "mindful that . . . California's antitrust-standing provision is broader in some respects than federal antitrust-standing law because of California's repealer statute"); *but see Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*, No. 13-CV-01180, 2015 WL 4755335, at *19 n.11 (N.D. Cal. Aug. 11, 2015) (concluding that the California Supreme Court "would not find rationale set forth in *Vinci* persuasive and would not apply *AGC*" given "repeated instruction that federal antitrust law does not control interpretation of the Cartwright Act"); *In re Capacitors Antitrust Litig.*, 2015 WL 3398199, at *13 (N.D. Cal. May 26, 2015) ("The application of *AGC* to

California state antitrust claims has recently become murky, and that murkiness persuades the Court *AGC* should not be applied.").

The Court finds that it is appropriate to apply the *AGC* factors in order to determine whether Plaintiffs have antitrust standing to assert their Cartwright Act claim and that the factors are "instructive, not conclusive." *See Aryeh*, 55 Cal. 4th at 1195. Consistent with the Ninth Circuit's approach in *Knevelbaard*, this Court will apply the *AGC* factors "liberally," and in concert with the broader antitrust standing requirements under California law, particularly with respect to the application of *AGC*'s second factor, the directness of the injury. *See Knevelbaard*, 232 F.3d at 985, 89 ("[F]ederal antitrust precedents are properly included in a Cartwright Act analysis, but their role is limited: they are 'often helpful' but not necessarily decisive." (quoting *State of Cal. ex rel. Van de Kamp v. Texaco, Inc.*, 762 P.2d 385, 395 (1988))).

### B. Plaintiffs lack antitrust standing under the Cartwright Act as direct purchasers

The Court now applies the *AGC* factors to determine whether Plaintiffs have antitrust standing to assert a claim pursuant to the Cartwright Act. The factors for determining "whether a plaintiff who has borne an injury has antitrust standing" are: "(1) the nature of the plaintiff's alleged injury, (2) the directness of the injury, (3) the speculative nature of the harm, (4) the risk of duplicative recovery and (5) the complexity in apportioning damages." *Abbouds' McDonald's LLC v. McDonald's Corp.*, No. 05-CV-36032, 2006 WL 1877247, at *1 (9th Cir. July 7, 2006) (citing *AGC*, 459 U.S. at 535–37); *see also Vinci*, 43 Cal. Rptr. 2d at 339 ("The factors identified by the court which favor a finding that the plaintiff is a proper party include the following: (1) the existence of an antitrust violation with resulting harm to the plaintiff; (2) an injury of a type which the antitrust laws were designed to redress; (3) a direct causal connection between the asserted injury and the alleged restraint of trade; (4) the absence of more direct

victims so that the denial of standing would leave a significant antitrust violation unremedied; and (5) the lack of a potential for double recovery.").

### (1)   The nature of Plaintiffs' injury

The first *AGC* factor considers whether the nature of the injury asserted by a plaintiff is "the type the antitrust laws were intended to forestall." *Knevelbaard*, 232 F.3d at 987 (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999)).  The Ninth Circuit has "identif[ied] four requirements that must be met in order to conclude that there is antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Id.* (quoting *Am. Ad Mgmt.*, 190 F.3d at 1055).  "The requirement that the alleged injury be related to anti-competitive behavior requires, *as a corollary*, that the injured party be a participant in the same market as the alleged malefactors." *In re Flash Memory*, 643 F. Supp. 2d at 1153 (internal quotation marks and citation omitted) (quoting *Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985)); *see also AGC*, 459 U.S. at 539 (dismissing claim asserted where plaintiff "was neither a consumer nor a competitor in the market in which trade was restrained"); *Vinci*, 36 Cal. App. 4th at 1816 (dismissing for lack of antitrust standing because "plaintiff was neither a consumer nor a competitor in the market in which trade was restrained"); *Tanaka v. Univ. of Southern Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (explaining that the anticompetitive effects must be felt in the "relevant market"); *In re Dynamic Random Access Memory (Dram) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1090 (N.D. Cal. 2007) (dismissing antitrust claims asserted by plaintiffs who were "participants in separate, albeit related, markets").

Here, Plaintiffs allege that cardholders were injured by the "payment of inflated [i]nterchange [f]ees by payment cardholders to their [i]ssuer banks" and that cardholders pay interchange fees directly in the Payment Card Market "because *the cardholder is the first and only person who pays anything*." (Pls. MTD Opp'n 5.) Plaintiffs assert that "by extracting the price-fixed 'interchange fee' directly from the cardholder's account . . . and keeping it, the [i]ssuer bank inflicts injury and damage on the cardholder . . . within the [i]ssuer-cardholder market." (Pls. MTD Opp'n 7 (citing Compl. ¶¶ 49, 81).)

Defendants' central argument is that Plaintiffs "are not consumers, competitors, or participants in the allegedly restrained market," and that any unlawful conduct by Defendants was not directed at Plaintiffs. (Defs. MTD 7 (citing *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 539–43 (9th Cir. 1987) (affirming a district court determination that plaintiffs failed to satisfy the first *AGC* factor because they were "neither consumers nor competitors in the relevant market" and "because the alleged anticompetitive conduct was directed" at a party other than the plaintiffs)).) In *Eagle*, fishing boat employees and their union sued their employer for its allegedly anticompetitive behavior in the market to buy and sell fish, arguing that the employer's conspiracy to set artificially low prices for tuna reduced their wages and, ultimately, the dues paid to their union. *Eagle*, 812 F.2d at 539. The Ninth Circuit held that the crewmembers lacked standing because, as non-parties to their employer's agreements to sell the fish, they were not participants in the relevant market as either consumers or competitors and the employer's conduct was "directed at the vessel owners, not the crewmembers or the union." *Id*. at 541.

According to Defendants, Plaintiffs "blur the definition of the relevant market" to obscure the distinction between the Payment Card Market, in which cardholders participate, and the Card Network Services Market, in which the interchange fee is paid between financial

institutions.  (*Id.* at 8 (citing Compl. ¶ 94 (alleging that "Visa and MasterCard general purpose Credit cards and Debit cards and Visa and MasterCard credit card network services and Debit card network services are the relevant markets")).)  Defendants argue that Plaintiffs fail to allege any participation by cardholders in the Card Network Services Market or any anticompetitive conduct in the Payment Card Market and thus, like the fishing boat employees in *Eagle*, there was no anticompetitive conduct directed at Plaintiffs.  (*Id.*)

In attempting to characterize the allegedly anticompetitive conduct of the issuing banks as being directed at cardholders, Plaintiffs emphasize that cardholders are in privity with issuing banks in the Payment Card Market.  For example, Plaintiffs argue that Defendants' reliance on *Eagle* is misplaced and the facts are distinguishable because, "unlike cardholders" who do have a contractual relationship with the issuing banks, the fishing boat employees were "not parties to their employer's . . . agreement" to sell fish.  (Pls. MTD Opp'n 8 (citing *Eagle*, 812 F.2d at 539).)  In *Eagle*, the fishing boat employees had a contractual relationship with their employer in a separate and distinct market for the fishing services provided by the fishing boat employees, but were nevertheless not parties to the agreement relevant to the anticompetitive behavior. *Eagle*, 812 F.2d at 539.  The same is true here.  Plaintiffs allege in the Complaint that cardholders "participate in the . . . card market in that they are issued payment cards" rather than in the Card Network Services Market, which facilitates the purchases of goods and services when cardholders use their payment cards to obtain goods and services from merchants.  (Compl. ¶ 81.)  Although cardholders and issuing banks transact in the Payment Card Market, that is insufficient to overcome the fact that the allegedly anticompetitive interchange fee is set and paid between financial institutions in the Card Network Services Market, not between issuing banks and cardholders in the Payment Card Market.

Plaintiffs also argue that the Ninth Circuit's decision in *Knevelbaard*, where the court found sufficient antitrust injuries despite conduct by the defendants across multiple relevant markets, supports a finding of sufficient injuries here. (Pls. MTD Opp'n 9 (citing *Knevelbaard*, 232 F.3d at 987).) Plaintiffs' reliance on *Knevelbaard* is misplaced. In *Knevelbaard*, the milk-seller plaintiffs asserted a claim against milk-buyer defendants, who the plaintiffs alleged had rigged the price of bulk cheese with the direct effect of creating "artificially depressed milk prices." *Knevelbaard*, 232 F.3d at 987–88. The Ninth Circuit concluded that the defendants' actions in the market for bulk cheese caused economic loss to the plaintiffs in the related market for milk, in which the defendants both participated and sought to fix prices. *Id*. at 989 ("[T]he complaint's allegations unmistakably place all parties in the milk market — the defendants as buyers and the plaintiffs as sellers — and even have them transacting business with each other."). Unlike the milk seller plaintiffs in *Knevelbaard*, Plaintiffs have not alleged that issuing banks directed anticompetitive fees at cardholders in the Payment Card Market or that cardholders suffered any resulting economic harm when issuing banks "kept" the interchange fee charged within the Card Network Services Market. Although conduct across multiple markets may result in an antitrust injury, Plaintiffs have not alleged such injury.

Plaintiffs further argue that cardholders suffer an injury analogous to those experienced by purchasers at the low end of a distribution chain. (Pls. MTD Opp'n 9–10.) Plaintiffs argue that the Payment Card Market and the Card Network Services Market are "inextricably linked" because "without the card with its card number, the network is inoperable." (*Id*. at 8.) Plaintiffs contend that, because no transaction could take place without cardholders and their accounts, the interchange fees are sufficiently "traceable" to cardholders to provide antitrust standing, similar to damages that are passed along a distribution chain. (*Id*. at 8–9.) Plaintiffs argue repeatedly

that the similarity between their injury and that of secondary purchasers renders the damages to cardholders traceable. (*Id*. at 9 (first citing *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1024 (N.D. Cal. 2010) (finding an alleged overcharge for cathode ray tubes significantly intertwined and traceable through market for televisions and computer monitors that contain cathode ray tubes); then citing *In re Flash Memory*, 643 F. Supp. 2d at 1150–56 (finding antitrust injury across markets for NAND flash memory and finished products containing NAND flash memory); then citing *In re TFT-LCD*, 586 F. Supp. 2d at 1123–24 (identifying traceable antitrust injury across market for TFT-LCD panels and market for finished products containing TFT-LCD panels); and then citing *In re Graphics Processing Units*, 540 F. Supp. 2d at 1098–99 (finding an antitrust injury traceable from a market for GPUs through a market for computers that contain GPUs)).) Defendants contend that the "inextricably linked" exception to participating in the relevant market is a narrow one, and requires a plaintiff to suffer a direct injury. (Defs. MTD Reply 3.) Defendants argue that Plaintiffs have not alleged any injury, including one traceable to a secondary market. (*Id*.)

Plaintiffs have expressly alleged in the Complaint that cardholders are directly injured when interchange fees are assessed from the funds extracted from cardholders' accounts, and have disclaimed the allegation that the cost of supracompetitive interchange fees are passed onto cardholders through merchants. (Compl. ¶¶ 49, 81; *see also* Pls. MTD Opp'n 13–14; MTD Reply 5 (arguing that "plaintiffs expressly disavow reliance on an overcharge pass-through theory, or a claim that the prices they paid for goods and services were inflated at all").) As such, the cases Plaintiffs rely on to argue that their harm is traceable or similar to damages passed through a distribution change are inapposite.

With respect to demonstrating the presence of "unlawful conduct causing an injury to the plaintiff," *Knevelbaard*, 232 F.3d at 987, because Plaintiffs are "neither consumer[s] nor competitor[s] in the market in which trade was restrained," anticompetitive behavior by issuing banks within the Card Network Services Market was not directed at Plaintiffs, *AGC*, 459 U.S. at 539. Rather, cardholders are "consumer[s] of goods sold by merchants who happen to be part of the affected market." *Nass-Romero v. Visa U.S.A. Inc.*, 279 P.3d 772, 778 (N.M. Ct. App. 2012) (affirming dismissal of federal antitrust claims asserted by cardholders against Visa entities for lack of standing, including because cardholders are not in the restrained market)). Plaintiffs have failed to plead that anticompetitive behavior by Defendants, the issuing banks, was directed at cardholders or caused an economic injury to cardholders, and thus, have failed to allege an antitrust injury that satisfies the first *AGC* factor. The failure to satisfy this factor is grounds to dismiss Plaintiffs' claim. *See, e.g.*, *Crouch v. Crompton Corp.*, No. 02-CV-4375, 2004 WL 2414027, at *26 (N.C. Super. Ct. Oct. 28, 2004) ("This factor alone would strongly support a finding of no standing . . . ."). The Court nevertheless addresses the additional factors.

### (2) The directness of Plaintiffs' injury

To assess the directness of a plaintiff's injury, pursuant to the second *AGC* factor, the court "look[s] to the chain of causation between [plaintiff's] injury and the alleged restraint in the market." *Knevelbaard*, 232 F.3d at 989 (internal quotation marks omitted) (quoting *Am. Ad Mgmt.*, 190 F.3d at 1058). In *AGC*, the Supreme Court identified "two separate considerations" within the directness inquiry: "(1) the chain of causation alleged by the plaintiffs; and (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09-CR-3690, 2013 WL 4506000, at *12 (N.D. Ill. Aug. 23, 2013) (citing

*AGC,* 459 U.S. at 540–42); *see also In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *14–15 (E.D. Mich. Apr. 9, 2013) (explaining that the "causal nexus between the alleged conspiracy" and the alleged injury cannot be "too remote and attenuated" for it to provide antitrust standing"). However, as explained above, "[t]he extent to which antitrust injury is recognized under the Cartwright Act is enlarged, by statute, in comparison to federal law" because an action "may be brought by any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, *regardless of whether such injured person dealt directly or indirectly with the defendant*." *Knevelbaard*, 232 F.3d at 991 (internal quotation marks omitted) (quoting Calif. Bus. & Prof. Code § 16750(a)).

The parties' arguments with respect to the directness of the injury to Plaintiffs are the same as their arguments about the nature of the injury to Plaintiffs. Defendants contend that "any impact on Plaintiffs" through final consumer prices "would be at most derivative" of the effect on the Card Network Services Market. (Defs. MTD 9.) Plaintiffs assert that Defendants have misconstrued their allegations, and that the payment of the interchange fee from funds withdrawn from cardholders' accounts renders a direct injury to Plaintiffs. (Pls. MTD Opp'n 11.) Plaintiffs argue that the injury is directly incurred from issuing bank to cardholder, rather than passed along through the merchant and the cost of the good or service purchased by the cardholder. (*Id.*) Plaintiffs also reiterate their argument that their injuries are traceable and, thus, "adequate to show that there is a chain of causation between . . . allegedly anticompetitive conduct" and the injury to cardholders. (*Id.* (quoting *In re Flash Memory*, 643 F. Supp. at 1155).)

When considering the application of the directness factor to a Cartwright Act claim, the Court is aware that California law allows recovery for antitrust injuries that result from a more

attenuated and indirect causal chain than is permitted under federal law. *See Knevelbaard*, 232 F.3d at 989 (explaining the development of the Cartwright Act in response to *Illinois Brick*); *In re Dairy Farmers*, 2015 WL 3988488, at *8 (explaining that "California's antitrust-standing provision is broader in some respects than federal antitrust-standing law because of California's repealer statute"). Plaintiffs' allegations are deficient, not because they fail to assert a direct injury, but because they fail to plead that the cardholders suffered any plausible economic injury. Although Plaintiffs argue that the interchange fee is paid from "the cardholder's account *first* before paying *the balance* to the acquirer bank and the merchant," their allegations also acknowledge that the amount withdrawn from a cardholder's account is due, in its entirety, to a merchant for goods or services, and thus there is no increased cost to cardholders from the interchange fee. (Pls. MTD Sur-Reply 2.) Plaintiffs concede that the amount withdrawn from the cardholder's account is the price to purchase the goods, rather than the price of the goods combined with a surcharge for any interchange fee. (Pls. MTD Opp'n 11.) The Court finds that Plaintiffs cannot satisfy the second *AGC* factor because, as explained above, the allegedly anticompetitive conduct of the issuing banks was not directed at cardholders and has not resulted in an injury for the Court to assess for its directness.

### (3) Speculative nature of the harm, the risk of duplicative recovery, and the complexity in apportioning damages

The Court considers the final three *AGC* factors together, as they reflect overlapping concerns. Under the third factor, courts consider whether a plaintiff's damages are only speculative, in that "(1) the alleged injury was indirect; and (2) 'the alleged effects . . . may have been produced by independent factors.'" *Am. Ad Mgmt.*, 190 F.3d at 1059 (quoting *AGC*, 459 U.S. at 542); *see also Knevelbaard*, 232 F.3d at 991 (Where "the alleged effects on the [plaintiff]

31

may have been produced by independent factors, the [plaintiff's] damages claim" may also be "highly speculative."); *Eagle*, 812 F.2d at 542 (citing these considerations). As to the fourth factor, "[t]he risk to be avoided . . . is that potential plaintiffs may be in a 'position to assert conflicting claims to a common fund . . . thereby creating the danger of multiple liability.'" *Am. Ad Mgmt.*, 190 F.3d at 1059 (quoting *AGC*, 459 U.S. at 544); *see also Eagle*, 812 F.2d at 542. Finally, the court considers whether, "if the plaintiff is allowed standing, any attempt to ascertain damages would lead to 'long and complicated proceedings involving massive evidence and complicated theories.'" *Eagle*, 812 F.2d at 543 (quoting *AGC*, 459 U.S. at 544).

Plaintiffs argue that merchants asserting claims arising from the same allegedly anticompetitive interchange fees "are not better positioned to assert injury to card holders as they are not direct payers" of the interchange fee, and thus the recovery to Plaintiffs is neither speculative nor complex to apportion. (Pls. MTD Opp'n 12.) Plaintiffs also argue that the injury is concrete and simple, and rely on their assertion that cardholders' injury need not be traced through inflated costs passed on by merchants. (*Id*. at 12–13.) Similarly, Plaintiffs state that because damages are "traceable by cardholder account number, there is no risk of duplicative recovery." (*Id*. at 13.) Defendants counter that other parties "are better positioned to bring these claims" and have an adequate economic motivation to do so, including both merchants and the acquiring banks who pay the interchange fees in the Card Network Services Market. (Defs. MTD 10.)

Assuming that there is harm to Plaintiffs caused by the interchange fees and also that it would be feasible to determine the amount of such harm, there remains a large and predictable risk of duplicative recovery against the issuing banks as well as the need for "long and complicated proceedings" to determine the damages due to cardholders and merchants. *Eagle*,

812 F.2d at 543. Plaintiffs do not address the certified class of merchants before the Court who have asserted essentially identical claims to Plaintiffs, and the fact that duplicative recovery — and thus the need to apportion damages — is not merely hypothetical. Thus, assuming an injury to cardholders, Plaintiffs have not shown that their claims can be litigated without expensive and duplicative efforts.

The Court finds that Plaintiffs have failed to assert a direct antitrust injury that confers standing to bring a claim under the Cartwright Act because Plaintiffs are not in the relevant market of the alleged antitrust conduct and because allowing such a claim would inevitably result in duplicative and expensive litigation.

### 2. Standing to recover as indirect purchasers

On reconsideration, Plaintiffs for the first time argue that the Court may decline to dismiss their state law claim on an alternative ground that cardholders are indirect purchasers. (Pls. Cross Mot. Opp'n 1–2.) In response, Defendants argue that "it is neither in dispute nor relevant" that California has "no *per se* bar against actions by indirect purchasers" because Plaintiffs have "never alleged that they were *indirect* purchasers" but rather have only alleged that cardholders are the *direct* payors of interchange fees. (Defs. Cross Mot. for Reconsideration Reply 2, Docket Entry No. 106.) Defendants also argue that Plaintiffs are not permitted to "amend [the] complaint through statements made in moving papers." (*Id*. at 3 (quoting *Hernandez v. City of New York*, No. 11-CV-3521, 2013 WL 593450, at *4 n.5 (E.D.N.Y. Feb. 13, 2013)).)

Arguments "raised for the first time in [a] motion for reconsideration" are "not properly presented to the district court" and, absent a reason to excuse the untimeliness, are waived by the party. *Phillips v. City of New York*, 775 F.3d 538, 544 (2d Cir.), *cert. denied sub nom.*,

*Phillips v. City of New York, N.Y.*, 136 S. Ct. 104 (2015) (finding that a party had waived arguments based on documents obtained in discovery and asserted for the first time in a motion for reconsideration); *see also Harris v. Millington*, 613 F. App'x 56, 57 (2d Cir. 2015) ("We do not generally consider claims that were raised for the first time in a motion for reconsideration."); *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 188 (2d Cir. 2014) (declining to consider arguments raised without excuse for the first time on a motion to reconsider); *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 159 (2d Cir. 2003) (explaining that the appeals court retains discretion to consider "issues not timely raised below," including those raised for the first time on reconsideration, particularly in instances where "(1) consideration of the issue is necessary to avoid manifest injustice or (2) the issue is purely legal and there is no need for additional factfinding"); *Goldberg v. UBS AG*, 690 F. Supp. 2d 92, 98 (E.D.N.Y. 2010) ("[B]y failing to timely raise such an argument during the briefing of its motion to dismiss, defendant waived its right to seek reconsideration of this point.").

In opposing Defendants' original motion to dismiss, Plaintiffs argued that cardholders satisfy the requirements for standing as direct purchasers. Plaintiffs stated that they "sue herein for direct payment by them to their issuer banks" of the allegedly supra-competitive price-fixed interchange fees. (Pls. MTD Opp'n 14.) Plaintiffs' only mention of indirect purchasers prior to their motion for reconsideration was in a passing reference to the fact that the Cartwright Act "contains an *Illinois Brick* repealer for indirect purchasers," not in connection with an argument by Plaintiffs that cardholders sought to recover as indirect purchases. (*Id.* at 5.) Plaintiffs now direct the Court's attention to cases concluding that the Cartwright Act is a so-called "Repealer Act," which, unlike federal antitrust statutes, provides standing to indirect purchasers to assert

claims for antitrust injury.  (Pls. June 22, 2015 Ltr 1, Docket Entry No. 109 (citing *In re Capacitors*, 2015 WL 3398199, at \*13).)  These arguments are untimely and "not properly presented" to the Court, as they were not made prior to the motion for reconsideration.  *Phillips*, 775 F.3d at 544.  Plaintiffs have not presented any compelling excuse for the untimeliness of this argument, and the Court therefore declines to consider whether cardholders could have standing to assert antitrust claims as indirect purchasers.

### III.  Conclusion

For the foregoing reasons, the Court denies Plaintiffs' motion for reconsideration.  The Court grants Defendants' cross-motion for reconsideration, and, on reconsideration, dismisses Plaintiffs' claim under the Cartwright Act.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: February 24, 2016
       Brooklyn, New York